# Exhibit 1

Name of Offeree: _____          Copy No. _____

CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

**WILLOW CREEK INVESTMENTS LP**

*A Delaware Limited Partnership*

LIMITED INTERESTS

MINIMUM INVESTMENT: $1,000,000

GENERAL PARTNER:

**WILLOW CREEK GP LLC**

INVESTMENT MANAGER:

**WILLOW CREEK ADVISORS LLC**

APRIL 2016

## Willow Creek Investments LP

1 Liberty Plaza, Suite 2310
New York, NY 10006

This Confidential Private Placement Memorandum (the "*Memorandum*") has been prepared on a confidential basis and is intended solely for the use of the recipient named on the cover hereof in connection with this offering. Each recipient, by accepting delivery of this Memorandum, agrees not to make a copy of the same or to divulge the contents hereof to any person other than a legal, business, investment or tax advisor in connection with obtaining the advice of any such persons with respect to this offering.

This PRIVATE PLACEMENT MEMORANDUM takes effect May 1, 2016. Any agreements & deposits previously made are still in effect per their original terms and "grandfathered in". This agreement covers any and all "new" funds and or agreements received and/or signed after May 1,2016.

The Memorandum relates to the offering (the "*Offering*") of limited partnership interests (the "*Interests*") of Willow Creek Investments LP, a Delaware limited partnership (the "*Partnership*"). Interests are suitable only for sophisticated investors (a) who do not require immediate liquidity for their investments, (b) for whom an investment in the Partnership does not constitute a complete investment program and (c) who fully understand and are willing to assume the risks involved in the Partnership's investment program. The Partnership's investment practices, by their nature, involve a substantial degree of risk. See "*Investment Program*" and "*Risk Factors*." The Offering is made only to certain qualified investors. See "*Qualification of Investors*." Prospective investors should carefully consider the material factors described in "*Risk Factors*," together with the other information appearing in this Memorandum, prior to purchasing any of the Interests offered hereby.

**THE INTERESTS OFFERED HEREBY HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "*SEC*") OR THE SECURITIES REGULATORY AUTHORITY OF ANY STATE, NOR HAS THE SEC OR ANY SUCH AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THE INTERESTS ARE BEING OFFERED PURSUANT TO EXEMPTIONS FROM REGISTRATION WITH THE SEC AND STATE SECURITIES REGULATORY AUTHORITIES; HOWEVER, NEITHER THE SEC NOR ANY STATE SECURITIES REGULATORY AUTHORITY HAS MADE AN INDEPENDENT DETERMINATION THAT THE SECURITIES OFFERED HEREIN ARE EXEMPT FROM REGISTRATION.**

WHILE THE PARTNERSHIP MAY TRADE COMMODITY FUTURES, OPTIONS ON FUTURES, AND/OR COMMODITY OPTIONS CONTRACTS, THE GENERAL PARTNER IS EXEMPT FROM REGISTRATION WITH THE U.S. COMMODITY FUTURES TRADING COMMISSION ("CFTC") AS A COMMODITY POOL OPERATOR ("CPO") PURSUANT TO CFTC RULE 4.13(a)(3). THEREFORE, UNLIKE A REGISTERED CPO, THE GENERAL PARTNER IS NOT REQUIRED TO DELIVER A CFTC DISCLOSURE DOCUMENT TO PROSPECTIVE LIMITED PARTNERS, NOR IS IT REQUIRED TO PROVIDE LIMITED PARTNERS WITH CERTIFIED ANNUAL REPORTS THAT SATISFY THE REQUIREMENTS OF CFTC RULES APPLICABLE TO REGISTERED CPOs.

THE INFORMATION IN THIS MEMORANDUM IS GIVEN AS OF THE DATE ON THE COVER PAGE, UNLESS ANOTHER TIME IS SPECIFIED, AND INVESTORS MAY NOT INFER FROM

EITHER THE SUBSEQUENT DELIVERY OF THIS MEMORANDUM OR ANY SALE OF INTERESTS THAT THERE HAS BEEN NO CHANGE IN THE FACTS DESCRIBED SINCE THAT DATE.

This Memorandum does not constitute an offer to sell or the solicitation of an offer to buy the Interests by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale.

No offering literature or advertising in any form other than this Memorandum and the agreements and documents referred to herein shall be considered to constitute an Offering of the Interests. No person has been authorized to make any representation with respect to the Interests except the representations contained herein. Any representation other than those set forth in this Memorandum and any information other than that contained in documents and records furnished by the Partnership upon request, must not be relied upon. This Memorandum is accurate as of its date, and no representation or warranty is made as to its continued accuracy after such date.

Sales of Interests may be made only to investors deemed suitable for an investment in the Partnership under the criteria set forth in this Memorandum. The Partnership reserves the right, notwithstanding any such offer, to withdraw or modify the Offering and to reject any subscriptions for the Interests in whole or in part for any or no reason.

The Interests being offered have not been registered under the Securities Act of 1933, as amended (the "*Securities Act*"), and have not been registered under the securities laws of any state, but are being offered and sold for purposes of investment and in reliance on the statutory exemptions contained in Sections 4(2) and/or 3(b) of the Securities Act and in reliance on applicable exemptions under state securities laws. Such Interests may not be sold, pledged, transferred or assigned except in a transaction which is exempt under the Securities Act and applicable state securities laws, or pursuant to an effective registration statement thereunder or in a transaction otherwise in compliance with the Securities Act, applicable state securities laws, this Memorandum and the Partnership's Limited Partnership Agreement.

THERE IS NO PUBLIC MARKET FOR THE INTERESTS AND NONE IS EXPECTED TO DEVELOP IN THE FUTURE.

The Partnership is not registered as an investment company under the Investment Company Act of 1940, as amended (the "*Investment Company Act*"), in reliance upon Section 3(c)(1) thereof. As a result of its reliance upon Section 3(c)(1), the Interests may not at any time be owned by more than 100 beneficial owners (as determined under the Investment Company Act).

Prospective investors are invited to meet with their advisors to discuss, and to ask questions and receive answers, concerning the terms and conditions of this Offering of the Interests, and to obtain any additional information, to the extent the General Partner or its delegate possess such information or can acquire it without unreasonable effort or expense, necessary to verify the information contained herein.

**NASAA Uniform Disclosure:**

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY

OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

**Florida Residents:**

IF SALES ARE MADE TO FIVE OR MORE PERSONS IN FLORIDA, AND YOU PURCHASE SECURITIES HEREUNDER, THEN YOU MAY VOID SUCH PURCHASE EITHER WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY YOU TO THE ISSUER, AN AGENT OF THE ISSUER, OR AN ESCROW AGENT OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THIS PRIVILEGE COMMUNICATED TO YOU, WHICHEVER OCCURS LATER.

## TABLE OF CONTENTS

Page

EXECUTIVE SUMMARY .................................................................................6

DIRECTORY ....................................................................................................7

INVESTMENT PROGRAM................................................................................8

MANAGEMENT OF THE PARTNERSHIP......................................................11

SUMMARY OF KEY TERMS.........................................................................12

RISK FACTORS.............................................................................................21

POTENTIAL CONFLICTS OF INTEREST .....................................................33

VALUATION OF INVESTMENTS ...................................................................35

SERVICE PROVIDERS ..................................................................................37

BROKERAGE AND CUSTODY ......................................................................39

QUALIFICATION OF INVESTORS.................................................................42

FEDERAL TAX ASPECTS.............................................................................45

ERISA CONSIDERATIONS............................................................................56

RESTRICTIONS ON TRANSFER OF INTERESTS.........................................59

ADDITIONAL INFORMATION ........................................................................59

PRIVACY NOTICE .........................................................................................60

## EXECUTIVE SUMMARY

Willow Creek Investments LP was organized as a Delaware limited partnership (the "*Partnership*") on March 22, 2016 to operate as a private investment partnership. The primary investment objective of the Partnership is to deliver returns to investors through capital growth. The Partnership aims to achieve this objective by seeking to invest in opportunities that are considered by the Investment Manager to be trading below their intrinsic value and that offer the potential of being positively influenced by corporate earnings reports that are deemed by the market as favorable or non-favorable and taking advantage of the move with a combination of options, equities and CDS (credit default swaps).

Willow Creek GP LLC, a New York limited liability company, serves as the general partner (the "*General Partner*") of the Partnership. Under the Partnership's Limited Partnership Agreement (as the same may be amended, supplemented or revised from time to time, the "*Partnership Agreement*"), the General Partner is primarily responsible for the management of the Partnership. The office of the General Partner is located at 1 Liberty Plaza, Suite 2310, New York, NY 10006 and its telephone number is (212) 837-1577.

The General Partner has delegated the investment management responsibilities for the Partnership to Willow Creek Advisors LLC, a Delaware limited liability company (the "*Investment Manager*"), and an affiliate of the General Partner. The Investment Manager is charged by the General Partner with the day-to-day investment of the Partnership's capital.

The Partnership is presently accepting subscriptions from a limited number of sophisticated investors (as described in the "*Summary of Key Terms*," below), generally in minimum amounts of not less than $1,000,000. The Partnership will generally accept initial or additional capital contributions as of the first business day of any calendar month, or at any other time the General Partner chooses to accept such contributions.

Investors in the Partnership will generally be subject to (i) a quarterly management fee, equal to 0.5% (2% *per annum*) of such investor's closing capital account balance for the current quarter; and (ii) an annual performance allocation equal to 25% of each investor's ratable share of the Partnership's profits for such year, but only to the extent that such profits exceed such investor's "high water mark."

Investors will generally be permitted to make withdrawals of capital as of the close of business on the last day of each quarter, provided the withdrawing investor notifies the General Partner not less than 60 days in advance of the applicable withdrawal date of its intent to make a withdrawal, and provided further, the amount to be withdrawn has been invested in the Partnership for not less than twelve months (the "*Lock-Up Period*").

## DIRECTORY

| | |
|---|---|
| **The Partnership:** | Willow Creek Investments LP<br>c/o Willow Creek GP LLC<br>1 Liberty Plaza, Suite 2310<br>New York, NY 10006<br>Tel: (212) 837-1577 |
| **General Partner:** | Willow Creek GP LLC<br>1 Liberty Plaza, Suite 2310<br>New York, NY 10006<br>Tel: (212) 837-1577<br>Email: ngenovese@willowcreekadvisors.com<br>Attn: Nicholas Genovese |
| **Investment Manager:** | Willow Creek Advisors LLC<br>1 Liberty Plaza, Suite 2310<br>New York, NY 10006<br>Tel: (212) 837-1577<br>Email: ngenovese@willowcreekadvisors.com<br>Attn: Nicholas Genovese |
| **Legal Advisor:** | Riveles Wahab LLP<br>40 Wall Street, 28th Floor<br>New York, NY 10005<br>Tel: (212) 785-0096<br>Attn: Simon Riveles |
| **Accountant:** | Grant Thornton |

# INVESTMENT PROGRAM

## Objective and Strategy Overview

The objective of the Partnership is to deliver returns to investors through capital growth. The Partnership aims to achieve this objective by seeking to invest in opportunities that are considered by the Investment Manager to be trading below their intrinsic value and that offer the potential of being positively influenced by corporate earnings reports that are deemed by the market as favorable or non-favorable and taking advantage of the move with a combination of options, equities and CDS (credit default swaps).

## Partnership Investments

The assets of the Partnership may be invested and traded in a broad variety of securities and other instruments, whether traded on exchanges, over-the-counter or negotiated on electronic markets.

The Partnership has broad and flexible investment authority. Accordingly, the investments of the Partnership may at any time include, without limitation, publicly traded stocks, options, and credit default swaps, whether long or short; ETFs, commodities, commodity futures contracts and options on futures; fixed-income securities; certificates of deposit, bankers' acceptances, trust receipts and trade and commercial obligations, loans and loan participations and creditor claims, whether secured or unsecured, and irrespective of ranking; and any other instruments or other evidences of indebtedness. The Partnership may periodically maintain all or a portion of its assets in money market instruments and other cash equivalents and may not be fully invested at all times.

The Investment Manager, as delegated by the General Partner, has complete flexibility in determining the instruments and markets in which the Partnership may invest and the investment techniques the Partnership may use to achieve their investment objectives.

## Distributions and Reinvestment

The Partnership does not expect to make any dividend payments or other distributions to Limited Partners out of the Partnership's earnings and profits, but rather expects that such income will be reinvested. Potential investors should keep this limitation in mind when determining whether or not an investment in the Partnership is suitable for their particular purposes. The General Partner reserves the right to change such policy.

## Plan of Distribution and Use of Proceeds; Cash Equivalents

Interests will be offered through private placement to a variety of sophisticated investors. See "*Qualification of Investors*." The net proceeds of the private offering contemplated herein will be invested in accordance with the policies set forth under "*Investment Objective and Strategy.*" The Partnership, without limitation, may hold cash or invest in cash equivalents for short-term investments. Among the cash equivalents in which the Partnership may invest are obligations of the U.S. Government, its agencies or instrumentalities (i.e., U.S. Government Securities; U.S. Treasury Bills), commercial paper and repurchase agreements, money market mutual funds, certificates of deposit and bankers' acceptances issued by domestic branches of U.S. banks that are members of the Federal Deposit Insurance Corporation. In the event the Investment Manager determines that there is not sufficiently good value in any securities suitable for investment of the Partnership's capital, all such capital may be held in cash and cash equivalents.

**Borrowing and Lending**

While the Investment Manager generally does not intend to utilize leverage on behalf of the Partnership, on occasion, certain option positions may have the effect of implicit leverage or may be assigned and result in the use of margin in the Partnership's account.

The Partnership is permitted to borrow for purposes of providing liquidity to fund withdrawals by Limited Partners and/or for investment purposes, subject to regulatory requirements, and for the payment of fees, expenses and other short-term Partnership obligations. Loans with respect to the Partnership generally may be obtained from securities brokers and dealers or from other financial institutions or third party lenders; such loans will be secured by securities or other capital of the Partnership, as the case may be, pledged to such brokers, financial institutions or third party lenders.

In the event the Partnership obtains a credit facility, the Investment Manager's investment discretion may be subject to certain limitations prior to and/or following an event of default. For example, pursuant to the terms of the credit facility, the Partnership's trading may have to abide by certain formulas, or the Investment Manager may have to obtain the lender's consent to engage in some or all transactions while the credit facility is outstanding. After the occurrence of an event of default (whether because of nonpayment or otherwise), it is likely that, among other consequences, the lender would assume total control of the Partnership's assets and/or trading activities and no distributions could be made or withdrawals effected without the lender's consent.

If securities are sold short, the Partnership may be required to pay a premium and/or interest to the lender of the securities, which would increase the cost of the securities sold. Until the borrowed securities are replaced, the Partnership generally will be required to pay to the lender amounts equal to any dividends or interest that accrue on the securities borrowed during the period of the loan. The use of leverage may, in certain circumstances, maximize the adverse impact to which the Partnership's investment portfolio may be subject.

**Possible Master-Feeder Structure in the Future**

In the future, the General Partner or affiliated entities may sponsor the formation of an offshore company (the "*Offshore Feeder*") which will offer its interests primarily to non-U.S. individuals and U.S. tax-exempt entities. In such event, the Partnership, together with the Offshore Feeder (when and if established), will place all or substantially all of its assets in, and conduct its investment activities primarily through, a master fund structured as an offshore company or limited partnership (the "*Master Fund*") utilizing a "Master-Feeder" structure. When and if such events occur, the General Partner or an affiliate will serve as the investment manager to the Offshore Feeder and the Master Fund and will conduct the investment activities of the Master Fund, managing its day-to-day activities. The Partnership and the Offshore Feeder would participate on a *pro rata* basis in the profits and losses of the Master Fund and would bear a *pro rata* portion of all expenses of the Master Fund based on the net asset value of their respective interests in the Master Fund. The purpose of establishing the Master Fund would be to achieve trading and administrative efficiencies.

**Limits of Description of Investment Program**

The General Partner or Investment Manager, as charged by the General Partner, is not limited by the above discussion of the investment program. Further, the investment program is a strategy as of the date of this Memorandum only. The Investment Manager has wide latitude to invest or trade the Partnership's assets, to pursue any particular strategy or tactic, or to change the emphasis without obtaining

the approval of the Limited Partners, although the Investment Manager will only cause a material change to the Partnership's investment strategy with the consent of a majority in interest of Limited Partners. Except as specifically provided in this section, the investment program imposes no significant limits on the types of instruments in which the Investment Manager may take positions, the type of positions it may take, its ability to borrow money, or the concentration of investments. The foregoing description is general and is not intended to be exhaustive. Prospective investors must recognize that there are inherent limitations on all descriptions of investment processes due to the complexity, confidentiality, and subjectivity of such processes. In addition, the description of virtually every trading strategy must be qualified by the fact that trading approaches are continually changing, as are the markets invested in by the Investment Manager.

There can be no assurance that the Partnership will achieve its investment objective or avoid substantial losses. An investor should not make an investment in the Partnership with the expectation of sheltering income or receiving cash distributions. Investors are urged to consult with their personal advisers before investing in the Partnership. Because risks are inherent in all the investments in which the Partnership engages, no assurances can be given that the Partnership's investment objectives will be realized.

## MANAGEMENT OF THE PARTNERSHIP

Willow Creek GP LLC, a New York limited liability company, serves as the General Partner of the Partnership. Under the Partnership Agreement, the General Partner is primarily responsible for the management of the Partnership. The office of the General Partner is located at 1 Liberty Plaza, Suite 2310, New York, NY 10006 and its telephone number is (212) 837-1577. Nicholas Genovese ("*Mr. Genovese*") is the principal of the General Partner (the "*Principal*"). A biography of the Principal is set forth below.

The General Partner has delegated the investment management responsibilities for the Partnership to Willow Creek Advisors LLC, a Delaware limited liability company, and an affiliate of the General Partner (the "*Investment Manager*"). The Investment Manager is charged by the General Partner with the day-to-day investment of the Partnership's capital.

Neither the General Partner nor the Investment Manager is registered as an investment adviser with the SEC under the Investment Advisers Act of 1940, as amended ("*Advisers Act*") nor with any state securities regulatory authority as an investment adviser. The General Partner has claimed an exemption under U.S. Commodity Futures Trading Commission ("*CFTC*") Rule 4.13(a)(3) from registration with the CFTC as a commodity pool operator and, accordingly, is not subject to certain regulatory requirements with respect to the Partnership that would otherwise be applicable absent such an exemption.

### Nicholas J. Genovese

Nicholas Genovese is the founder and Chief Executive Officer of the General Partner and the Investment Manager and the main portfolio manager/analyst with primary responsibility for making investment decisions for the Partnership. Prior to founding Willow Creek 8 years ago, Mr. Genovese was a Partner at Goldman Sachs and previous to that was Portfolio Manager, and member of the Investment Strategy Committee at Bear Stearns. He received a B.S. in Finance from University of Kentucky and a M.B.A. in Finance from Dartmouth –Tuck Business School.

## SUMMARY OF KEY TERMS

The following is a summary of certain of the principal terms governing an investment in Willow Creek Investments LP. This summary is not complete and is qualified in its entirety by reference to the more detailed information set forth elsewhere in this Memorandum and by the terms and conditions of the Partnership Agreement, each of which should be read carefully by any prospective investor before investing. Prospective investors are urged to read the entire Memorandum and to seek the advice of their own counsel, tax consultants and business advisors with respect to the legal, tax and business aspects of investing in the Partnership. Capitalized terms used herein and not otherwise defined will have the same meaning as set forth in the Partnership Agreement. If any disclosure made herein is inconsistent with any provision of the Partnership Agreement, the provision of the Partnership Agreement will control.

| | |
|---|---|
| **PARTNERSHIP:** | The Partnership was organized as a Delaware limited partnership on March 22, 2016 to operate as a private investment partnership. |
| **GENERAL PARTNER:** | The General Partner of the Partnership is Willow Creek GP LLC, a New York limited liability company. Under the Partnership Agreement, the General Partner is primarily responsible for the management of the Partnership. The General Partner has claimed an exemption under U.S. Commodity Futures Trading Commission ("*CFTC*") Rule 4.13(a)(3) from registration with the CFTC as a commodity pool operator and, accordingly, is not subject to certain regulatory requirements with respect to the Partnership that would otherwise be applicable absent such an exemption. In accordance with such exemption, at all times either (a) the aggregate initial margin and premiums required to establish commodity interest positions will not exceed 5% of the liquidation value of the Partnership's portfolio; or (b) the aggregate net notional value of commodity interest positions will not exceed 100% of the liquidation value of the Partnership's portfolio. |
| **INVESTMENT MANAGER:** | The General Partner has delegated the investment management responsibilities for the Partnership to Willow Creek Advisors LLC, an affiliate of the General Partner. The Investment Manager is charged by the General Partner with the day-to-day investment of the Partnership's capital. |
| **ELIGIBLE INVESTORS:** | Interests in the Partnership are being offered under the 3(c)(1) exemption of the Investment Company Act for investment by up to 100 persons who are "accredited investors" as defined in Rule 501(a) of Regulation D under the Securities Act, and who have sufficient knowledge and experience in financial and business matters to make them capable of evaluating the merits and risks of an investment in the Partnership. |
| | The Interests will not be registered under the Securities Act or the securities laws of any state or any other jurisdiction, nor is any such registration contemplated. |
| | An investment in the Partnership will be suitable only for investors who can bear the economic risk of the investment. Investors will be required to make |

representations to the foregoing effect to the Partnership as a condition to acceptance of their subscription.

Rule 506(d) of Regulation D of the Securities Act provides for disqualification of a Rule 506 offering in the event 20 percent or more of the Partnership's interests are owned by a Limited Partner involved in a 'disqualifying event' in connection with the sale of securities, a disciplinary sanction within the securities industry or with the SEC (a "*Bad Actor Event*"). A prospective investor subject to a Bad Actor Event may be denied admittance to the Partnership in the General Partner's sole discretion. An existing Limited Partner must inform the General Partner immediately upon being subject to a Bad Actor Event. The General Partner may remove such Limited Partner at its sole discretion.

See *"Qualification of Investors"* below for specific Limited Partners eligibility requirements.

**THE OFFERING:** There is no minimum dollar amount of capital contributions the Partnership must accept to commence operations. There is no maximum dollar amount of capital contributions the Partnership may accept.

Capital contributions may be made in cash (by means of a wire transfer) or, in the sole discretion of the General Partner, an in-kind contribution of securities, at the time of subscription.

The Partnership may issue additional classes of Interests in the future which may differ in terms of, among other things, the Performance Allocation and/or the Management Fee, minimum investment amounts, withdrawal rights and other rights. The terms of such additional classes will be determined by the General Partner, without the approval of the Limited Partners, and may be described in a supplement to this Memorandum.

**INITIAL CAPITAL CONTRIBUTION:** The minimum initial capital contribution to the Partnership is $1,000,000, subject to the General Partner's sole discretion to accept subscriptions for lesser amounts. The General Partner may, in its sole discretion, elect to temporarily or permanently suspend the offering of Interests. The General Partner may, in its sole discretion, reject any subscription request for any reason or no reason.

**CAPITAL ACCOUNT:** The Partnership will establish and maintain on its books a capital account ("*Capital Account*") for each limited partner (each, a "*Limited Partner*," and collectively with the General Partner, the "*Partners*") into which its capital contribution(s) will be credited and in which certain other transactions will be reflected. (See *"Profits and Losses,"* below). At the beginning of each accounting period, an allocation percentage (the "*Allocation Percentage*") will be determined for each Partner by dividing such Partner's Capital Account balance as of the beginning of such period by the aggregate Capital Account balances of all Partners as of the beginning of such period.

**ADDITIONAL CAPITAL CONTRIBUTIONS:** Existing Limited Partners may make additional capital contributions in amounts of not less than $100,000, with the consent of the General Partner and subject to its sole and absolute discretion to accept lesser amounts, as of the

first business day of any calendar month or at any other time the General Partner chooses to accept such initial or additional contributions. The General Partner may, in its sole discretion, elect to temporarily or permanently suspend the ability of investors to contribute capital to the Partnership.

**CUSTODY:** The amounts paid by an investor to the Partnership shall be placed directly in an account with one or more financial institutions or brokerage firms selected by the Investment Manager, under appropriate arrangements, after all necessary investor documentation has been received and all due diligence procedures have been completed.

**SELLING COMMISSIONS:** Selling commissions and/or referral fees may be paid in connection with the offering of the Partnership Interests. A portion of the Management Fee and/or Performance Allocation may be remitted to registered broker-dealers introducing Limited Partners to the Partnership, or the General Partner and/or Investment Manager may use their own resources to compensate registered broker-dealers for such introductions. The Investment Manager may also direct brokerage from Partnership trades to broker-dealers which introduce Limited Partners to the Partnership, subject to applicable laws.

**LIMITATION OF LIABILITY:** The Partnership Agreement provides that the General Partner, the Investment Manager and their respective affiliates, shareholders, members, partners, managers, directors, officers and employees, agents and representatives (collectively, the "*Indemnified Parties*") shall not be liable, responsible nor accountable in damages or otherwise to the Partnership or any Partner, or to any successor, assignee or transferee of the Partnership or of any Partner, for (i) any acts performed or the omission to perform any acts, within the scope of the authority conferred on such Indemnified Party by the Partnership Agreement, except by reason of acts or omissions found by a court of competent jurisdiction upon entry of a final non-appealable judgment to have been made in bad faith or to constitute fraud, willful misconduct or gross negligence; (ii) performance by such Indemnified Party of, or the omission to perform, any acts on advice of legal counsel, accountants, or other professional advisors to the Partnership; (iii) the negligence, dishonesty, bad faith, or other misconduct of any consultant, employee, or agent of the Partnership, including, without limitation, an affiliate of the General Partner or Investment Manager, selected or engaged by such Indemnified Party with reasonable care and in good faith; or (iv) the negligence, dishonesty, bad faith, or other misconduct of any person in which the Partnership invests or with which the Partnership participates as a partner, joint venturer, or in another capacity, which was selected by such Indemnified Party with reasonable care and in good faith.

Nothing in the Partnership Agreement nor this Memorandum may be interpreted to limit or modify the General Partner's or the Investment Manager's fiduciary duty to the Limited Partners nor waive any right or remedy a Limited Partner may have under federal or state securities laws. Federal and state securities laws impose liabilities under certain circumstances on persons who act in good faith.

**WITHDRAWALS:**  A Limited Partner will be generally permitted to make withdrawals from its Capital Account as of the last business day of any calendar quarter, or such other date as the General Partner may determine in its discretion (each such date, a "*Withdrawal Date*"), provided that the Partnership receives at least 90 days written notice (the "*Notice Period*") of such withdrawal prior to the applicable Withdrawal Date, and provided further, the amount to be withdrawn has been invested in the Partnership for not less than the twelve-month Lock-Up Period. The General Partner, in its sole discretion, may not reduce or waive the Notice Period. Withdrawals may be permitted prior to the expiration of the Lock-Up Period applicable to a Limited Partner in the sole and absolute discretion of the General Partner, in which case the Limited Partner requesting such withdrawal shall be subject to an early withdrawal penalty of 15% (the "*Early Withdrawal Penalty*") charged on the withdrawal proceeds. The Early Withdrawal Penalty may not be reduced by the General Partner. Any amount paid as an Early Withdrawal Penalty shall be an asset of the Partnership. The Lock-Up Period will apply to the Limited Partner's initial investment in the Partnership and each additional capital contribution.

In the event of a partial withdrawal, a Limited Partner must withdraw at least $100,000 and shall maintain a minimum Capital Account balance, after giving effect to the withdrawal, of not less than $1,000,000. A Limited Partner failing to maintain the minimum Capital Account balance may be required to withdraw the balance of its Capital Account at any time without notice. .

Payments for withdrawals are generally made within 90 days of the effective Withdrawal Date; *however,* in the event a Partner withdraws 90% or more of the funds from such Partner's Capital Account (or if a withdrawal, when combined by all other withdrawals effected by such Partner during the preceding 12 months, would result in such Partner having withdrawn 90% or more of its Capital Account during such period), a portion (generally not to exceed 10%) of the withdrawal payment will be retained in the General Partner's discretion pending completion of the annual audit for the fiscal year in which the withdrawal occurs. No interest shall accrue on such retained withdrawal payments.

The General Partner may suspend the right of withdrawal or postpone the date of payment for any period during which (i) any stock exchange or over-the-counter market on which a substantial part of the Securities owned by the Partnership are traded is closed, (other than weekend or holiday closings) or trading on any such exchange or market is restricted or suspended, (ii) there exists a state of affairs that constitutes a state of emergency, as a result of which disposal of the Securities owned by the Partnership is not reasonably practicable or it is not reasonably practicable to determine fairly the value of its assets, (iii) a breakdown occurs in any of the means normally employed in ascertaining the value of a substantial part of the assets of the Partnership or when for any other reason the value of such assets cannot reasonably be ascertained, or (iv) a delay is reasonably necessary, as determined in the reasonable discretion of the General Partner, in order to effectuate an orderly liquidation of the Partnership's investments in a manner that does not have a material adverse impact on the Partnership or the non-withdrawing Limited Partners. The General Partner has reserved the right, in its sole discretion and

without notice, to require any Limited Partner to withdraw entirely from the Partnership, for any reason or no reason.

The General Partner may establish reserves for expenses, liabilities or contingencies (including those not addressed by U.S. generally accepted accounting principles ("*GAAP*")) which could reduce the amount of a distribution upon withdrawal.

At the discretion of the General Partner, any withdrawal by a Limited Partner may be subject to a charge, as the General Partner may reasonably require, in order to defray the costs and expenses of the Partnership in connection with such withdrawal including, without limitation, any charges or fees imposed by any Partnership investment in connection with a corresponding withdrawal or redemption by the Partnership from such investment or any other costs associated with the sale of any of the Partnership's portfolio investments.

In the event that Mr. Genovese dies, becomes incapacitated or is adjudicated incompetent, the Limited Partners will be promptly notified of such event and the Partnership will terminate and be liquidated in accordance with the Partnership Agreement.

**PROFITS AND LOSSES:**    At the end of each accounting period of the Partnership, any net capital appreciation or depreciation is allocated to the Capital Accounts of all Partners in proportion to their respective Allocation Percentages for such period. For this purpose, each accounting period shall end at the close of each month, at any other time a Partner makes an additional capital contribution or effects a withdrawal, and at such other times as the General Partner may determine. Net capital appreciation and depreciation are determined on an accrual basis of accounting in accordance with GAAP and are deemed to include net realized and unrealized profits or losses on security positions as of the end of each accounting period, as well as Partnership expenses.

In addition, the General Partner shall receive an annual performance profit allocation (the "*Performance Allocation*") in an amount equal to 25% of the net capital appreciation allocated to each Limited Partner during each calendar year *provided, however,* that such Performance Allocation be subject to a loss carry-forward provision, also known as a "high water mark," so that the Performance Allocation will only be deducted from a Limited Partner's Capital Account to the extent that such Limited Partner's *pro rata* share of such appreciation causes its Capital Account balance, measured on a cumulative basis and net of any losses, to exceed such Limited Partner's highest historic Capital Account balance as of the end of any prior calendar year or, if higher, such Limited Partner's Capital Account immediately following its admission to the Partnership (as adjusted for any withdrawals at a time when a Limited Partner's Capital Account balance is below the applicable "high water mark"). The Performance Allocation may be computed at any time, in the sole discretion of the General Partner, for a Partner who makes a partial or complete withdrawal.

The General Partner may, in its sole discretion, enter into arrangements with Limited Partners under which the Performance Allocation is reduced, waived

or calculated differently with respect to such Limited Partners, including, without limitation, Limited Partners that are members, affiliates or employees of the General Partner, members of the immediate families of such persons and trusts or other entities for their benefit, or Limited Partners that make a substantial investment or otherwise are determined by the General Partner in its sole discretion to represent a strategic relationship.

Employee Retirement Income Security Act of 1974, as amended ("*ERISA*") and current Internal Revenue Service ("*IRS*") regulations prohibit fee payments to oneself and/or an affiliate from one's individual retirement account or other self-directed retirement account. Accordingly, such an account of an officer of the General Partner (or of his spouse) will not be subject to the Management Fee or Performance Allocation.

**MANAGEMENT FEE:**

In consideration for its services, a management fee (the "*Management Fee*") is paid quarterly to the Investment Manager. The Management Fee is equal to 0.5% (2% *per annum*) of the closing Capital Account balance of each Limited Partner for then current quarter.

The Management Fee will be appropriately prorated to reflect any capital contributions which occur during a quarter. The Capital Account of a Limited Partner making a withdrawal other than the last day of a quarter (whether pursuant to ordinary withdrawal rights or where the special consent of the General Partner is required and, in its discretion, granted) will be charged a *pro rata* portion of the Management Fee immediately prior to such withdrawal based on the number of days elapsed during such quarter and the portion withdrawn from such Capital Account.

The General Partner may, in its sole discretion, enter into arrangements with Limited Partners under which the Management Fee is reduced waived or calculated differently with respect to such Limited Partners, including, without limitation, Limited Partners that are members, affiliates or employees of the General Partner, members of the immediate families of such persons and trusts or other entities for their benefit, or Limited Partners that make a substantial investment or otherwise are determined by the General Partner in its sole discretion to represent a strategic relationship.

**EXPENSES:**

All expenses of the Offering and organization of the Partnership (including legal and other expenses) ("*Organizational Expenses*") will be paid by the Partnership and/or reimbursed by the Partnership to the extent paid by the General Partner and/or Investment Manager. The Organizational Expenses will be amortized and charged to the Partners' Capital Accounts on a monthly basis over a period of five years commencing from the launch of the Partnership's investment activities. GAAP require that organizational costs be treated as an expense when incurred. The General Partner believes that the impact on the Partnership's results from this departure from GAAP will result in a fairer apportionment of such expenses among Limited Partners. This departure from GAAP may also result in a qualified audit opinion from the Partnership's auditors. If the Partnership is terminated within five years of the commencement of investment activities, any unamortized expenses will be recognized.

17

The Partnership shall pay (or reimburse the General Partner or the Investment Manager) for all ordinary and reasonable operating and other expenses, including, but not limited to, investment-related expenses (*e.g.*, brokerage commissions, clearing and settlement charges, custodial fees, interest expenses, and expenses relating to consultants, brokers or other professionals or advisors who provide research, advice or due diligence services with regard to investments); research costs and expenses (including fees for news, quotation and similar information and pricing services); registered agent fees; legal expenses (including, without limitation, the costs of on-going legal advice and services, blue sky filings and all costs and expenses related to or incurred in connection with the General Partner's compliance obligations under applicable federal and/or state securities and investment adviser laws arising out of its relationship to the Partnership, as well as extraordinary legal expenses, such as those related to litigation or regulatory investigations or proceedings); the Management Fee; accounting fees and audit expenses; administrative fees; tax preparation expenses and any applicable tax liabilities (including transfer taxes and withholding taxes); other governmental charges or fees payable by the Partnership; director and officer and/or errors and omissions liability insurance premiums or fiduciary liability insurance premiums for directors, officers and personnel of the General Partner; costs of printing and mailing reports and notices; and other similar expenses related to the Partnership, as the General Partner determines in its sole discretion.

**LEVERAGE:** While the Investment Manager generally does not intend to utilize leverage on behalf of the Partnership, on occasion, certain option positions may have the effect of implicit leverage or may be assigned and result in the use of margin in the Partnership's account.

**BROKERAGE COMMISSIONS:** The Investment Manager may enter into one or more "soft dollar" arrangements with brokers that execute trades for the Partnership's account. Under these "soft dollar" arrangements, the broker would provide certain products and services (or arrange for and pay third parties to provide such products and services) based upon the volume of commissions generated by the Partnership's trading activities. Subject to the Investment Manager's duty to obtain best execution, these arrangements may not result in the execution of trades at the lowest available commission rates. As a result of these arrangements, the Partnership may pay higher commissions than would be the case in the absence of such arrangements. In all events, the Investment Manager will always seek to obtain best execution for the Partnership's portfolio transactions.

**SIDE LETTERS:** The General Partner may enter into agreements with certain Limited Partners that will result in different terms of an investment in the Partnership than the terms applicable to other Limited Partners. As a result of such agreements, certain Limited Partners may receive additional benefits which other Limited Partners will not receive (e.g., additional information regarding the Partnership's portfolio, different withdrawal terms, or lower Management Fees or Performance Allocations). The General Partner will not be required to notify the other Limited Partners of any such agreement or any of the rights and/or terms or provisions thereof, nor will the General Partner be required to offer

such additional and/or different terms or rights to any other Limited Partner. The General Partner may enter into any such agreement with any Limited Partner at any time in its sole discretion.

**BROKER AND CUSTODIAN:**  The Partnership's broker is JP Morgan.  The Partnership reserves the right to use other and/or additional firms for brokerage services. Contributions by Partnership investors will be placed directly in an account with one or more financial institutions or brokerage firms who are qualified custodians as selected by the Investment Manager, under appropriate arrangements.  The Broker shall be the initial qualified custodian of the Partnership's assets.

**RISK FACTORS:**  In general, investment in the Interests involves various and substantial risks, including (but not limited to) the risk that the Partnership assets may be invested in high risk investments, risks for certain tax-exempt investors, risks related to the limited transferability of a Limited Partner's interest in the Partnership, the lack of operating history of the Partnership, the Partnership's dependence upon the General Partner and the Investment Manager, and certain tax risks.  (See "*Risk Factors*.")

**DIVERSIFICATION:**  The Partnership does not have fixed guidelines for diversification and may concentrate its investments in particular countries, issuers or types of investments and may utilize different investment strategies.

**NET ASSET VALUE:**  The Net Asset Value of the Partnership ("*Net Asset Value*") will be determined as is required by the Partnership Agreement or as may be determined by the General Partner, but in any case no less than monthly.  Each Partner's share of the Net Asset Value is determined by multiplying the total value of the Partnership's investments and other assets less any liabilities, by the Partner's Allocation Percentage.  (See "*Valuation of Investments*.")

**RESTRICTIONS ON TRANSFER:**  A Limited Partner may not pledge, assign, sell, exchange or transfer its Interest (or any portion thereof), and no assignee, purchaser or transferee may be admitted as a substitute Limited Partner, except with the consent of the General Partner, which consent may be given or withheld in its sole and absolute discretion.

**FISCAL YEAR:**  The Partnership's fiscal year shall end on December 31.

**REPORTS:**  The Partnership's books of account will be audited at the end of each fiscal year by a firm of certified public accountants selected by the General Partner. Books of account will generally be kept by the Partnership, in accordance with GAAP.  The General Partner will furnish audited financial statements to all Limited Partners within 120 days, or as soon thereafter as is reasonably practicable, following the conclusion of each fiscal year, although the General Partner may elect to postpone the first audit of the Partnership's annual financial statements until the completion of the Partnership's first full fiscal year, in which case the initial audit will cover the applicable fiscal year as well as the partial "stub" year in which the Partnership commenced operations.  In addition, all Limited Partners will receive the information necessary to prepare federal and state income tax returns following the conclusion of such fiscal year as soon thereafter as is reasonably practical.

Each Limited Partner will also receive unaudited reports of Partnership activity on an annual basis (including all gains and losses in each Limited Partner's Capital Account and the Net Asset Value of such Capital Account) and such other information as the General Partner determines. The General Partner will not be required to provide information with regard to specific investment transactions of the Partnership.

**TERM:**

The Partnership shall continue until the earlier of (i) the termination, bankruptcy, insolvency or dissolution of the General Partner, (ii) the complete withdrawal of the General Partner from the Partnership, unless a successor general partner is appointed, (iii) entry of a decree of judicial dissolution, (iv) a determination by the General Partner that the Partnership should be dissolved, or (v) in the event of (a) the death of the Principal or (b) an adjudication in a final non-appealable decision on the merits of a court of competent jurisdiction that the Principal is physically or mentally incapable of making investment decisions on behalf of the General Partner.

**AMENDMENT OF THE PARTNERSHIP AGREEMENT:**

The Partnership Agreement provides that the General Partner has the right to amend the Partnership Agreement to, among other things, conform to applicable laws and regulations, to correct any ambiguous, false, or erroneous provision, or to otherwise amend the Partnership Agreement; provided, that no such amendment shall adversely affect the rights, privileges, and powers of the Limited Partners as a group, unless agreed to by the holders of a majority of Allocation Percentages held by Limited Partners. The General Partner is authorized on its own motion to institute proceedings for adoption of a proposed amendment to the Partnership Agreement. Investors should note that Limited Partners have no voting rights except in very limited and specific situations.

**LEGAL COUNSEL:**

Riveles Wahab LLP acts as legal counsel to the General Partner and the Partnership in connection with the organization of the Partnership, the offering of Interests and other ongoing matters, and does not represent Limited Partners in any capacity.

**AUDITOR:**

The Partnership's independent certified public accountant is Grant Thornton . The Partnership reserves the right to use other and/or additional firms for audit services.

**SUBSCRIPTION PROCEDURE:**

Persons interested in subscribing for Interests will be furnished, and will be required to complete and return to the Administrator, subscription documents.

## RISK FACTORS

*An investment in the Partnership involves a number of significant risks. The risk factors set forth below are those that, at the date of this Memorandum, the General Partner and Investment Manager deem to be the most significant. Any reference to the General Partner shall include the Investment Manager, as applicable. The following is not intended to be a complete description or an exhaustive list of risks. Other factors ultimately may affect an investment in the Partnership in a manner and to a degree not now foreseen. Prospective investors should carefully consider, in addition to the matters set forth elsewhere in this Memorandum, the factors discussed below. An investment in the Partnership should form only a part of a complete investment program, and an investor must be able to bear the loss of its entire investment. Prospective investors should also consult with their own financial, tax and legal advisors regarding the suitability of this investment.*

### General

General Investment Risks. The Partnership's success depends on the Investment Manager's ability to implement its investment strategy. Any factor that would make it more difficult to execute timely trades, such as a significant lessening of liquidity in a particular market, may also be detrimental to profitability. No assurance can be given that the investment strategies to be used by the Partnership will be successful under all or any market conditions.

A potential investor in the Partnership should note that the prices of the securities and other instruments in which the Partnership invests may be unavailable. Market movements are difficult to predict and are influenced by, among other things, government trade, fiscal, monetary and exchange control programs and policies; changing supply and demand relationships; national and international political and economic events; changes in interest rates; and the inherent volatility of the marketplace. In addition, governments from time to time intervene, directly and by regulation, in certain markets, often with the intent to influence prices directly. The effects of governmental intervention may be particularly significant at certain times in the financial instrument and currency markets, and such intervention (as well as other factors) may cause these markets and related investments to move rapidly.

Investment and Trading Risks. All investments involve the risk of a loss of capital. The Investment Manager believes that the Partnership's investment program and its research and risk-management techniques moderate this risk through the careful selection of securities and other financial instruments. No guarantee or representation is made that the Partnership's investment program will be successful, and investment results may vary substantially over time. The Partnership's investment program will utilize such investment techniques as option transactions, limited diversification, margin transactions, short sales and futures contracts, which practices can, in certain circumstances, maximize the adverse impact to which the Partnership may be subject.

### Instruments Traded

Equity Securities. The value of the equity securities held by the Partnership are subject to market risk, including changes in economic conditions, growth rates, profits, interest rates and the market's perception of these securities. While offering greater potential for long-term growth, equity securities are more volatile and more risky than some other forms of investment.

Option Transactions. The purchase or sale of an option by the Partnership involves the payment or receipt of a premium payment and the corresponding right or obligation, as the case may be, to either purchase or sell the underlying investment for a specific price at a certain time or during a certain period. Purchasing options involves the risk that the underlying investment does not change in price in the manner expected, so that the option expires worthless and the investor loses its premium. Selling options, on the other hand, involves potentially greater risk because the investor is exposed to the extent of the actual price movement in the underlying investment in excess of the premium payment received.

Exchange Traded Funds. The Partnership may invest in ETFs. ETFs are a recently developed type of investment security, representing an interest in a passively managed portfolio of securities selected to replicate a securities index, such as the S&P 500 Index or the Dow Jones Industrial Average, or to represent exposure to a particular industry or sector. Unlike open-end mutual funds, the shares of ETFs and closed-end investment companies are not purchased and redeemed by investors directly with the fund, but instead are purchased and sold through broker-dealers in transactions on a stock exchange. Because ETF and closed-end fund shares are traded on an exchange, they may trade at a discount from or a premium to the net asset value per share of the underlying portfolio of securities. As a relatively new type of security, the trading characteristics of ETFs may not yet be fully developed or understood by potential investors. In addition to bearing the risks related to investments in equity securities, investors in ETFs intended to replicate a securities index bear the risk that the ETFs performance may not correctly replicate the performance of the index. Investors in ETFs, closed-end funds and other investment companies bear a proportionate share of the expenses of those funds, including management fees, custodial and accounting costs, and other expenses. Trading in ETF and closed-end fund shares also entails payment of brokerage commissions and other transaction costs.

Credit Default Swap Agreements. The Partnership may enter, typically as a "buyer," into credit default swap agreements. The "buyer" in a credit default swap contract is obligated to pay the "seller" a periodic stream of payments over the term of the contract in return for a contingent payment upon the occurrence of a credit event with respect to an underlying reference obligation. Generally, a credit event means bankruptcy, failure to pay, obligation acceleration or restructuring. If the Partnership is a buyer and no credit event occurs, the Partnership will lose its periodic stream of payments over the term of the contract. However, if a credit event occurs, the buyer typically receives the face value of the reference obligation or the difference between the face amount and the current market value of the obligation. If the Partnership is a seller, the Partnership receives a fixed rate of income throughout the term of the contract, which typically is between one month and ten years, provided that no credit event occurs. If a credit event occurs, the Partnership typically must pay the contingent payment to the buyer, which will be either (i) the "par value" (face amount) of the reference obligation, in which case the Partnership will receive the reference obligation in return, or (ii) an amount equal to the difference between the par value and the current market value of the reference obligation. The periodic payments previously received by the Partnership, coupled with the value of any reference obligation received, may be less than the full amount it pays to the buyer, resulting in a loss of value to the Partnership.

Credit default swaps may involve greater risks than if the Partnership had invested in the reference obligation directly. Credit default swaps are subject to general market risk, liquidity risk, interest rate risk, and credit risk.

Small- and Medium-Capitalization Stocks. The Partnership may invest its assets in stocks of companies with smaller market capitalizations. Small- and medium-capitalization companies may be of a less seasoned nature or have securities that may be traded in the over-the-counter market. These "secondary" securities often involve significantly greater risks than the securities of larger, better-known companies. In addition to being subject to the general market risk that stock prices may decline over short or even extended periods, such companies may not be well-known to the investing public, may not have

significant institutional ownership and may have cyclical, static or only moderate growth prospects. Additionally, stocks of such companies may be more volatile in price and have lower trading volumes than larger capitalized companies, which results in greater sensitivity of the market price to individual transactions. Accordingly, investors in the Partnership should have a long-term investment horizon.

Small- and medium-capitalization securities may be followed by relatively few securities analysts with the result that there tends to be less publicly available information concerning these securities compared to what is available for exchange-listed or larger companies. The securities of these companies have more limited trading volumes than those of larger issuers and may be subject to more abrupt or erratic market movements than the securities of larger, more established companies or the market averages in general, and the Partnership may be required to deal with only a few market makers when purchasing and selling these securities. Transaction costs in small- and medium-capitalization stocks may be higher than those involving larger capitalized companies. Companies in which the Partnership may invest may also have limited product lines, markets or financial resources and may lack management depth and may be more vulnerable to adverse business or market developments.

Futures. Futures markets are highly volatile. Investing in the futures markets involves being able to analyze correctly such markets, which are influenced by, among other things, changing supply and demand relationships, weather, governmental, agricultural, and commercial and trade programs and policies designed to influence commodity prices, world political and economic events, and changes in interest rates. Moreover, investments in commodities, futures, and options contracts involve additional risks including, without limitation, leverage (i.e., margin is usually only Five Percent (5%) to Fifteen Percent (15%) of the face value of the contract and exposure can be nearly unlimited) and credit risk vis-à-vis the contract counterparty. A futures position may be illiquid because certain commodity exchanges limit fluctuations in certain futures contract prices during a single day by regulations referred to as "daily price fluctuation limits" or "daily limits." Under such daily limits, during a single trading day no trades may be executed at prices beyond the daily limits. Once the price of a particular futures contract increases or decreases by an amount equal to the daily limit, positions in the future can neither be taken nor liquidated unless traders are willing to effect trades at or within the limit. This could prevent the Partnership from promptly liquidating unfavorable positions and subject it to substantial losses.

Commodity Interests. Commodity interest prices are highly volatile. Price movements for such interests are influenced by, among other things, changing supply and demand relationships; trade, fiscal, political, and economic events and policies; changes in national and international interest rates of inflation; and currency devaluation and emotions of the marketplace. None of these factors can be controlled by the Investment Manager and no assurance can be given that the Partnership's investment program will result in profitable trades or that losses will not be incurred.

The low margin deposits normally required in commodity interest trading result in an extremely high degree of leverage. A relatively small price movement in an unfavorable direction in a commodity interest, therefore, could result in immediate and substantial losses to the investor. Like other leveraged instruments any purchase or sale of a commodity interest may result in losses in excess of the amount invested in that commodity interest. The Partnership may lose more that its initial margin deposit on a trade. Gains made using leverage will generally cause the value of the Partnership's portfolio to rise faster than could be the case without borrowing. Conversely, if investment results fail to cover the cost of borrowing, the value of the Partnership's portfolio could decrease faster than if there had been no borrowing. In connection with borrowing limited by applicable margin limitations, the Partnership may be required to reduce such borrowing on a timely basis in the event the value of the Partnership's assets falls below the coverage requirement of the margin limitations. In the event of such a required reduction of borrowing, the Partnership could be required to liquidate positions at times when it might not be desirable or advantageous from the Partnership's standpoint to do so.

It is not always possible to execute a buy or a sell order at the desired price, or to close out an open position, due to market illiquidity. Such illiquidity can be caused by intrinsic market conditions or it may be the result of extrinsic factors like the imposition of daily price fluctuation limits. Most United States commodity exchanges limit fluctuations in certain commodity interest prices during a single day by imposing what are known as "daily price fluctuation limits" or "daily limits." The daily limit, which is set by most exchanges for all but a portion of the expiration months, impose a floor and a ceiling on the process at which a trade may be executed, as measured from the last trading day's close. The purpose of daily limits is to limit risk of loss during a trading session. However, the existence of "daily limits" may have the less salutary effect of reducing liquidity or effectively curtailing trading in a particular market for both the future and its option.

Once the price of a particular contract has increased by an amount equal to the daily limit, a "limit up" or "limit down" position in the contract generally cannot be taken or liquidated unless traders are willing to effect trades at or within the limit. As a result, all trading ceases unless traders are willing to effect trades at or within the limit. It is not unusual for the price of a futures contract to move the daily limit for several consecutive days with little or no trading. Similar occurrences could prevent a participating customer from promptly liquidating unfavorable positions and subject him o substantial losses that could exceed the margin initially committed to such trades.

In market emergencies, the CFTC and individual exchanges can take strong action that impacts on liquidity. Specifically, they are empowered to suspend or limit trading in a particular contract, order immediate liquidation and settlement of a particular contract, or order that trading in a particular contract be conducted for liquidation only. In this regard, toward the end of 1988, the Chicago Mercantile Exchange, which trades the Standard & Poor's 500 Stock Index futures contract, and three other futures markets which trade stock index futures contracts, adopted what has become known as "circuit breakers," that is, procedures for an automatic halt in trading that will trigger whenever the Dow Jones Industrial Average or the S&P 500 average declines or rises by a certain number of points. The installation of circuit breakers was recommended by the Brady Commission, which examines the causes of and industry response to a 508 point drop in the stock market on October 19, 1987, and by the Working Group on Financial Markets, composed of the heads of interested federal agencies, which also studied the events of October 19. Since the CFTC first approved these rules on October 18, 1988 there has been limited experience with their effect on liquidity and prices in the stock index futures markets and the full impact of these rules on trading in futures and options cannot be determined at this time.

Intrinsic market factors, such as the lack of demand for an overabundant supply of the underlying commodity, will affect market interest and therefore liquidity. The Investment Manager is committed to trading in active markets although the determination of what is active is within its discretion.

Debt and Other Income Securities. The Partnership may invest in fixed-income and adjustable rate securities. Income securities are subject to interest rate, market and credit risk. Interest rate risk relates to changes in a security's value as a result of changes in interest rates generally. Even though such instruments are investments that may promise a stable stream of income, the prices of such securities are inversely affected by changes in interest rates and, therefore, are subject to the risk of market price fluctuations. In general, the values of fixed income securities increase when prevailing interest rates fall and decrease when interest rates rise. Because of the resetting of interest rates, adjustable rate securities are less likely than non-adjustable rate securities of comparable quality and maturity to increase or decrease significantly in value when market interest rates fall or rise, respectively. Market risk relates to the changes in the risk or perceived risk of an issuer, industry, country or region. Credit risk relates to the ability of the issuer to make payments of principal and interest. The values of income securities may be affected by changes in the credit

24

rating or financial condition of the issuing entities. Income securities denominated in non-U.S. currencies are also subject to the risk of a decline in the value of the denominating currency relative to the U.S. dollar.

Currency Risk. The value of the Partnership's assets may be affected favorably or unfavorably by the changes in currency rates and exchange control regulations. Some currency exchange costs may be incurred when the Partnership changes investments from one country to another. Currency exchange rates may fluctuate significantly over short periods of time. They generally are determined by the forces of supply and demand in the respective markets and the relative merits of investments in different countries, actual or perceived changes in interest rates and other complex factors, as seen from an international perspective. Currency exchange rates can also be affected unpredictably by intervention by governments or central banks (or the failure to intervene) or by currency controls or political developments. The Partnership may seek to mitigate the risk of currency exchange fluctuation through the active and systematic use of currency hedges.

**Strategy Risks**

Leverage and Margin Transactions. While the Investment Manager generally does not intend to utilize leverage on behalf of the Partnership, on occasion, certain option positions may have the effect of implicit leverage or may be assigned and result in the use of margin in the Partnership's account.

Systems Risks. The Partnership depends on the Investment Manager to develop and implement appropriate systems for the Partnership's activities. The Partnership relies extensively on computer programs and systems to trade, clear and settle securities transactions, to evaluate certain securities based on real-time trading information, to monitor its portfolio and net capital, and to generate risk management and other reports that are critical to oversight of the Partnership's activities. The ability of its systems to accommodate an increasing volume of transactions could also constrain the Investment Manager's ability to manage the portfolio. In addition, certain of the Partnership's and the Investment Manager's operations interface with or depend on systems operated by third parties, including prime brokers and market counterparties and their respective sub-custodians, and other service providers, and the Partnership or Investment Manager may not be in a position to verify the risks or reliability of such third party systems. These programs or systems may be subject to certain defects, failures or interruptions, including, but not limited to, those caused by worms, viruses and power failures. Any such defect or failure could have a material adverse effect on the Partnership. For example, such failures could cause settlement of trades to fail, lead to inaccurate accounting, recording or processing of trades, and cause inaccurate reports, which may affect the Partnership's ability to monitor its investment portfolio and its risks. The Investment Manager is not liable to the Partnership for losses caused by systems failures or due to any breakdown in the means of the communication normally used to ascertain the value of the Partnership's investments or to conduct trading in such investments.

Execution of Orders. The Partnership's trading strategies depend on the ability to establish and maintain an overall market position in a combination of financial instruments selected by the Investment Manager. The Partnership's trading orders may not be executed in a timely and efficient manner due to various circumstances, including, without limitation, systems failures or human error attributable to employees, brokers, agents or other service providers. In such events, the Partnership might only be able to acquire some, but not all, of the components of such position, or if the overall position were to need adjustment, the Partnership might not be able to make such adjustment. As a result, the Partnership would not be able to achieve the market position selected by the Investment Manager, and might incur a loss in liquidating its position.

Operational Risks.  The volume and complexity of the Partnership's transactions may place substantial burdens on the Investment Manager's operational systems and resources, including those related to trade entry and execution, position reconciliation, corporate actions, marking procedures, finance, accounting, profit and loss reporting, internal management and risk reporting and funds transfers.  Human error, system failure or other problems with any of these processes could result in material losses or costs, which will generally be borne by the Partnership.

Short Selling.  The Partnership may engage in short selling as part of its general investment strategy.  Short selling involves selling securities that are not owned and borrowing the same securities for delivery to the purchaser, with an obligation to replace the borrowed securities at a later date.  Short selling allows the Partnership to profit from declines in market prices to the extent such decline exceeds the transaction costs and the costs of borrowing the securities.  However, because the borrowed securities must be replaced by purchases at market prices in order to close out the short position, any appreciation in the price of the borrowed securities would result in a loss upon such repurchase.  The Partnership's obligations under its short sales will be marked to market daily and collateralized by the Partnership's assets held at the broker, including its cash balance and its long securities positions.  Because short sales must be marked to market daily, there may be periods when short sales must be settled prematurely, and a substantial loss would occur.  Purchasing securities to close out the short position can itself cause the price of the securities to rise further, thereby exacerbating the loss.  Short-selling exposes the Partnership to unlimited risk with respect to that security due to the lack of an upper limit on the price to which an instrument can rise.  Short sales may be utilized to enhance returns and hedge the portfolio. The Partnership anticipates that the frequency of short sales will vary substantially in different periods.  There are no prescribed limits to the amount of Partnership assets that may be subject to short sales.

Lack of Diversification.  Although the Partnership intends to structure its portfolio so that investments (both individually and in the aggregate) have desirable risk/reward characteristics and so that the Partnership may be able to satisfy Limited Partners' requests for withdrawals, the Partnership is not subject to any restrictions with respect to investments in any particular industry, geography or type of investment.

Highly Volatile Instruments.  The prices of financial instruments in which the Partnership may invest can be highly volatile.  Price movements of option contracts in which the Partnership's assets may be invested are influenced by, among other things, interest rates, changing supply and demand relationships, trade, fiscal, monetary and exchange control programs and policies of governments, and national and international political and economic events and policies.  The Partnership is subject to the risk of failure of any of the exchanges on which its positions trade or of their clearinghouses.

In-Kind Distributions.  A withdrawing Limited Partner may, in the sole discretion of the General Partner, receive financial instruments owned by the Partnership in lieu of, or in combination with, cash.  The value of financial instruments distributed may increase or decrease before such financial instruments can be sold and the Limited Partner will incur transaction costs in connection with the sale of such financial instruments.  Additionally, financial instruments distributed with respect to a withdrawal by a Limited Partner may not be readily marketable.  The risk of loss and delay in liquidating such financial instruments will be borne by the Limited Partner, with the result that such Limited Partner may receive less cash than it would have received on the date of withdrawal.

Failure of Broker-Dealers.  Institutions, such as brokerage firms or banks, may hold certain of the Partnership's assets in "street name."  Bankruptcy or fraud at one of these institutions could impair the operational capabilities or the capital position of the Partnership.  In addition, if the Partnership were to borrow money or securities, the Partnership will post certain of its assets as collateral securing the obligations ("*Margin Securities*").  The Partnership's broker generally holds the Margin Securities on a

commingled basis with margin securities of its other customers and may use certain of the Margin Securities to generate cash to fund the Partnership's leverage, including pledging such Margin Securities. Some or all of the Margin Securities may be available to creditors of the Partnership's broker in the event of its insolvency. The Partnership's broker has netting and set off rights over all the assets held by it (which may indirectly include amounts held for the Partnership's benefit in the special segregated bank account) to satisfy the Partnership's obligations under its agreements with the Partnership's broker, including obligations relating to any margin or short positions.

Risk of Default of Exchanges. Exchange-traded futures and/or options on futures contracts may be utilized by Investment Manager and although these exchanges are highly regulated and have never defaulted in the past, there is a risk that these exchanges could fail to perform in clearing executed transactions.

Stop Loss May Not Be Effective. The placement of contingent orders by the Investment Manager, such as a "stop-loss" or "stop-limit" orders, will not necessarily limit the Partnership's losses to the intended amounts, since market conditions may make it impossible to execute such orders.

Spread Position May Be Riskier. A "spread" position may not be less risky than a simple "long" or "short" position.

The Investment Manager Methodology. Trading decisions of the Investment Manager are on a discretionary basis using fundamental and/or technical analysis and no assurance can be given that such trading strategies used by the Investment Manager will be successful, or that losses could not occur. In entering orders into the Partnership's accounts, the Investment Manager will use market, limit, stop, and other qualified orders, if in its judgment, that appears appropriate under given market conditions. In addition, when liquidating a position, the Investment Manager may place a reversal order, *i.e.*, the current position is liquidated and an opposite one is established.

**Management Risks**

Reliance on the General Partner and Investment Manager and no Authority by Limited Partners. All decisions regarding the management and affairs of the Partnership will be made exclusively by the General Partner and/or the Investment Manager. Accordingly, no person should invest in the Partnership unless such person is willing to entrust all aspects of management of the Partnership to the General Partner and Investment Manager. Limited Partners will have no right or power to take part in the management of the Partnership. As a result, the success of the Partnership for the foreseeable future depends solely on the abilities of the General Partner and Investment Manager.

Dependence on Key Personnel. The General Partner and Investment Manager are dependent on the services of the Principal and there can be no assurance that it will be able to retain the Principal, whose credentials are described under the heading "*Management of the Partnership*." The departure or incapacity of the Principal could have a material adverse effect on the Investment Manager's management of the investment operations of the Partnership.

Changes in Investment Strategies. The Partnership's investment strategies may be altered from time to time with the approval of a majority-in-interest of Limited Partners. In such event, a Limited Partner who does not consent to such change may nevertheless be out-voted by other Limited Partners in which case the opposing Limited Partner may only withdraw from the Partnership pursuant to the terms of the Partnership Agreement and subject to the limitations described therein.

Discretionary Decision Making May Result in Missed Opportunities. The Partnership's trading strategies do involve some discretionary aspects. Discretionary decision-making may result in failure to capitalize on certain price trends or unprofitable trades in a situation where a strictly systematic approach might not have done so.

Proprietary Nature of Investment Strategy. All documents and other information concerning the Partnership's portfolio of investments will be made available to the Partnership's auditors, accountants, attorneys and other agents in connection with the duties and services performed by them on behalf of the Partnership. However, because the Investment Manager's investment techniques may be proprietary, the Partnership Agreement will provide that neither the Partnership nor any of its auditors, accountants, attorneys or other agents will disclose to any person, including investors in the Partnership, any of the investment techniques employed by the Investment Manager in managing the Partnership's investments or the identity of specific investments held by the Partnership at any particular time.

Limitations on Liability and Indemnification. The Partnership Agreement provides that the General Partner, the Investment Manager and any of their respective affiliates, shareholders, members, partners, managers, directors, officers and employees, agents and representatives and the legal representatives of any of them (each, an "*Indemnified Party*"), shall not be liable, responsible nor accountable in damages or otherwise to the Partnership or any Partner, or to any successor, assignee or transferee of the Partnership or of any Partner, for (i) any acts performed or the omission to perform any acts, within the scope of the authority conferred on such Indemnified Party by the Partnership Agreement, except by reason of acts or omissions found by a court of competent jurisdiction upon entry of a final non-appealable judgment to have been made in bad faith or to constitute fraud, willful misconduct or gross negligence; (ii) performance by such Indemnified Party of, or the omission to perform, any acts on advice of legal counsel, accountants, or other professional advisors to the Partnership; (iii) the negligence, dishonesty, bad faith, or other misconduct of any consultant, employee, or agent of the Partnership, including, without limitation, an affiliate of the General Partner or Investment Manager, selected or engaged by such Indemnified Party with reasonable care and in good faith; or (iv) the negligence, dishonesty, bad faith, or other misconduct of any Person in which the Partnership invests or with which the Partnership participates as a partner, joint venturer, or in another capacity, which was selected by such Indemnified Party with reasonable care and in good faith. No Indemnified Party shall be liable to the Partnership or to any Partner, or any successors, assignees, or transferees of the Partnership or any Partner, for any loss, damage, expense, or other liability due to any cause beyond its reasonable control, including, but not limited to, strikes, labor troubles, riots, fires, blowouts, tornadoes, floods, bank moratoria, trading suspensions on any exchange, acts of a public enemy, insurrections, acts of God, acts of terrorism, failures to carry out the provisions hereof due to prohibitions imposed by law, rules, or regulations promulgated by any governmental agency, or any demand or requisition by any government authority.

Furthermore, to the fullest extent permitted by law, the Partnership, in the General Partner's sole discretion, shall indemnify and hold harmless each Indemnified Party from and against any loss, liability, damage, cost or expense suffered or sustained by an Indemnified Party by reason of (i) any acts, omissions or alleged acts or omissions arising out of or in connection with the Partnership, the Partnership Agreement or any investment made or held by the Partnership (including, without limitation, any judgment, award, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding, or claim), provided that such acts, omissions or alleged acts or omission upon which such actual or threatened action, proceeding or claim are based are not found by a court of competent jurisdiction upon entry of a final non-appealable judgment to have been made in bad faith or to constitute fraud, willful misconduct or gross negligence by such Indemnified Party, or (ii) any acts or omissions, or alleged acts or omissions, of any broker or agent of any Indemnified Party, provided that such broker or agent was selected, engaged or retained by the Indemnified Party in accordance with reasonable care.

The Partnership Agreement also provides that the Partnership will, in the sole discretion of the General Partner, advance to any Indemnified Party attorneys' fees and other costs and expenses incurred in connection with the defense of any action or proceeding which arises out of such conduct.

Limited Reporting. The Partnership will provide monthly unaudited reports of Partnership activity. As a result, Limited Partners will not be able to evaluate the Partnership's activity at shorter intervals. Additionally, as a result of side letter arrangements, questions, due diligence requests, meetings or other communications, certain Limited Partners may receive information that is not generally available or otherwise provided to other Limited Partners, which may affect such Limited Partners' decision to request a withdrawal of their respective Capital Accounts or take other actions on the basis of such information.

**Other Risks**

No Operating History. The Partnership is a recently formed entity and has no operating history upon which prospective investors can evaluate its likely performance. There can be no assurance that the Partnership will achieve its investment objective.

Risk of Loss. A Limited Partner could incur substantial, or even total, losses on an investment in the Partnership. An investment in the Partnership is only suitable for persons willing to accept this high level of risk.

Effect of Performance Allocation. The General Partner will receive a Performance Allocation based on a percentage of any net realized and unrealized profits. Performance allocations may create an incentive for the Investment Manager, as delegated by the General Partner, to make investments that are riskier or more speculative than would be the case in the absence of such incentive compensation arrangements. In addition, the General Partner's performance allocations will be based on unrealized as well as realized gains. There can be no assurance that such unrealized gains will, in fact, ever be recognized. Furthermore, the valuation of unrealized gain and loss may be subject to material subsequent revision.

Effect of Substantial Withdrawals. Substantial withdrawals by Limited Partners within a short period of time could require the Partnership to liquidate its investments more rapidly than would otherwise be desirable, possibly reducing the value of the Partnership's assets and/or disrupting the Partnership's investment strategies. Reduction in the Partnership's size could make it more difficult to generate a positive return or to recoup losses due to, among other things, reductions in the Partnership's ability to take advantage of particular investment opportunities or decreases in the ratio of its income to its expenses.

Lack of Liquidity. The Partnership's withdrawal provisions place certain restrictions on the right of a Limited Partner to withdraw all or part of its Interest, transfer its Interest and pledge or otherwise encumber its Interest. Thus, a Limited Partner may not be able to liquidate the entire value of his or her Capital Account on any given withdrawal date. Interests may not be transferred or pledged except in compliance with significant restrictions on transfer as required by federal and state securities and commodities laws and as provided in the Partnership Agreement. The Partnership Agreement does not permit a Limited Partner to transfer or pledge all or any part of its Interest to any person without the prior written consent of the General Partner, the granting of which is in the General Partner's sole and absolute discretion. These limitations, taken together, will significantly limit a Limited Partner's ability to liquidate an investment in the Partnership quickly. As a result, an investment in the Partnership would not be suitable for an investor who needs liquidity.

Suspension of Withdrawals and Deferment of Withdrawal Proceeds. In certain circumstances, the General Partner, in its sole and absolute discretion, may suspend the valuation of the Partnership's assets,

the right or obligation to honor withdrawal requests (including the right to receive withdrawal proceeds), and/or extend the period for payment on withdrawal. In addition, the General Partner may suspend the right of withdrawal or postpone the date of payment for any period during which there is an extraordinary circumstance as determined in good faith by the General Partner.

Contingency Reserves. Under certain circumstances, the Partnership may find it necessary to set up one or more reserves for contingent or future liabilities or valuation difficulties and, upon withdrawal by a Limited Partner, withhold a portion of that Limited Partner's withdrawal proceeds. This could happen, for example, if the Partnership or the issuer of portfolio securities were involved in a dispute regarding the value of its assets, in litigation, or subject to a tax audit at the time the withdrawal request would otherwise be satisfied.

Tax Considerations; Distributions to Limited Partners and Payment of Tax Liability. It is not possible to provide here a description of all potential tax risks to a person considering investing in the Partnership. Prospective investors are urged to consult their own legal counsel and tax advisors with respect thereto. The Partnership will not seek a ruling from the IRS with respect to any tax issues affecting the Partnership.

It should also be noted that the Partnership's tax return may be audited by the IRS, and any such audit may result in an audit of the returns of the Limited Partners for the year(s) in question or unrelated years. Further, any adjustment resulting from an audit would also result in adjustments to the tax returns of the Limited Partners and may result in an examination and adjustment of other items in such returns unrelated to the Partnership. Limited Partners could incur substantial legal and accounting costs in litigation of any IRS challenge, regardless of the outcome. (*See "Federal Tax Aspects."*)

Delayed Schedules K-1. The Partnership may not be able to provide final Schedules K-1 to Limited Partners for any given fiscal year until significantly after April 15 of the following year. The Partnership will provide Schedules K-1 as soon as practicable after receipt of all of the necessary information. Limited Partners should be prepared to obtain extensions of the filing date for their income tax returns at the U.S. Federal, state and local level.

Undistributed Income. The General Partner in its sole discretion may, but is not required to, make distributions to Limited Partners during the term of the Partnership. Taxable income realized in any year by the Partnership will be taxable to the Partners in that year regardless of whether they have received any distributions from the Partnership. Accordingly, Limited Partners may recognize taxable income for federal, state, and local income tax purposes without receiving any or a sufficient distribution from the Partnership with which to pay the taxes thereon. The General Partner may consider such possible tax liability of the Limited Partners when determining whether to make distributions, but no assurance is given that distributions, if made, will equal the amount of any Limited Partner's tax liability.

Restrictions on Transfer. The Interests are subject to certain restrictions on transfer, including a requirement that the General Partner consent to any such transfer. There is no present market for the Interests, and no market is likely to develop in the future. Accordingly, Limited Partners may not be able to liquidate their investment in the event of an emergency or for any other reason, and Interests may not be readily acceptable as collateral for loans. Interests should be purchased only by prospective Investors who can bear the economic risk of their investment, who can afford to have their funds committed to an illiquid investment according to the withdrawal provisions in the Partnership Agreement and who, if necessary, can afford a complete loss of their investment. (*See "Restrictions on Transfers of Interests."*)

Lack of Insurance. The assets of the Partnership are not insured by any government or private insurer except to the extent portions may be deposited in bank accounts insured by the Federal Deposit

Insurance Corporation or with brokers insured by the Securities Investor Protection Corporation and such deposits and securities are subject to such insurance coverage. Therefore, in the event of the insolvency of a depository or custodian, the Partnership may be unable to recover all of its funds or the value of its securities so deposited.

Side Letters. The General Partner may enter into agreements with certain Limited Partners that will result in different terms of an investment in the Partnership than the terms applicable to other Limited Partners. As a result of such agreements, certain Limited Partners may receive additional benefits which other Limited Partners will not receive (*e.g.*, additional information regarding the Partnership's portfolio, different withdrawal terms, lower Management Fee rates or Performance Allocations). The General Partner will not be required to notify the other Limited Partners of any such agreement or any of the rights and/or terms or provisions thereof, nor will the General Partner be required to offer such additional and/or different terms or rights to any other Limited Partner. The General Partner may enter into any such agreement with any Limited Partner at any time in its sole discretion.

Regulations under Investment Company Act of 1940. The Partnership's operations are similar to an investment company as defined under the Investment Company Act, because the Partnership engages in the business of purchasing securities for investment. The Partnership is currently not required to register under the Investment Company Act due to an exemption for an entity which is beneficially owned by not more than 100 persons and which does not intend to make any public offering of its securities. Accordingly, the provisions and extensive regulations of the Investment Company Act, which might otherwise govern the activities of the Partnership, will not be applicable.

Risks for Certain Benefit Plan Investors Subject to ERISA. Prospective investors that are benefit plan investors subject to the ERISA, and Department of Labor Regulations issued thereunder should read the section hereof entitled *"ERISA Considerations"* in its entirety for a discussion of certain risks related to an investment by benefit plan investors in the Partnership.

Revised Regulatory Interpretations Could Make Certain Strategies Obsolete. In addition to proposed and actual accounting changes, there have recently been certain well-publicized incidents of regulators unexpectedly taking positions which prohibited trading strategies which had been implemented in a variety of formats for many years. In the current unsettled regulatory environment, it is impossible to predict if future regulatory developments might adversely affect the Partnership.

Future Regulatory Change is Impossible to Predict. The securities markets are subject to comprehensive statutes, regulations and margin requirements. In addition, the Securities and Exchange Commission and the exchanges are authorized to take extraordinary actions in the event of a market emergency, including, for example, the retroactive implementation of speculative position limits or higher margin requirements, the establishment of daily price limits and the suspension of trading. The regulation of securities both inside and outside the United States is a rapidly changing area of law and is subject to modification by government and judicial action. The effect of any future regulatory change on the Partnership is impossible to predict, but could be substantial and adverse.

Importance of General Economic Conditions. Overall market, industry or economic conditions, which the Investment Manager cannot predict or control, will have a material effect on performance.

Risks Relating to Markets. The value of those securities in which the Partnership invests and that are traded on exchanges or over-the-counter and the risks associated therewith vary in response to events that affect such markets and that are beyond the control of the Partnership and the Investment Manager. Market disruptions such as those that occurred during October of 1987 and on September 11, 2001 could

have a material effect on general economic conditions and market liquidity which could result in substantial losses to the Partnership.

There is no guarantee that securities exchanges and markets can at all times provide continuously liquid markets in which the Partnership can close out its positions in those securities that the Partnership purchases that are publicly traded. The Partnership could experience delays and may be unable to sell securities purchased through a broker or clearing member that has become insolvent due to the deterioration of industry conditions in general. In that event, positions could also be closed out fully or partially without the Partnership's consent.

**The foregoing list of risk factors does not purport to be a complete enumeration or explanation of the risks involved in an investment in the Partnership.  Prospective Limited Partners should read the entire Memorandum and the Partnership Agreement and consult with their own advisers before deciding whether to invest in the Partnership. In addition, as the Partnership's investment program develops and changes over time, an investment in the Partnership may be subject to additional and different risk factors.**

## POTENTIAL CONFLICTS OF INTEREST

The General Partner, the Investment Manager and/or their respected affiliates, shareholders, Principals, members, partners, managers, directors, officers and employees (collectively the "*Affiliated Persons*") will only devote so much time to the affairs of the Partnership as is reasonably required in the judgment of the General Partner and/or the Investment Manager. The Affiliated Persons will not be precluded from engaging directly or indirectly in any other business or other activity, including exercising investment advisory and management responsibility and buying, selling or otherwise dealing with securities and other investments for their own accounts, for the accounts of family members, for the accounts of other funds and for the accounts of individual and institutional clients (collectively, "*Other Accounts*"). Such Other Accounts may have investment objectives or may implement investment strategies similar to those of the Partnership. The Affiliated Persons may also have investments in certain of the Other Accounts. Each of the Affiliated Persons may give advice and take action in the performance of their duties to their Other Accounts that could differ from the timing and nature of action taken with respect to the Partnership. The Affiliated Persons will have no obligation to purchase or sell for the Partnership any investment that the Affiliated Persons purchase or sell, or recommend for purchase or sale, for their own accounts or for any of the Other Accounts. The Partnership will not have any rights of first refusal, co-investment or other rights in respect of the investments made by Affiliated Persons for the Other Accounts, or in any fees, profits or other income earned or otherwise derived from them. If a determination is made that the Partnership and one or more Other Accounts should purchase or sell the same investments at the same time, the Affiliated Persons will allocate these purchases and sales as is considered equitable to each. No Limited Partner will, by reason of being a Limited Partner of the Partnership, have any right to participate in any manner in any profits or income earned or derived by or accruing to the Affiliated Persons from the conduct of any business or from any transaction in investments effected by the Affiliated Persons for any account other than that of the Partnership.

The Affiliated Persons will attempt to allocate investment opportunities that come to their attention on a fair and equitable basis among the Partnership and the Other Accounts for which participation in the respective opportunity is considered appropriate. In determining whether participating by an account is appropriate, the Affiliated Persons shall take into account, among other considerations: (a) whether the risk-return profile of the proposed investment is consistent with the objectives of the Partnership, which objectives may be considered (i) solely in light of the specific investment under consideration or (ii) in the context of the portfolio's overall holdings and available capital; (b) the potential for the proposed investment to create an imbalance in the portfolio of the Partnership; (c) liquidity requirements of the Partnership; (d) potential tax consequences; (e) legal or regulatory restrictions; (f) the need to re-size risk in the portfolio of the Partnership; and (g) whether the Partnership and/or Other Accounts have a substantial amount of investable cash (*e.g.*, during a "ramp-up" period). Notwithstanding the foregoing, there can be no assurance that an investment opportunity which comes to the attention of any of the Affiliated Persons will not be allocated to an Other Account, with the Partnership being unable to participate in such investment opportunity or participating only on a limited basis. In addition, there may be circumstances under which the Affiliated Persons will consider participation by Other Accounts in investment opportunities in which the Affiliated Persons do not intend to invest, or intend to invest only on a limited basis, on behalf of the Partnership. Because these considerations may differ for the Partnership and the Other Accounts in the context of any particular investment opportunity, investment activities of the Partnership and the Other Accounts may differ considerably from time to time.

As a result of the foregoing, the Affiliated Persons may have conflicts of interest in allocating their time and activity between the Partnership and the Other Accounts, in allocating investments among the

Partnership and the Other Accounts and in effecting transactions for the Partnership and the Other Accounts, including ones in which the Affiliated Persons may have a greater financial interest.

The Partnership, the General Partner and the Investment Manager are not represented by separate professional advisers. Without independent legal and other professional representation, investors may not receive legal and other advice regarding certain matters that might be in their interests but contrary to the interest of the Affiliated Persons. However, should a dispute arise between the Partnership and any Affiliated Person, or should there be a need in the future to negotiate and prepare contracts and agreements between the Partnership and any of the Affiliated Persons, other than those existing or contemplated on the date of this Memorandum, the General Partner will cause the Partnership to retain separate counsel and, if necessary, other professionals for such matters.

## VALUATION OF INVESTMENTS

The Net Asset Value of the Partnership will be determined as of such times as is required by the Partnership Agreement or as may be determined by the General Partner, but in any case no less than monthly.

Each Partner's share of the Net Asset Value of the Partnership is determined by multiplying (i) the sum of the value of the securities held by the Partnership plus any cash or other assets (including interest and dividends accrued but not yet received) minus all liabilities (including accrued expenses), by (ii) the Partner's Allocation Percentage.

The following general guidelines apply to the determination of the value of the Partnership's investments:

(a)     Securities which are listed on one or more United States or foreign securities exchanges or are traded on a recognized over-the-counter market (including the NASDAQ), or for which market quotations are available shall be valued at their last reported sales price on the date of determination on the primary exchange or market on which such Securities are traded or, if no sale occurred on the valuation date, the value for long positions shall be the "last bid" and the value for short positions shall be the "last ask" (or, if on such date securities markets were closed, then the last preceding business day on which they were open).

(b)     Securities in the form of options listed on a securities exchange will be valued at the last reported sales price on the date of determination on the primary exchange or market on which such Securities are traded or, if the last sales price does not fall between the "last bid" and "last ask" price for such options on such date, such options will be valued at the mean between "last bid" and "last ask" prices on the date of determination.

(c)     Commodity futures contracts will be valued at the most recent available closing quotation on the commodity exchange on which the commodity futures contract is traded by the Partnership. Foreign currency exchange contracts will be valued at the current cost of covering or offsetting such contracts. Futures instruments will be valued at the settlement price on the exchange on which that futures interest is traded on the day the value is being determined. However, if a futures interest could not have been liquidated on that day because of the operation of daily limits or other rules of the exchange or otherwise, the settlement price on the first subsequent day on which the futures interest could be liquidated will be the market value of that futures interest for that day.

(d)     Securities generally traded on an established securities market but for which no recorded sales information or quotations of bid and ask prices are available on such date (or, if applicable, the last preceding business day) shall be valued by the General Partner in good faith with reference to (i) the most recently reported bid and ask prices (in that order), (ii) bid and ask price information as of such date not generally reported but secured from a reputable broker or investment banker, and (iii) such other information as the General Partner believes in good faith is relevant.

(e)     Securities not listed or traded on any exchange or on the over-the-counter market shall be valued based upon quotations obtained from independent market makers, dealers or pricing

35

services, and if no such quotations are available, shall be considered as having no ascertainable market value and shall be valued at cost or fair value based on information available to the General Partner regarding the value or worthlessness of such securities.

For purposes of these guidelines, sales and bid and ask prices reported in newspapers of general circulation, or in electronic quotation systems or in standard financial periodicals or in the records of securities exchanges or other markets, any one or more of which may be selected by the General Partner, shall be accepted as evidence of the price of a security.

A security purchased, and awaiting payment against delivery, shall be included for valuation purposes as a security held, and the cash account shall be adjusted by the deduction of the purchase price, including brokers' commissions or other expenses of the purchase. A security sold but not delivered pending receipt of proceeds shall be valued at the net sales price.

Net Asset Value will include any unrealized profit or loss on open positions and any other credit or debit accruing to the Partnership but unpaid or not received by the Partnership. Interest earned on the Partnership's brokerage account, if any, will be accrued at least monthly. The amount of any distribution declared by the Partnership, and of any withdrawal proceeds due but not yet paid, will be treated as a liability from the day when the distribution is declared, or the related withdrawal is effective, as applicable, until it is paid.

The General Partner may make adjustments to the value of securities to best reflect their fair market value. All matters concerning the valuation of securities, the allocation of profits, gains, and losses among the Partners, and accounting procedures not specifically and expressly provided for by the terms of the Partnership Agreement, shall be determined by the General Partner and shall be final and conclusive as to all of the Partners.

## SERVICE PROVIDERS

### Legal Counsel

Riveles Wahab LLP (the "*Attorney*") will represent the Partnership and the General Partner in connection with the organization of the Partnership, the offering of Interests and other ongoing matters. The Attorney has not been engaged to protect the interests of prospective Limited Partners or the Limited Partners. Prospective Limited Partners should consult with and rely upon their own counsel concerning an investment in the Partnership, including the tax consequences to Limited Partners of an investment in the Partnership. No independent counsel has been retained to represent the Limited Partners of the Partnership.

The Attorney's representation of the Partnership is limited to the organization of the Partnership, the offering of Interests and to certain other specific matters as to which the Attorney has been consulted by the Partnership and/or the General Partner. There may exist other matters which could have a bearing on the Partnership and/or the General Partner as to which the Attorney has not been consulted. In addition, the Attorney does not undertake to monitor the compliance of the General Partner and its affiliates with the investment program, valuation procedures and other guidelines set forth herein, nor does the Attorney monitor compliance with all applicable laws. In the course of advising the Partnership, there are times when the interests of the Limited Partners may differ from those of the General Partner and its affiliates. For example, issues may arise relating to trade errors, expenses to be charged to the Partnership, withdrawal rights of Limited Partners and other terms of the Partnership Agreement, such as those relating to amendments and indemnification. The Attorney does not represent the Limited Partners' interests in resolving such issues.

### Broker

In the sole discretion of the Investment Manager, the Partnership may utilize a broker (including, but not limited to JP Morgan (the "*Broker*")) who will clear the securities transactions for the Partnership. The Partnership is not committed to continue its brokerage relationship with any Broker(s) for any minimum period, and the Investment Manager may select other or additional brokers to act as a broker or prime broker for the Partnership. Subject to the considerations described above, the selection of a broker (including a prime broker) to execute transactions, provide financing and securities on loan, hold positions, cash and short balances and provide other services may be influenced by, among other things, the provision by the broker of the following: commitment of capital, access to company management, access to deal flow, capital introduction and marketing assistance.

### Auditor

The General Partner, in its sole discretion, may select the auditor which will complete the year-end audit for the Partnership. The Partnership's books of account shall be audited as of the close of each fiscal year by Grant Thornton or any other independent accounting firm designated by the General Partner, although the General Partner may elect to postpone the first audit of the Partnership's annual financial statements until the completion of the Partnership's first full fiscal year, in which case the initial audit will cover the applicable fiscal year as well as the partial "stub" year in which the Partnership commenced operation. Within 120 days after the end of each fiscal year, or as soon thereafter as is reasonably practicable, annual reports containing audited financial statements will be sent to all Limited Partners.

37

**Administrator**

The Partnership has entered into an administration agreement ("*Administration Agreement*") with Willow Creek GP (the "*Administrator*"). The Administrator will perform certain administrative services on behalf of the Partnership, including tracking investors' capital balances, calculating returns and computing compensation payable to the General Partner. If requested by the General Partner, the Administrator also may prepare certain interim reports. For its services, the Administrator will be paid its customary rates for providing similar services.

The Administrator is not affiliated with the Partnership, the General Partner or the Investment Manager. It has not participated in the preparation of this Memorandum and is not responsible for the accuracy or adequacy of any disclosures concerning the Partnership. The Administrator makes no representation as to the propriety of an investment in the Partnership. Its awareness that a person has invested in the Partnership will not signify the Administrator's belief that such investment is appropriate for the person.

The Administrator is authorized to rely on any written or oral information provided to it by the General Partner, the Investment Manager or their respective agents, a Partnership broker or custodian, or any other person who the Administrator reasonably believes has been authorized to provide the information. The Administrator has no duty to verify, investigate or confirm the authenticity, accuracy or completeness of any such information. No person should assume that the Administrator has verified, investigated or confirmed any information presented in any report that the Administrator may prepare or review on behalf of the Partnership. Nor is the Administrator required to review, monitor or otherwise ensure compliance by the Partnership with any investment policies, restrictions or guidelines applicable to it, nor any person's compliance with any other term of the Partnership's Limited Partnership Agreement or this Memorandum. The Administrator has no responsibility to ensure that the Partnership seeks or receives competent legal, tax or other professional advice.

The Administrator has no authority or practical ability to prevent unauthorized withdrawals or other transfers of Partnership securities, cash or other assets, whether by the General Partner, the Investment Manager or any other person, and will have no obligation to prevent, detect or report any such unauthorized transfers.

The Administrator will not be responsible for any loss sustained by the Partnership, any investor, or any other person, by reason of any action or inaction by the Partnership, the General Partner, the Investment Manager, any broker or custodian, any attorney or accountant or other professional, or any other person in connection with the Partnership's operations or the offering or sale of Partnership ownership interests, nor by reason of any action or inaction of the Administrator or its agents unless the Administrator is found to have engaged in willful misconduct or acted in bad faith or with gross negligence. The Administration Agreement includes a broad indemnification provision under which the Partnership and the General Partner agree to indemnify and defend the Administrator and its affiliates against claims asserted by a third party in connection with a broad range of claims involving the Partnership's operations or the offering or sale of Partnership ownership interests, including the Administrator's actions or failures to act under the Administration Agreement unless the Administrator is found to have engaged in willful misconduct or acted in bad faith or with gross negligence.

The Administration Agreement may be terminated at any time without penalty by either party, though its liability limitations and indemnification provisions will survive any termination.

38

## BROKERAGE AND CUSTODY

The Partnership's accounts will be maintained with the Broker. The General Partner or Investment Manager, as authorized by the General Partner, has complete discretion regarding the selection of such brokers and the amount of brokerage commissions and fees paid to such brokers. Brokerage fees paid by the Partnership to brokers vary and may be greater than those typical for investment funds similar to the Partnership if the General Partner or Investment Manager has determined that the execution and other services rendered by a particular broker merit greater than typical fees.

The Investment Manager, as delegated by the General Partner, makes investment decisions and arranges for the placement of buy and sell orders and the execution of portfolio transactions for the Partnership. In arranging for the execution of portfolio transactions on behalf of the Partnership, the Investment Manager seeks to obtain best execution at favorable prices on behalf of the Partnership. The Investment Manager has discretion to execute trades, select broker-dealers and negotiate commissions. In selecting broker-dealers, the Investment Manager seeks those broker-dealers who can provide best execution of transactions under the circumstances. The principal factors determining this selection are: (1) a broker's ability to execute the types of transactions occurring in client accounts; (2) the net prices for such transactions; and, (3) trading ideas generated by brokers. "Best execution" is not synonymous with lowest brokerage commission. Consequently, in a particular transaction the Partnership may pay a brokerage commission in excess of that which another broker might have charged for executing the same transaction.

The Investment Manager may generate "soft dollars" with respect to the Partnership's trades; if it does so, the Investment Manager intends to comply with the safe harbor of Section 28(e) of the Securities Exchange Act of 1934, as amended. Under "soft dollar" arrangements, the brokerage firms would provide or pay the costs of certain services, equipment or other items for the benefit of the Partnership, the Investment Manager, or one or more of their affiliates in consideration of the allocation to the firm of brokerage transactions (with resulting commission income) made on behalf of the Partnership on both an agency and net basis. Services that may be furnished or paid for by brokers or dealers may include, without limitation (in addition to the research products and services described below) special execution capabilities, clearance, settlement, net pricing, online pricing, block trading and block positioning capabilities, willingness to execute related or unrelated difficult transactions in the future, performance measurement data, consultations, financial strength and stability, efficiency of execution and error resolution, availability of stocks to borrow for short sales, custody, recordkeeping and similar services. Although these soft dollar arrangements may benefit the Partnership, the General Partner and the Investment Manager by reducing their respective expenses, the amount of the Management Fees payable to the Investment Manager will not be reduced. Because such services could be considered to benefit the Investment Manager and its affiliates, and the "soft dollars" used to acquire them are the assets of the Partnership, the Investment Manager could be considered to have a conflict of interest in allocating brokerage business on behalf of the Partnership. The Investment Manager believes, however, that to the extent it makes allocations of brokerage business and soft dollar arrangements, these would generally enhance the Partnership's ability to obtain research and optimal execution, as well as other benefits to the Partnership. Notwithstanding the foregoing, the Partnership will not necessarily benefit from all such soft dollar services. The Investment Manager and its affiliates and the Other Accounts they may advise may also derive substantial benefits from these services, particularly to the extent the Investment Manager uses soft dollars to pay for expenses it would otherwise be required to pay itself. Furthermore, because the extent of the products and services provided by these brokers will be based largely on the volume of commissions generated by the Partnership's trading

activities, these soft dollar arrangements may create an incentive for the Investment Manager to increase the volume of the Partnership's trading activities.

Under Section 28(e) of the U.S. Securities Exchange Act of 1934, the Investment Manager's use of the Partnership's commission dollars to acquire "research" products and brokerage services is not a breach of the Investment Manager's fiduciary duty to the Partnership--even if the brokerage commissions paid are not the lowest available--as long as (among other requirements) the Investment Manager determines that the commissions are reasonable in relation to the value of the brokerage services and the "research" acquired. For these purposes, "research" means services or products used to provide lawful and appropriate assistance to the Investment Manager in making investment decisions for all of its clients. The types of "research" the Investment Manager may acquire include: research reports on or other information about particular companies or industries; economic surveys and analyses; recommendations as to specific securities; financial publications; portfolio evaluation services; financial database software and services; computerized news and pricing services; quotation equipment and other computer hardware for use in running software used in investment decision making; and other products or services that may enhance the Investment Manager's investment decision making. Research obtained by the use of "soft dollars" arising from the Partnership's portfolio transactions may be used by the Investment Manager or its affiliates in its other investment activities and may benefit the Other Accounts, and the Partnership therefore may not, in any particular instance, be the direct or indirect beneficiary of the research provided. Where a product or service obtained with soft dollars provides assistance both within the safe harbor created by Section 28(e) and outside of the safe harbor, the Partnership will make a reasonable allocation of the cost that may be paid for with soft dollars and pay the remaining portion using the General Partner's and/or Investment Manager's own hard dollars. The "safe harbor" is not available where the transactions that compensate a broker-dealer for "research" services or products are effected on a principal basis, with a markup or markdown paid to the broker-dealer (e.g., in transactions with market makers).

The Investment Manager intends generally to consider the amount and nature of services provided by brokers as well as the extent to which such services are relied on, and will attempt to allocate a portion of the brokerage business of the Partnership and any such Other Accounts and entities on the basis of such considerations. The services received from brokers, however, may be used by the General Partner and/or the Investment Manager, their affiliates and principals in servicing some or all of such Other Accounts and entities, but not all such information may be used by the General Partner and/or Investment Manager in connection with the Partnership. The General Partner and Investment Manager believe that such an allocation of brokerage business will help the Partnership to obtain research and execution capabilities and provides other benefits to the Partnership.

If, in the Investment Manager's reasonable judgment, the aggregation of sale and purchase orders of securities for the Partnership with similar orders for the Other Accounts is reasonably likely to result in administrative convenience or an overall economic benefit to the Partnership based on an evaluation that the Partnership is benefited by relatively better purchase or sale prices, lower commission expenses or beneficial timing of transactions or a combination of these and other factors, the Investment Manager may place "bunched orders" with respect to such trades. A bunched order is a group of orders for more than one client entered as one order. Bunched orders will be allocated to client accounts in a systematic non-preferential manner. If the bunched order does not fill at one price, resulting in partial fills, allocations to client accounts will be made on an average pricing basis. Average pricing amounts to adding up all the buys or sells at their particular price levels, multiplied by the number of contracts at each particular price level, and dividing by the total number of contracts to determine an average price for the whole bunched order. This is standard industry practice and the Broker's back office will facilitate the process.

The Investment Manager, as delegated by the General Partner, is authorized to determine the brokers or dealers to be used for each securities transaction for the Partnership. Custody of the Partnership's

investments will be maintained at one or more financial institutions or brokerage firms selected by the General Partner, under appropriate arrangements.

## QUALIFICATION OF INVESTORS

AN INVESTMENT IN THE PARTNERSHIP IS SUITABLE ONLY FOR INVESTORS OF SUBSTANTIAL FINANCIAL MEANS WHO HAVE NO NEED FOR IMMEDIATE AND FULL LIQUIDITY IN THIS INVESTMENT. The Partnership intends to sell Interests generally only to "eligible investors." An "eligible investor" in the Partnership must be an "accredited investor," as defined in Rule 501(a) of Regulation D under the Securities Act, who has such knowledge and experience in financial matters to evaluate the merits and risks of an investment in the Partnership.

In order to satisfy the criteria for an "*accredited investor*," in the case of individuals, an investor must have either (i) an annual income of not less than $200,000 for each of the previous two years (or a combined income with such person's spouse of not less than $300,000), and reasonably anticipate the same level of income for the current year, or (ii) a net worth in excess of $1,000,000 (excluding the value of such person's primary residence). Other types of accredited investors permitted to invest in the Partnership include (i) banks or savings and loan associations acting in an individual or fiduciary capacity, (ii) broker-dealers registered under the Securities Exchange Act of 1934, as amended, (iii) insurance companies, (iv) any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of making the investment, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) of Regulation D, and (v) a corporation, business trust or partnership not formed for the purpose of making the investment (x) which has total assets in excess of $5,000,000, or (y) in which all of the equity owners are accredited investors.

Employee benefit plans and individual retirement accounts ("*IRAs*") will qualify as accredited investors if either (i) the investment decision is made by a plan fiduciary which is a bank, savings and loan association, insurance company or investment adviser registered under the Advisers Act, (ii) the plan, including plans established by a state or its political subdivisions or any agency or instrumentality of a state or its political subdivisions for the benefit of employees, has total assets in excess of $5,000,000, or (iii) the plan is a self-directed plan with investment decisions made solely by persons who are accredited investors. Foundations, endowments and other tax-exempt investors must not be formed for the purpose of investing in the Partnership and must have total assets in excess of $5,000,000. Other types of accredited investors include (i) any investment company registered under the Investment Company Act or a business development company as defined in Section 2(a)(48) of that Act; (ii) any Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; (iii) any private business development company as defined in Section 202(a)(22) of the Advisers Act; or (iv) any entity in which all of the equity owners are accredited investors.

The Partnership reserves the right to reject subscriptions in its sole discretion. Each purchaser will be required to represent that such purchaser's overall commitment to investments which are not readily marketable is not disproportionate to such purchaser's net worth, and that such purchaser's investment in the Partnership will not cause such overall commitment to become excessive; that such purchaser can sustain a complete loss of such purchaser's investment in the Partnership and has limited need for liquidity in such purchaser's investment in the Partnership; and that such purchaser has evaluated the risks of investing in the Partnership.

Limited Partners may not be able to liquidate their investment in the event of an emergency or for any other reason because there is not now any public market for the Interests and none is expected to develop.

The Partnership will not be registered as an investment company under the Investment Company Act of 1940, in reliance on Section 3(c)(1) thereof. As a Section 3(c)(1) fund, the Partnership may offer Interests in a private placement and may have no more than 100 beneficial owners. The Interests therefore may not be resold except in a transaction registered under the Securities Act and the laws of certain states or in a transaction exempt from such registration. (See "*Restrictions on Transfer of Interests.*")

Investors who reside in certain states may be required to meet standards different from or in addition to those described above. Investors will be required to represent in writing that they meet any such standards that may be applicable to them. The General Partner may, without the consent of the existing Limited Partners, admit new Partners to the Partnership. The General Partner may reject a subscription for an Interest for any reason in its sole and absolute discretion. If a subscription is rejected, the payment remitted by the Investor will be returned without interest.

Rule 506(d) of Regulation D of the Securities Act provides for disqualification of a Rule 506 offering in the event 20 percent or more of the Partnership's interests is beneficially owned by a Limited Partner involved in a 'disqualifying event' in connection with the sale of securities, within the securities industry or with the SEC (a "*Bad Actor Event*"). A prospective investor subject to a Bad Actor Event within the previous 10 years may be denied admittance to the Partnership in the General Partner's sole discretion. An existing Limited Partner must inform the General Partner immediately upon being subject to a Bad Actor Event. The General Partner may remove such Limited Partner from the Partnership at its sole discretion. The following eight infractions, as provided under Rule 506(d)(i) – (viii), constitute Bad Actor Events:

1. Conviction, within ten years before the sale of the securities (or five years, in the case of issuers, their predecessors and affiliated issuers), of any felony or misdemeanor: in connection with the purchase or sale of any security; involving the making of any false filing with the SEC; or arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities.

2. Being subject to any order, judgment or decree of any court of competent jurisdiction, entered within five years before the sale of the securities, that, at the time of such sale, restrains or enjoins you from engaging or continuing to engage in any conduct or practice: in connection with the purchase or sale of any security; involving the making of any false filing with the SEC; or arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities.

3. Being subject to a final order of a state securities commission (or an agency or officer of a state performing like functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state performing like functions); an appropriate federal banking agency; the Commodity Futures Trading Commission; or the National Credit Union Administration that, at the time of the sale of the securities, bars you from: association with an entity regulated by such commission, authority, agency or officer; engaging in the business of securities, insurance or banking; or engaging in savings association or credit union activities; or constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten years before the sale of securities.

4. Being subject to an order of the SEC entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934 (the "*Exchange Act*") or section 203(e) or 203(f) of the Investment Advisers Act of 1940 (the "*Advisers Act*") that, at the time of the sale of the securities: suspends or revokes your registration as a broker, dealer, municipal securities dealer, municipal securities dealer or investment adviser; places limitations on the activities, functions or operations of, or imposes civil

money penalties on such person; or bars you from being associated with any entity or from participating in the offering of any penny stock.

5. Being subject to any order of the SEC, entered within five years before the sale of the securities, that, at the time of such sale, orders you to cease and desist from committing or causing a future violation of: any scienter-based anti-fraud provision of the federal securities laws, including, but not limited to, Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Section 206(1) of the Advisers Act or any other rule or regulation thereunder, or Section 5 of the Securities Act.

6. Being suspended or expelled from membership in, or suspended or barred from association with a member of, a securities self-regulatory organization (e.g., a registered national securities exchange or a registered national or affiliated securities association) for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade.

7. Having filed (as a registrant or issuer), or having been named as an underwriter in any registration statement or Regulation A offering statement filed with the SEC that, within five years before the sale of the securities, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is, at the time of the sale of the securities, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued.

8. Being subject to a United States Postal Service false representation order entered within five years before the sale of the securities, or, at the time of the sale of the securities, being subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations.

EACH PROSPECTIVE INVESTOR SHOULD CONSIDER WHETHER THE PURCHASE OF THE SECURITIES OFFERED HEREBY IS SUITABLE FOR HIM IN LIGHT OF HIS INDIVIDUAL INVESTMENT OBJECTIVES.

## FEDERAL TAX ASPECTS

The following material describes certain Federal income tax aspects of an investment in the Partnership. No consideration has been given to state and local income tax consequences. This summary provides only a general discussion and does not represent a complete analysis of all income tax consequences of an investment in the Partnership, many of which may depend on individual circumstances, such as the residence or domicile of a Limited Partner. Capitalized terms used herein and not otherwise defined will have the same meaning set forth in the Partnership Agreement.

The summary is based on the Internal Revenue Code of 1986, as amended (the "*Code*"), the regulations thereunder (the "*Regulations*") and judicial and administrative interpretations thereof, all as of the date of this Memorandum. No assurance can be given that future legislation, Regulations, administrative pronouncements and/or court decisions will not significantly change applicable law and materially affect the conclusions expressed herein. Any such change, even though made after a Limited Partner has invested in the Partnership, could be applied retroactively. Moreover, the effects of any state, local or foreign tax law, or of federal tax law other than income tax law, are not addressed in these discussions and, therefore, must be evaluated independently by each prospective investor.

No ruling has been requested from the Internal Revenue Service ("*IRS*") or any other federal, state or local agency with respect to the matters discussed below; nor has the General Partner asked its counsel to render any legal opinions regarding any of the matters discussed below. This summary does not in any way either bind the IRS or the courts or constitute an assurance that the income tax consequences discussed herein will be accepted by the IRS, any other federal, state or local agency or the courts. The Partnership is not intended and should not be expected to provide any tax shelter.

THIS SUMMARY IS INCLUDED FOR GENERAL INFORMATION ONLY. NOTHING HEREIN IS OR SHOULD BE CONSTRUED AS LEGAL OR TAX ADVICE TO ANY INVESTOR. EACH PROSPECTIVE LIMITED PARTNER IS URGED TO CONSULT SUCH LIMITED PARTNER'S PERSONAL TAX ADVISOR WITH RESPECT TO THE STATE AND FEDERAL INCOME TAX CONSEQUENCES OF HIS PARTICIPATION AS A LIMITED PARTNER IN THE PARTNERSHIP.

### Partnership Status

The Federal income tax consequences to the Partnership and its Partners will depend primarily upon the characterization of the Partnership as a partnership for Federal income tax purposes rather than as a corporation. If the Partnership were treated as a corporation for Federal income tax purposes, all items of income, gain, loss, deduction, and credit would be those of the corporation and would not be passed through to the Partners, and distributions to Partners would be treated as dividends to the extent of current and accumulated earnings and profits. The General Partner has not requested, nor does it intend to request, a private letter ruling from the IRS that for Federal income tax purposes, the Partnership will be treated as a partnership and not as an association taxable as a corporation.

Recently issued Treasury Regulations provide a default classification as a partnership for Federal tax purposes for any entity formed after 1996 as a limited partnership under state law. Such an entity may elect to be treated as a corporation for Federal tax purposes. The Partnership was formed as a Delaware limited partnership and does not intend to elect to be treated as a corporation for federal tax purposes. Accordingly, the Partnership will be classified as a partnership for federal tax purposes.

A partnership is not a taxable entity subject to Federal income tax. Accordingly, the Partnership will report its operations for each calendar year and annually will file a United States partnership return of income. Each individual Partner should report on his tax return his distributive share of the Partnership's income, loss, deductions, and credits, if any, for the taxable year of the Partnership ending within or with his taxable year. Each Limited Partner's distributive share of such items is determined in accordance with his allocable share of Net Profit and Net Loss as provided in the Partnership Agreement. As soon as reasonably practicable following the end of the taxable year of the Partnership, the Partnership will provide each Limited Partner with reports showing the items of income, gain, loss, deductions, or credits allocated to the Limited Partner for use in the preparation of the tax return. It should be noted that a Limited Partner may recognize taxable income attributable to his Interest without receiving any cash distribution with which to pay the taxes thereon.

Publicly Traded Partnership Status. Under the Code, a "publicly traded partnership" generally is treated as a corporation. A partnership is a publicly traded partnership if interests therein (1) are traded on an established securities market (as defined under the applicable Regulations ("*PTP Regulations*")) or (2) are readily tradable on a secondary market (or the substantial equivalent thereof) ("readily tradable"). The Interests will not be listed for trading on an established securities market, and the Partnership will use its best efforts to ensure that its Interests will not be readily tradable.

The PTP Regulations include a "private placement safe harbor" under which partnership interests can avoid being treated as readily tradable. The PTP Regulations provide that this safe harbor applies if (1) the partnership interests were issued in a transaction or transactions not requiring registration under the Securities Act and (2) the partnership has no more than 100 partners.

For purposes of determining the number of partners, a person owning a partnership interest through a partnership, grantor trust or S corporation (a "flow-through entity") is counted as a partner only if substantially all the value of that person's interest in the flow-through entity is attributable to the underlying partnership and a principal purpose for using a tiered structure was to satisfy the 100-partner condition. Because the offering of Interests is not required to be registered under the Securities Act, if the Partnership has no more than 100 Limited Partners (as determined in accordance with the rules regarding "flow-through" entities noted above), the Partnership will meet this "private placement safe harbor" and thus should not be treated as a publicly traded partnership for federal tax purposes. The Partnership Agreement of the Partnership restricts the total number of Limited Partners to 100 (as determined in accordance with the rules regarding "flow-through" entities). Thus, the Partnership should qualify for the "private placement safe harbor."

**Taxation of Operations**

The tax consequences to investors of the Partnership's trading activities in securities are very complex. Prospective investors should consult with tax advisers who have substantial expertise with this aspect of the tax law.

Gains and Losses from Securities Transactions. Generally, the current maximum rate of tax for individuals on capital gains from assets held more than a year and on qualifying dividends is 20% and on ordinary income and short term capital gains is 39.6%. Individuals are allowed to use capital losses to offset in full capital gains. To the extent that capital losses of an individual exceed capital gains in a taxable year, such excess capital losses are also allowed against a maximum of $3,000 of ordinary income. Any capital losses not used in a taxable year may be carried forward. The maximum federal rate of tax for corporations on ordinary income and long-term capital gains is 35%. Corporations are allowed to use capital

losses to offset in full capital gains but are not allowed to offset ordinary income. Corporations generally may carry capital losses back 3 years and forward 5 years.

The Partnership expects to deal with its securities as a trader or investor (generally, a person that buys and sells securities for its own account for purposes of investment) and not as a dealer (generally, a person that buys from and sells securities to customers with a view to the gains from those transactions). Accordingly, except as discussed below (see "*Market Discount*") and absent an election under Section 475(f) of the Code (discussed below), the Partnership generally expects that gains and losses recognized on the sale of its securities will be capital gains and losses, which will be long-term or short-term depending, in general, on the length of time it held the securities and, in some cases, the nature of the transactions. There can be no assurance that the IRS will not determine that, for tax purposes, the Partnership is a dealer (or should for other reasons be comparably treated). In the event the IRS were to prevail on this issue, transactions which would otherwise have received capital gain or loss treatment may result in ordinary income or loss being recognized by a Limited Partner.

Gains from property held for more than one year generally will be eligible for favorable tax treatment. As of the date of this memorandum, the maximum Federal income tax rate applicable to a noncorporate taxpayer's net capital gain (the excess of net long-term capital gain over net short-term capital loss) recognized on the sale or exchange of capital assets held for more than one year is either zero percent, 15%, or 20%, depending on the investor's marginal tax bracket.

Gain or loss from the disposition of securities generally is taken into account for tax purposes only when realized. Capital losses in excess of capital gains may only be deducted up to $3,000 in any year. The net excess of capital losses above $3,000 may be carried forward indefinitely to offset future capital gains. However, a taxpayer that is engaged in a trade or business as a trader in securities (defined to include, among other instruments, corporate stock, bonds and other evidences of indebtedness, certain notional principal contracts and interests and derivative financial instruments in any of the foregoing or a currency, including any option, futures contract, forward contract, short position and similar financial instrument in such a security or currency) may elect under Section 475(f) of the Code to "mark to market" the securities it holds at the end of each taxable year (that is, to recognize gain or loss with respect to those securities as if the trader sold them for their fair market value on the last business day of the year). The Partnership does not intend to make this "mark to market" election, but may do so if deemed, in the General Partner's sole discretion, to be in the best interest of the Partnership. If it were to do so, the election would apply to the year in which it is made and all subsequent taxable years and to all securities held in connection with the trader's trade or business. A mark-to-market election cannot be revoked without the consent of the IRS. Any gain or loss recognized pursuant to the election would be treated as ordinary income or loss.

Medicare Tax: Starting in the 2013 tax year, individuals, estates and trusts are subject to a Medicare tax of 3.8% on "net investment income" (or undistributed "net investment income," in the case of estates and trusts) for each such taxable year, with such tax applying to the lesser of such income or the excess of such person's adjusted gross income (with certain adjustments) over a specified amount. The amount is $250,000 for married individuals filing jointly, $125,000 for married individuals filing separately, $200,000 for other individuals and the dollar amount at which the highest income tax bracket for estates and trusts begins. Net investment income includes net income from interest, dividends, annuities, royalties and rents and net gain attributable to the disposition of investment property. It is anticipated that net income and gain attributable to an investment in the Partnership will be included in an investor's "net investment income" subject to this Medicare tax.

Constructive Sales. If the Partnership has an "appreciated financial position" – generally, an interest (including an interest through an option, futures contract, forward contract or short sale) with respect to any stock, debt instrument (other than "straight debt") or partnership interest the fair market value

of which exceeds its adjusted basis – and enters into a "constructive sale" of the position, it will be treated as having made an actual sale thereof, with the result that gain will be recognized at that time. A constructive sale generally consists of a short sale, an offsetting notional principal contract, a futures contract or a forward contract entered into by the Partnership or a related person with respect to the same or substantially identical property. In addition, if the appreciated financial position is itself such a short sale or such a contract, acquisition of the underlying property or substantially identical property will be deemed a constructive sale. In general, however, a transaction will not be considered a constructive sale if it is closed by the Partnership within 30 days after the end of the taxable year in which it was originally entered into and the Partnership holds the related appreciated financial position unhedged for 60 days after that closing (*i.e.*, at no time during that 60-day period is the Partnership's risk of loss regarding that position reduced by reason of certain specified transactions with respect to substantially identical or related property, such as having an option to sell, being contractually obligated to sell, making a short sale or granting an option to buy substantially identical stock or securities).

Stuffing. As of the close of each year the capital gains and capital losses of the Partnership shall be allocated to the Partner's Capital Account so as to minimize, to the extent possible, any disparity between the "book" Capital Account and the "tax" Capital Account, consistent with the principles set forth in section 704 of the Code. To the extent permitted by the Treasury Regulations (or successor regulations) in effect under Code Sections 704(b) and 704(c), allocations of capital gain that have been realized up to the time a Capital Account was completely withdrawn may be allocated first to each Capital Account that was completely withdrawn during the applicable Fiscal Year to the extent that the "book" Capital Account as of the Withdrawal Date exceeds the "tax" Capital Account at that time, and allocations of capital loss that have been realized up to the time a Capital Account is completely withdrawn may be allocated first to each Capital Account that was completely withdrawn during the applicable Fiscal Year to the extent that the "tax" Capital Account as of the Withdrawal Date exceeded the "book" Capital Account of such Capital Account at that time. Notwithstanding anything herein to the contrary, capital gain or capital loss recognized with respect to Securities contributed to the Partnership, if any, shall be specifically allocated to the contributing Partner in the amount and manner required by Code Section 704(c) and the regulations thereunder, and, to the extent so allocated, shall be excluded from the computation of the Partnership's capital gain or capital loss, as applicable, for the relevant fiscal year.

Short Sales and Constructive Sales Treatment. The "short-sale" rules may apply to positions held by the Partnership so that what might otherwise be characterized as long-term capital gain or short-term capital loss would be characterized as, respectively, short-term capital gain or long-term capital loss. These rules may also terminate the running of the holding period of "substantially identical property" held by the Partnership.

Under the constructive sales provisions of Section 1259 of the Code, a taxpayer may be required to currently recognize gain with respect to certain appreciated financial positions held by such taxpayer if the taxpayer (or a related person) (i) enters into a short sale of the same or substantially identical property, (ii) enters into an offsetting notional principal contract with respect to the same or substantially identical property, (iii) enters into a futures or forward contract to deliver the same or substantially identical property, or (iv) in the case of an appreciated financial position that is a short sale or a contract described in (ii) and (iii) with respect to any property, acquires the same or substantially identical property underlying such short position or contract.

Straddles. If the Partnership incurs a loss upon the disposition of any position which is part of a "straddle" (i.e., two or more offsetting positions), recognition of that loss for tax purposes will be deferred until the Partnership recognizes the gain in the offsetting position of the straddle. In general, investment positions will be treated as offsetting if there is a substantial diminution of the risk of loss from holding one position by reason of holding one or more other positions.

This rule would apply to all of the positions in a straddle which includes one or more Section 1256 contracts (discussed below) but which does not consist entirely of Section 1256 contracts (a "mixed straddle"). This rule does not apply to a straddle in which all of the positions are Section 1256 contracts. The Partnership may elect to have the Section 1256 contract components of a mixed straddle be treated as not subject to the mark-to-market rules. The Partnership can specifically identify particular positions as being components of a straddle, in which case a realized loss would be allowable only upon the liquidation of all of the components of the identified straddle. The Partnership's trading strategies may include the use of straddles, with or without making such identification.

Wash Sale Rules. "Wash sale" rules, which prevent the recognition of a loss from the sale of a security where a substantially identical security is (or has been) acquired within a prescribed time period, may apply where certain offsetting positions are entered into within the prescribed period.

Original Issue Discount. The Partnership may acquire certain debt instruments that are subject to the original issue discount ("*OID*") rules of Section 1272 of the Code. A debt instrument subject to such rules (which apply to most debt instruments) is treated as having OID if its "stated redemption price at maturity" exceeds its "issue price" by more than a *de minimis* amount. Generally, the stated redemption price of a debt instrument includes all amounts payable other than "qualified stated interest" (*i.e.*, payments that are unconditionally required to be paid at least annually at a single fixed rate over the term of the instrument). Thus, if and to the extent the Partnership acquires debt instruments bearing OID, the Partnership (and, therefore, its Limited Partners) would be required to include in ordinary income OID, based on a constant yield method, before the receipt of cash attributable to such income, regardless of the Partnership's regular method of accounting. OID accrues daily in accordance with a constant yield method based on a compounding of interest. The OID allocable to any accrual period will be equal to the product of the adjusted issue price of the debt instrument as of the beginning of such period and the yield to maturity of the debt instrument. In the case of debt instruments acquired by the Partnership at their original issue, the adjusted issue price of the debt instrument as of the beginning of any accrual period will equal its issue price to the Partnership, increased by the amount of OID previously included in the gross income of the Partnership and decreased by the amount of any payments made to the Partnership on the debt instruments. If, on the other hand, the Partnership acquires debt instruments bearing OID subsequent to their original issuance, the Partnership will also be required to include OID in income, but the inclusion thereof may vary depending on the price paid by the Partnership for such debt instruments. If the Partnership purchases a debt instrument at less than its adjusted issue price, the Partnership will have market discount in addition to the remaining OID on such debt instrument (see "*Market Discount*"). If the price paid by the Partnership exceeds such adjusted issue price but is less than the stated redemption price at maturity, the Partnership will have acquisition premium equal to such excess and may offset OID accruals by the amortization of such acquisition premium. If the price paid by the Partnership for a debt instrument exceeds its stated redemption price at maturity, the Partnership may elect to amortize such excess under rules relating to acquisition premium.

Market Discount. If the Partnership purchases, subsequent to its original issuance, a debt instrument for a price that is less than its adjusted issue price, the Partnership (and, therefore, its Limited Partners) may be subject to the rules relating to accrued market discount. Generally, any gain recognized by the Partnership upon a sale or other disposition of a debt instrument will be treated as ordinary income rather than capital gain to the extent of that portion of the market discount that accrued prior to such disposition. Market discount generally accrues on a straight-line basis over the remaining term of a debt instrument, but the holder can elect to compute accrued market discount based on the economic yield of the debt instrument. If the Partnership's purchase is debt-financed, the Partnership will not be entitled to deduct interest expense allocable to accrued market discount until it recognizes the corresponding income. However, the Partnership may elect to include the market discount in income as it accrues. If this election

is made, any gain recognized on a disposition of the debt instrument would be entirely capital gain and the rules deferring the deduction of interest expense on related loans would not apply.

Bond Premium. If the Partnership purchases a debt instrument at a premium to its issue price, the Partnership may elect to deduct a prorated portion of such amount over par every year until the debt instrument matures. However, it is not necessary to amortize premium in the year the instrument is bought. The Partnership can begin doing so in any tax year. If the Partnership elects to amortize the premium for one bond, then it must also amortize the premium for all other similar bonds, both that year and going forward. If the Partnership decides to amortize the premium from a bond, it must reduce the cost basis of the position by an equivalent amount. Alternatively, the Partnership can elect to not amortize such deduction and simply declare a capital loss when the instrument is redeemed at maturity or is sold at a loss.

## Disallowance of Certain Itemized Deductions

The Partnership will be required each year to make the determination as to whether it will take the position for Federal income tax purposes that it is (i) a trader in securities or (ii) an investor in securities. This determination will be made separately each year based primarily on the level of the Partnership's securities activities during the particular year. Accordingly, the Partnership's status as a trader or an investor may vary from year to year and is difficult to predict in advance. If the Partnership is characterized as a trader, each partner who is an individual may deduct his share of the expenses of the Partnership (other than interest expense, but including the Management Fee) under Code Section 162 as a business expense. Alternatively, if the Partnership is characterized as an investor, the expenses of the Partnership (other than interest expense, but including the Management Fee) would constitute "miscellaneous itemized deductions," and as such, would be deductible by an individual only to the extent that his share of such expenses, when combined with his other "miscellaneous itemized deductions," exceeds 2% of his adjusted gross income. Further, the amount in excess of such 2% floor would be subject to the overall limitation on itemized deductions imposed by Code Section 68. In addition, the amount in excess of such 2% floor would be considered a tax preference item in computing the alternative minimum tax for an individual taxpayer.

The Partnership may also take a more aggressive tax position than a Partner might. Should the IRS disallow any such position, Partners could be audited and required to pay back taxes, interest and perhaps penalties. Under the Code, neither interest nor any penalties incurred in such circumstances would be deductible. Further, the Code provides for centralized resolution of tax disputes where partnerships are involved. As a result, the resolution of tax disputes affecting Partners' returns may ultimately be controlled by the General Partner. Any audit activity at the Partnership level could also result in the audit of individual Partners' returns with respect to items unrelated to the Partnership's activities.

## Allocation of Income, Deductions, or Loss

The Partnership Agreement provides that Net Profits shall be allocated to the Partners, including the General Partner, according to their Allocation Percentages. For each Fiscal Year of the Partnership, Net Loss shall be allocated to the Partners in accordance with their Allocation Percentages. Section 704(b) of the Code honors allocations of profits and losses as set forth in partnership agreements provided that such allocations have "substantial economic effect." The General Partner believes that the allocations provided for by the Partnership Agreement have substantial economic effect. However, if an allocation is determined not to have "substantial economic effect," a Partner's allocable share of the item or items involved must be determined on the basis of the Partner's Interest in the Partnership after taking into account all the facts and circumstances. No assurance can be given that the IRS will not challenge the allocation of income, gain, loss, deductions or credits contained in the Partnership Agreement, or in modifications to the Partnership Agreement. If such a challenge is made, no assurance can be given that a court will uphold the allocations so made.

## Tax Elections

The Code generally provides for optional adjustments to the basis of partnership property upon distributions of partnership property to a partner and transfers of partnership interests (including by reason of death) provided that a partnership election has been made pursuant to Section 754. Under the Partnership Agreement, the General Partner, in its sole discretion, may cause the Partnership to make such an election. Any such election, once made, cannot be revoked without the IRS's consent. As a result of the complexity and added expense of the tax accounting required to implement such an election, the General Partner presently does not intend to make such election.

## Mandatory Basis Adjustments

The Partnership is generally required to adjust its tax basis in its assets in respect of all Partners in cases of partnership distributions that result in a "substantial basis reduction" (*i.e.*, in excess of $250,000) in respect of the Partnership's property. The Partnership is also required to adjust its tax basis in its assets in respect of a transferee, in the case of a sale or exchange of an interest, or a transfer upon death, when there exists a "substantial built-in loss" (*i.e.*, in excess of $250,000) in respect of the Partnership property immediately after the transfer. For this reason, the Partnership will require (i) a Partner who receives a distribution from the Partnership in connection with a complete withdrawal, (ii) a transferee of an Interest (including a transferee in case of death) and (iii) any other Partner in appropriate circumstances to provide the Partnership with information regarding its adjusted tax basis in its Interest.

## Alternative Minimum Tax

The extent, if any, to which the federal alternative minimum tax will be imposed on any Limited Partner, will depend on the Limited Partner's overall tax situation for the taxable year. Prospective investors should consult with their tax advisers regarding the alternative minimum tax consequences of an investment in the Partnership.

## General Rules Applicable to Tax-Exempt Organizations

A tax-exempt organization generally is exempt from Federal income tax on its passive investment income, such as dividends, interest, and capital gains, whether realized by the organization directly or indirectly through a partnership in which it is a partner. (Tax-exempt organizations which are private foundations currently are subject to a 2% tax on their "net investment income.")

The general exemption from tax afforded to tax-exempt organizations does not apply to their "unrelated business taxable income" (*"UBTI"*). A type of UBTI is income or gain derived directly or through a partnership from "debt-financed property", which is any income-producing property with respect to which there is "acquisition indebtedness" at any time during the taxable year. Gain from the sale or exchange of, and derived from, debt-financed property generally is taxable in the proportion in which the property is financed by "acquisition indebtedness." The Partnership Agreement envisions the Partnership will incur indebtedness (through the purchase of securities on margin and otherwise). Tax-exempt organizations which are Partners will be subject to Federal income tax on such portion of their income from the Partnership that is considered to be UBTI.

There are special considerations which should be taken into account by certain beneficiaries of charitable remainder trusts that invest in the Partnership. Charitable remainder trusts should consult their own tax advisers concerning the tax consequences of such an investment on their beneficiaries. In particular, a charitable remainder trust will not be exempt from federal income tax under Code Section

664(c) for any year in which it has UBTI. Moreover, the charitable contribution deduction for a trust under Code Section 642(c) may be limited for any year in which the trust has UBTI.

## Option Transactions - Tax Consequences to Tax-Exempt Organizations

Code Section 512(b) excludes from UBTI (i) all gains or losses from the sale, exchange, or other disposition of capital assets, and (ii) all gains on the lapse or termination of options, written by a tax-exempt organization in connection with its investment activities, to buy or sell securities. The latter exclusion applies whether or not the organization owns the securities upon which the option is written, that is, whether or not the option is "covered."

Options written on a securities index are technically not options to buy or sell the underlying securities; however, the gain realized upon the exercise, lapse, or termination of securities index options is treated as gain derived from the sale of a capital asset under Sections 1234 or 1256 of the Code. Accordingly, pursuant to Section 512(b)(4) of the Code, such gain should not constitute UBTI.

The exclusion of option writing income from UBTI does not, by its terms, prevent the IRS from attempting to tax the option writing income as "debt-financed income," which, as noted above, is a type of UBTI. Section 512(b)(4) of the Code, in effect, provides that, notwithstanding the general exclusion of certain types of income such as interest, dividends, and capital gain from UBTI, if such income is "debt-financed," it is taxable as a type of UBTI. However, since no borrowing or "acquisition indebtedness" is incurred by the writer of an option, option writing income of the Partnership should not be taxable as debt-financed income. Nevertheless, a prospective Limited Partner subject to the rules of UBTI should consult its tax adviser concerning the foregoing matters.

## Passive Activity Losses

The Code restricts the deductibility of losses from a "passive activity" against certain income which is not derived from a passive activity. This restriction applies to individuals, estates or trusts, personal service corporations and certain closely-held corporations. Pursuant to Temp. Treas. Reg. §1.469-1T(e)(6)(i), however, the activity of trading personal property for the account of owners of interests in the activity is not a passive activity. Moreover, an example issued pursuant to such regulation expressly provides a partnership is not engaged in a passive activity if its activities consist of trading stocks, bonds, and other securities where the capital employed by the partnership consists of amounts contributed by the partners in exchange for their partnership interests and funds borrowed by the partnership. Therefore, to the extent the Partnership limits its activities to trading stocks, bonds, and other securities, the income or loss allocated to a Limited Partner will not constitute passive income or passive loss. Consequently, any income allocated to a Limited Partner will be portfolio income which cannot be used to shelter passive losses from a Limited Partner's other investments.

## Distributions

A distribution by a partnership to a partner generally is not taxable to the partner except to the extent the distribution consists of cash (and, in certain circumstances, marketable securities) and exceeds the partner's adjusted basis of its interest in the partnership immediately before the distribution. A partner who receives a distribution of property other than cash may recognize gain if such partner contributed appreciated property (other than the property being distributed) to the partnership within seven years before the distribution. In addition, a partner who has contributed appreciated property to a partnership may recognize gain if such property is distributed to another partner within seven years after the property was contributed. Ordinarily, any such excess will be treated as gain from a sale or exchange of the partner's interest. However, the Partnership does not generally intend to make distributions to its Limited Partners.

### Sale of Interest

A Limited Partner receiving a cash liquidating distribution from the Partnership, in connection with a complete withdrawal from the Partnership generally will recognize capital gain or loss to the extent of the difference between the proceeds received by such Limited Partner and such Limited Partner's adjusted tax basis in its Interest. Such capital gain or loss will be short-term or long-term depending upon the Limited Partner's holding period for its interest in the Partnership. However, a withdrawing Limited Partner will recognize ordinary income to the extent such Limited Partner's allocable share of the Partnership's "unrealized receivables" exceeds the Limited Partner's basis in such unrealized receivables, as determined pursuant to the Regulations. For these purposes, accrued but untaxed market discount, if any, on securities held by the Partnership will be treated as an unrealized receivable with respect to the withdrawing Limited Partner.

As discussed above, the Partnership Agreement provides that the General Partner may specially allocate items of Partnership capital gain or loss, including short-term capital gain or loss, to a withdrawing Limited Partner to the extent its liquidating distribution would otherwise exceed its adjusted tax basis in its Interest. Such a special allocation may result in the withdrawing Partner recognizing capital gain or loss, which may include short-term gain or loss, in the Partner's last taxable year in the Partnership, thereby reducing the amount of long-term capital gain or capital loss recognized during the tax year in which it receives its liquidating distribution upon withdrawal.

Except as provided below, distributions of property other than cash, whether in complete or partial liquidation of a Limited Partner's interest in the Partnership, generally will not result in the recognition of taxable income or loss to the Limited Partner, except to the extent such distribution is treated as made in exchange for such Limited Partner's share of the Partnership's unrealized receivables. Gain generally must be recognized where the distribution consists of marketable securities unless the distributing partnership is an "investment partnership" and the recipient is an "eligible partner" as defined in Code Section 731(c). While there can be no assurance, it is anticipated that the Partnership will qualify as an "investment partnership." Thus, if a Limited Partner is an "eligible partner," which term should include a Limited Partner whose sole contributions to the Partnership consisted of cash, the non-recognition rule described above should apply.

### Audit of Tax Returns

The IRS is applying greater scrutiny to a proper application of the tax laws to partnerships. An audit of the Partnership's information returns may precipitate an audit of the income tax returns of the Limited Partners. Any expense involved in an audit of a Limited Partner's return must be borne by the Limited Partner. If the IRS successfully asserts an adjustment of any item of income, gain, loss, deduction, or credit reported on a Partnership information return, corresponding adjustments will be made to the income tax returns of the Limited Partners. Further, any audit might result in the IRS making adjustments to items of non-Partnership income or loss. If a tax deficiency is determined, the taxpayer is liable for interest on the deficiency from the due date of the return and possible penalties.

In general, the tax treatment of items of partnership income, gain, loss, deduction, or credit is to be determined at the partnership level in a unified partnership proceeding, rather than in separate proceedings with the partners. Generally, the "tax matters partner" ("***TMP***") would represent the Partnership before the IRS and may enter into a settlement with the IRS as to the partnership tax issues, which generally will be binding on all the partners. Similarly, only one judicial proceeding contesting an IRS determination may be filed on behalf of a partnership and all partners. The TMP may consent to an extension of the statute of

limitations for all partners with respect to partnership items. The Partnership has designated the General Partner as the TMP.

## Tax Shelter Disclosure

Certain rules require taxpayers to disclose -- on their Federal income tax returns and, under certain circumstances, separately to the Office of Tax Shelter Analysis -- their participation in "reportable transactions" and require "material advisors" to maintain investor lists with respect thereto. These rules apply to a broad range of transactions, including transactions that would not ordinarily be viewed as tax shelters, and to indirect participation in a reportable transaction (such as through a partnership). For example, a Limited Partner that is an individual will be required to disclose a tax loss resulting from the sale or exchange of his Interest under Code Section 741 if the loss exceeds $2 million in any single taxable year or $4 million in the taxable year in which the transaction is entered into and the five succeeding taxable years -- those thresholds are $10 and $20 million, respectively, for Limited Partners that are C corporations and $50,000 in any single taxable year for individuals and trusts, either directly or through a pass-through entity, such as the Partnership, from foreign currency transactions. Losses are adjusted for any insurance or other compensation received but determined without taking into account offsetting gains or other income or limitations on deductibility. Prospective investors are urged to consult with their own tax advisers with respect to the regulations' effect on an investment in the Partnership.

## Non-U.S. Investors

The discussion in this section is limited to the U.S. federal income tax consequences applicable to an investor that is not a U.S. person (for U.S. federal income tax purposes) and who, in addition, is neither (i) an individual present in the United States for 183 days or more in a taxable year nor (ii) an expatriate or former long-term resident of the United States (a "*Non-U.S. Investor*"). A person is generally not a U.S. person for U.S. federal income tax purposes so long as such person is not a citizen or resident of the United States; not a corporation or other entity created or organized in the United States or under the laws of the United States or any political subdivision thereof; not an estate, the income of which is subject to U.S. federal income taxation regardless of its source; and not a trust which (a) is subject to the primary supervision of a court within the United States with one or more United States persons having the authority to control all substantial decisions of the trust or (b) has a valid election in effect under applicable U.S. Treasury regulations to be treated as a United States person. This discussion does not deal with all tax considerations that may be relevant to specific investors in light of their particular circumstances, and does not address the tax consequences of persons who are not Non-U.S. Investors or of persons investing in the Partnership through a partnership or other pass-through entity for U.S. federal income tax purposes, or (with certain exceptions) the application of state, local or U.S. federal estate taxes to an investment in the Partnership.

### U.S. Foreign Account Tax Compliance Act

The U.S. Foreign Account Tax Compliance Act ("*FATCA*") imposes a 30% withholding tax on U.S. persons holding offshore accounts on certain "withholdable payments" to "foreign financial institutions" which do not provide information about their U.S. accounts to the IRS. A "withholdable payment" is generally any U.S. source income, such as interest, dividends, rents, royalties and other fixed or determinable income ("*FDAP*").

A non-U.S. Limited Partner will generally be required to provide the Partnership information which identifies its direct and indirect U.S. ownership. Any such information provided to the Partnership will be shared with the IRS. A non-U.S. Limited Partner that is a "foreign financial institution" within the meaning of Section 1471(d)(4) of the Code will generally be required to enter into an agreement with the IRS by

June 30, 2013 identifying certain direct and indirect U.S. account holders or equity holders. A non-U.S. Limited Partner who fails to provide such information to the Partnership or enter into such an agreement with the IRS, as applicable, would be subject to the 30% withholding tax with respect to its share of any such payments attributable to actual and deemed U.S. investments of the Partnership and the General Partner may take any action in relation to a Limited Partner's interests or redemption proceeds to ensure that such withholding is economically borne by the relevant Limited Partner whose failure to provide the necessary information gave rise to the withholding. Limited Partners should consult their own tax advisors regarding the possible implications of this legislation on their investments in the Partnership.

**Effectively Connected Income**

The Federal income tax treatment of a Non-U.S. Investor in the Partnership will depend on whether that investor is found, for Federal income tax purposes, to be effectively connected with the conduct of a trade or business in the United States as a result of its investment in the Partnership. Generally, a Limited Partner would be deemed to be engaged in a trade or business in the United States, and would be required to file a U.S. tax return (and possibly one or more state or local returns) if the Partnership is so engaged.

As long as the Partnership's principal activity is investing and/or trading in stocks, securities and commodities for its own account and is not a dealer in such items, a "safe harbor" would apply that would exempt Non-U.S. Investors owning interests in the Partnership from being treated as engaged in a United States trade or business as a result of the Partnership's stocks, securities and commodities trading activity, even if such activity otherwise constitutes a U.S. trade or business, provided that such Non-U.S. Investors are not dealers in stocks, securities or commodities. Accordingly, such Non-U.S. investors owning interests in the Partnership should be eligible for the safe harbor and would be exempt from Federal net taxation on the Partnership activities that fall within the safe harbor (other than for gains on certain securities reflecting interests in United States real property). However, withholding taxes, if any, would be imposed on a Non-U.S. investor's share of the Partnership's U.S. source gross income from dividends and certain interest income arising from safe harbor activities, and certain other income, unless an exception were applicable to reduce or eliminate such withholding. In addition, non-U.S. investors may be subject to withholding taxes on fixed, determinable annual or periodical income ("*FDAP Income*").

To the extent the Partnership engages in a United States trade or business, income and gain effectively connected with the conduct of that trade or business allocated to a Non-U.S. Investor would subject such person to Federal income tax on that income on a net basis at the same rates that are generally applicable to that particular type of investor which is a U.S. person. The Partnership is required to withhold U.S. income tax with respect to each Non-U.S. Investor's share of the Partnership's effectively connected income. The amount withheld is reportable as a tax credit on the U.S. income tax return that such Non-U.S. Investor is required to file. Moreover, effectively connected earnings from the Partnership which are allocated to a Non-U.S. Investor and are not reinvested in a United States trade or business may be subject to a "branch profits tax."

**State and Local Taxation**

In addition to the Federal income tax considerations summarized above, prospective investors should consider potential state and local tax consequences of an investment in Interests. A Limited Partner's distributive share of the Partnership's taxable income or loss generally will be required to be included in determining the Limited Partner's taxable income for state and local tax purposes in the jurisdiction in which it is resident. However, state and local laws may differ from the Federal income tax law with respect to the treatment of specific items of income, gain, loss, and deduction.

# ERISA CONSIDERATIONS

THE FOLLOWING SUMMARY OF CERTAIN ASPECTS OF ERISA IS BASED UPON ERISA, JUDICIAL DECISIONS, DEPARTMENT OF LABOR REGULATIONS AND RULINGS IN EXISTENCE ON THE DATE HEREOF. THIS SUMMARY IS GENERAL IN NATURE AND DOES NOT ADDRESS EVERY ERISA ISSUE THAT MAY BE APPLICABLE TO THE PARTNERSHIP OR A PARTICULAR INVESTOR. ACCORDINGLY, EACH PROSPECTIVE INVESTOR SHOULD CONSULT WITH ITS OWN COUNSEL IN ORDER TO UNDERSTAND THE ERISA ISSUES AFFECTING THE PARTNERSHIP AND THE INVESTOR.

## General

Persons who are fiduciaries with respect to a U.S. employee benefit plan or trust within the meaning of and subject to the provisions of ERISA (an "***ERISA Plan***"), an IRA or a Keogh plan subject solely to the provisions of the Code[1] (an "***Individual Retirement Fund***") should consider, among other things, the matters described below before determining whether to invest in the Partnership. ERISA imposes certain general and specific responsibilities on persons who are fiduciaries with respect to an ERISA Plan, including prudence, diversification, avoidance of prohibited transactions and compliance with other standards. In determining whether a particular investment is appropriate for an ERISA Plan, U.S. Department of Labor ("***DOL***") regulations provide that a fiduciary of an ERISA Plan must give appropriate consideration to, among other things, the role that the investment plays in the ERISA Plan's portfolio, taking into consideration whether the investment is designed reasonably to further the ERISA Plan's purposes, the risk and return factors of the potential investment, the portfolio's composition with regard to diversification, the liquidity and current return of the total portfolio relative to the anticipated cash flow needs of the ERISA Plan, the projected return of the total portfolio relative to the ERISA Plan's funding objectives, and the limitation on the rights of Limited Partners to withdraw all or any part of their Interests or to transfer their Interests. Before investing the assets of an ERISA Plan in the Partnership, a fiduciary should determine whether such an investment is consistent with its fiduciary responsibilities and the foregoing regulations. For example, a fiduciary should consider whether an investment in the Partnership may be too illiquid or too speculative for a particular ERISA Plan and whether the assets of the ERISA Plan would be sufficiently diversified. If a fiduciary with respect to any such ERISA Plan breaches its responsibilities with regard to selecting an investment or an investment course of action for such ERISA Plan, the fiduciary may be held personally liable for losses incurred by the ERISA Plan as a result of such breach.

## Plan Assets Defined

ERISA and applicable DOL regulations describe when the underlying assets of an entity in which benefit plan investors ("***Benefit Plan Investors***") invest are treated as "plan assets" for purposes of ERISA. Under ERISA, the term Benefit Plan Investors is defined to include an "employee benefit plan" that is subject to the provisions of Title I of ERISA, a "plan" that is subject to the prohibited transaction provisions of Section 4975 of the Code, and entities the assets of which are treated as "plan assets" by reason of investment therein by Benefit Plan Investors. Under ERISA, as a general rule, when an ERISA Plan invests assets in another entity, the ERISA Plan's assets include its investment, but do not, solely by reason of such investment, include any of the underlying assets of the entity. However, when an ERISA Plan acquires an

---

[1] References hereinafter made to ERISA include parallel references to the Code.

"equity interest" in an entity that is neither: (a) a "publicly offered security"; nor (b) a security issued by an investment fund registered under the Investment Company Act, then the ERISA Plan's assets include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless it is established that: (i) the entity is an "operating company"; or (ii) the equity participation in the entity by Benefit Plan Investors is limited.  Under ERISA, the assets of an entity will not be treated as "plan assets" if Benefit Plan Investors hold less than 25% (or such higher percentage as may be specified in regulations promulgated by the DOL) of the value of each class of equity interests in the entity. Equity interests held by a person with discretionary authority or control with respect to the assets of the entity and equity interests held by a person who provides investment advice for a fee (direct or indirect) with respect to such assets or any affiliate of any such person (other than a Benefit Plan Investor) are not considered for purposes of determining whether the assets of an entity will be treated as "plan assets" for purposes of ERISA. The Benefit Plan Investor percentage of ownership test applies at the time of an acquisition by any person of the equity interests. In addition, an advisory opinion of the DOL takes the position that a redemption of an equity interest by an investor constitutes the acquisition of an equity interest by the remaining investors (through an increase in their percentage ownership of the remaining equity interests), thus triggering an application of the Benefit Plan Investor percentage of ownership test at the time of the redemption.

## Limitation on Investments by Benefit Plan Investors

It is the current intent of the General Partner to monitor the investments in the Partnership to ensure that the aggregate investment by Benefit Plan Investors does not equal or exceed 25% of the value of any class of the Interests in the Partnership (or such higher percentage as may be specified in regulations promulgated by the DOL) so that assets of the Partnership will not be treated as "plan assets" under ERISA. Interests held by the General Partner and its affiliates are not considered for purposes of determining whether the assets of the Partnership will be treated as "plan assets" for the purpose of ERISA. If the assets of the Partnership were treated as "plan assets" of a Benefit Plan Investor, the General Partner would be a "fiduciary" (as defined in ERISA and the Code) with respect to each such Benefit Plan Investor, and would be subject to the obligations and liabilities imposed on fiduciaries by ERISA. In such circumstances, the Partnership would be subject to various other requirements of ERISA and the Code. In particular, the Partnership would be subject to rules restricting transactions with "parties in interest" and prohibiting transactions involving conflicts of interest on the part of fiduciaries which might result in a violation of ERISA and the Code unless the Partnership obtained appropriate exemptions from the DOL allowing the Partnership to conduct its operations as described herein. The Partnership reserves the right to require the withdrawal of all or part of the Interest held by any Limited Partner, including, without limitation, to ensure compliance with the percentage limitation on investment in the Partnership by Benefit Plan Investors as set forth above.

## Representations by Plans

An ERISA Plan proposing to invest in the Partnership will be required to represent that it is, and any fiduciaries responsible for the ERISA Plan's investments are, aware of and understand the Partnership's investment objectives, policies and strategies, and that the decision to invest plan assets in the Partnership was made with appropriate consideration of relevant investment factors with regard to the ERISA Plan and is consistent with the duties and responsibilities imposed upon fiduciaries with regard to their investment decisions under ERISA. WHETHER OR NOT THE ASSETS OF THE PARTNERSHIP ARE TREATED AS "PLAN ASSETS" UNDER ERISA, AN INVESTMENT IN THE PARTNERSHIP BY AN ERISA PLAN IS SUBJECT TO ERISA. ACCORDINGLY, FIDUCIARIES OF ERISA PLANS SHOULD CONSULT WITH THEIR OWN COUNSEL AS TO THE CONSEQUENCES UNDER ERISA OF AN INVESTMENT IN THE PARTNERSHIP.

## ERISA Plans and Individual Retirement Funds Having Prior Relationships with the

**General Partner or its Affiliates**

Certain prospective ERISA Plan and Individual Retirement Fund investors may currently maintain relationships with the General Partner or other entities that are affiliated with the General Partner. Each of such entities may be deemed to be a party in interest to and/or a fiduciary of any ERISA Plan or Individual Retirement Fund to which any of the General Partner or its affiliates provides investment management, investment advisory or other services. ERISA prohibits ERISA Plan assets to be used for the benefit of a party in interest and also prohibits an ERISA Plan fiduciary from using its position to cause the ERISA Plan to make an investment from which it or certain third parties in which such fiduciary has an interest would receive a fee or other consideration. Similar provisions are imposed by the Code with respect to Individual Retirement Funds. ERISA Plan and Individual Retirement Fund investors should consult with counsel to determine if participation in the Partnership is a transaction that is prohibited by ERISA or the Code.   The provisions of ERISA are subject to extensive and continuing administrative and judicial interpretation and review. The discussion of ERISA contained herein is, of necessity, general and may be affected by future publication of regulations and rulings. Potential investors should consult with their legal advisors regarding the consequences under ERISA of the acquisition and ownership of Interests.

## RESTRICTIONS ON TRANSFER OF INTERESTS

The Interests offered hereby have not been registered under the Securities Act, in reliance upon the exemptions provided by the Securities Act and Regulation D thereunder, nor have the Interests been registered under the securities laws of any state in which they will be offered in reliance upon applicable exemptions in such states.   Therefore, the Interests cannot be reoffered or resold unless they are subsequently registered under the Securities Act and any other applicable state securities laws or an exemption from registration is available under the Securities Act or such other laws.  Pursuant to the terms of the Subscription Agreement, Limited Partners shall agree to pledge, transfer, convey or otherwise dispose of their Interests only in a transaction that is the subject of (i) an effective registration under the Securities Act and any applicable state securities laws or (ii) an opinion of counsel satisfactory to the Partnership to the effect that the registration of such transaction is not required.  Accordingly, prospective investors in the Partnership must be willing to bear the economic risk of an investment in the Partnership for the period of time stipulated in the withdrawal provisions of the Partnership Agreement.

## ADDITIONAL INFORMATION

Prospective investors should understand that the discussions and summaries of documents in this Memorandum are not intended to be complete.  Such discussions and summaries are subject to and are qualified in their entirety by reference to such documents.  The Partnership will deliver to any prospective investor, upon request, a copy of any and all such documents.  The General Partner will afford prospective investors and their purchaser representatives the opportunity to ask questions and receive answers concerning the terms and conditions of the Offering and to obtain any additional information which the Partnership possesses or can acquire without unreasonable effort or expense.

## PRIVACY NOTICE

### Willow Creek Investments LP

Current regulations require financial institutions (including investment funds) to provide their investors with an initial and annual privacy notice describing the institution's policies regarding the sharing of information about their investors. In connection with this requirement, we are providing this Privacy Notice to each of our investors.

We do not disclose nonpublic personal information about our investors or former investors to third parties other than as described below.

We collect information about you (such as name, address, social security number, assets and income) from our discussions with you, from documents that you may deliver to us (such as subscription documents) and in the course of providing services to you. In order to service your account and effect your transactions, we may provide your personal information to our affiliates and to firms that assist us in servicing your account and have a need for such information, such as the advisor, fund administrator, accountants or auditors. We do not otherwise provide information about you to outside firms, organizations or individuals except as required by law. Any party that receives this information will use it only for the services required and as allowed by applicable law or regulation, and is not permitted to share or use this information for any other purpose.

Willow Creek GP LLC
The General Partner of Willow Creek Investments LP
1 Liberty Plaza, Suite 2310
New York, NY 10006
