# Exhibit 8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COLONY HILLS CAPITAL, LLC, | Case No. 1:18-cv-00593 |
| Plaintiff, | |
| vs. | **COMPLAINT and JURY DEMAND** |
| WILLOW CREEK ADVISORS, LLC; NICHOLAS GENOVESE; WILLOW CREEK INVESTMENTS, LP; and WILLOW CREEK GP, CORP., | |
| Defendants. | |

Plaintiff Colony Hills Capital ("CHC"), as and for its complaint against Defendants Nicholas Genovese ("Genovese"), Willow Creek Advisors, LLC ("Willow Creek Advisors"), Willow Creek Investments, LP ("Willow Creek Investments"), Willow Creek GP, Corp. ("Willow Creek GP") (collectively, "Willow Creek"), alleges as follows:

### INTRODUCTION

1.      For more than two full years, CHC was fraudulently induced to expend more than $2.5 million and forego numerous profitable business and investment opportunities based on Genovese's misrepresentations and false promises, including his promise to have CHC manage $2 billion from his family's supposed fortune and, in turn, earn hundreds of millions of dollars in fees and other returns.

2.      As CHC would later learn, however, that promise was nothing more than a ploy to convince CHC to invest millions of dollars of *its* monies into *Willow Creek's* fund, and none of Genovese's representations upon which CHC reasonably relied – in assembling a team of real

estate professionals, upgrading and expanding its infrastructure, traveling the country to identify

and vet investment properties collectively valued at more than $3.5 billion, conducting due

diligence, negotiating deal terms, and essentially devoting all its resources and energies to

Willow Creek instead of pursuing other real and lucrative ventures – were the least bit true.

Despite his representations to the contrary:

- Genovese had no relationship to the founders of the famous Genovese Drug Store empire, and no claim to or control over their wealth;

- Genovese never obtained a degree from the University of Kentucky or Dartmouth University;

- Genovese was never a partner at Goldman Sachs or licensed to serve in any capacity in the financial sector;

- Genovese never had the ability or intention to have CHC manage *any* money; and

- in fact, Genovese had an extensive criminal history, including multiple convictions and custodial sentences for crimes of fraud and deceit.

3. The purposes of this action are to recover damages, hold Genovese and his

entities accountable for the devastating harm they have caused CHC, and prevent others from

also falling prey to their ongoing scheme.

## JURISDICTION and VENUE

4. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §

1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of

interest and costs, and is between citizens of different states.

5.      Venue in this District is proper under 28 U.S.C. § 1391(b)(1) & (2) as all entity defendants maintain their principal places of business, Genovese resides, and a substantial part of the events giving rise to the causes of action occurred, in the State of New York and, more particularly, in the Borough of Manhattan.

## PARTIES

6.      CHC is a limited liability company formed under the laws of the State of Delaware with its principal place of business located at 2040 Boston Road, Suite 20, Wilbraham, Massachusetts.  The members of CHC are citizens of Massachusetts, Ohio, Florida and New Hampshire.

7.      Willow Creek Investment is a limited partnership formed under the laws of the State of Delaware with its principal place of business located at 1 Liberty Plaza, 23rd Floor, New York, New York.  At all times relevant hereto, Willow Creek Investment operated a private investment partnership.

8.      Willow Creek GP is a corporation formed under the laws of the State of Delaware with its principal place of business located at 1 Liberty Plaza, 23rd Floor, New York, New York. Willow Creek GP is the general partner of Willow Creek Investment.  Willow Creek Investment and Willow Creek GP may be collectively referred to herein as the "Willow Creek Fund."

9.      Willow Creek Advisors is a limited liability company formed under the laws of the State of Delaware with its principal place of business located at 1 Liberty Plaza, 23rd Floor, New York, New York.  Among other things, Willow Creek Advisors managed the Willow Creek Fund.  Willow Creek Investment, Willow Creek GP and Willow Creek Advisors shall be collectively referred to herein as the "Willow Creek Defendants."

10.     Upon information and belief, Genovese is a resident of the State of New York.  At all times relevant hereto, Genovese was the sole principal and Managing Director of Willow Creek Advisors and owner of the other Willow Creek Defendants.

## OTHERS INVOLVED IN THE SCHEME

11.     At all times relevant hereto, Aimee L. Richter, Esq. ("Richter"), was an attorney-at-law licensed to practice in the State of New York with a principal place of business located at 156 Fifth Avenue, Suite 303, New York, New York.

12.     All at times relevant hereto, Salvatore Scibetta, Esq. ("Scibetta," together with Richter, the "Genovese Attorneys"), was an attorney-at-law licensed to practice in the State of New York with a principal place of business located at 156 Fifth Avenue, Suite 303, New York, New York.

## ALLEGATIONS OF FACT COMMON TO ALL COUNTS

**A.      Genovese Lies about his Education, Family's Wealth, and Professional Success to Induce CHC to Expend Substantial Resources and Forego Other Lucrative Business Opportunities in Preparation of Managing a $2 Billion Allocation.**

13.     In January 2014, CHC was introduced to Genovese, who claimed he was the grandson of Joseph Genovese, Sr., the founder of the famous Genovese Drug Store chain, and an heir to tens of billions of dollars from the sale of that company in the late 1990s (the "Genovese Fortune").

14.     Genovese boasted of his massive wealth and his own professional success. Among other things, he bragged to CHC about how, after attending college at the University of Kentucky and obtaining his M.B.A. from Dartmouth University, he made it "big" on Wall Street.

15.     Specifically, Genovese claimed that he managed the Genovese Fortune while at Goldman Sachs and Bear Stearns before starting his own investment advisory firm, Willow

Creek, where he continued to manage the Genovese Fortune, as well as substantial assets of other considerably wealthy clients. He also claimed that, while he was grateful to be a billionaire due to his ancestors' success, he was prouder to have earned "millions of his own money by successfully investing $30 million" provided to him by his family and then building Willow Creek into a successful investment advisory firm that he claimed managed over $32 billion.

16.     Genovese's claims of wealth and success were echoed in Willow Creek's marketing materials. For instance, they, too, proclaimed that Genovese attended Dartmouth University and had been a "Partner at Goldman Sachs" and "Portfolio Manager" at Bear Stearns.

17.     They also stated that Willow Creek managed substantial assets of "corporations, endowments, foundations, pension plans, private wealth, and sub-advisory relationships" through JPMorgan.

18.     After laying a foundation of lies concerning, among many other matters, his billionaire status, beneficiary relationship to the founders of the Genovese Drug Store empire, and professional success in finance, Genovese then touted to CHC that he and Willow Creek were the primary managers of the Genovese Fortune. In fact, he claimed that, after his father's death, he was given supermajority decision-making authority on behalf of the family, which, in turn, gave him complete control over the entire Genovese Fortune.

19.     Once confident that CHC had accepted these representations as truth, Genovese informed CHC that he and Willow Creek were searching for outside managers for the Genovese Fortune. Specifically, he advised CHC that at least $11.5 billion of the Genovese Fortune was liquid and he needed managers to assist in investing such funds in real estate.

20.     To this end, Genovese solicited CHC in early November 2015 to submit a proposal to Willow Creek with terms under which CHC would manage at least $2 billion of the

Genovese Fortune by investing in multi-family and other real estate projects that also would be managed by CHC. As Genovese put it, CHC was being seriously considered to serve as an outside manager for a "Capital Asset Allocation Plan" (the "CAAP") for "funds [that] come entirely from our family's assets."

## B. The Genovese Attorneys Play an Integral Role in Maintaining an Air of Legitimacy and Perpetuating the Lies.

21.     From the outset, Genovese introduced the Genovese Attorneys to CHC as Willow Creek's "outside general counsel." Yet, they, knowingly or not, were instrumental in covering up and advancing the Willow Creek Defendants' fraudulent scheme. Among other things:

(a)     The Genovese Attorneys performed functions that were far and oddly afield of the traditional role fulfilled by a "general counsel," including managing Genovese's personal calendar and serving as the go-between for virtually all (legal and non-legal) communications to buffer CHC from the truth.

(b)     The Genovese Attorneys purportedly undertook tasks that, as CHC would later learn, were well beyond their respective areas of expertise and experience for the sole purpose of creating the appearance of progress. Specifically, Scibetta, who publicly touts himself as a seasoned personal injury attorney, and Richter, who proclaims to devote her practice exclusively to family law, purported to review dense and complex deal documents, and vet incredibly complicated investment strategies in a specialized sector of the real estate market. And none of those tasks were meaningfully fulfilled.

(c)     The Genovese Attorneys served as scapegoats for constant delays and inaction.

(d)     The Genovese Attorneys maintained the purported legitimacy of Willow Creek, and the purported success and wealth of Genovese, through constant references to the Willow Creek Defendants' meteoric growth and glowing track record, the overwhelming satisfaction of

6

the Willow Creek Defendants' "other" investors and business partners, and the time they spent with Genovese attending polo matches and other lavish events.

**C.     CHC Exhausts Itself Developing Complex Investment Strategies, Identifying Large-Scale and Advantageous Real Estate Portfolios, and Otherwise Gearing Up for its Participation in the CAAP.**

22.     From November 2015 to July 2016, as part of its effort to be selected for the CAAP, CHC devoted substantial resources and incurred substantial expenses to present numerous proposals, analyses, investment options, and pro formas to Willow Creek.

23.     CHC was extremely candid with Genovese and Willow Creek about its capacity. Although skilled and successful, CHC was relatively modest in size.  As such, the prospect of managing more than $2 billion of the Genovese Fortune was not only an extraordinary opportunity for CHC, which, at the time, managed less than $200 million of real estate and other assets, but one, as Genovese was made aware, that would require (i) a dramatic and costly expansion of its staffing and infrastructure (the "CHC Build-Out"), and (ii) force CHC to forego other business opportunities and devote virtually all of its capital and its existing and new resources to the Willow Creek project.

24.     Notwithstanding these limitations, in reliance on Willow Creek's promises and representations, CHC wasted no time or effort demonstrating its commitment to the investment and management of the promised allocation.  CHC immediately abandoned its pursuit of other new deals, re-purposed pending deals to the CAAP, and worked tirelessly to develop a detailed, long-term strategy for the allocation.

25.     Within weeks of Genovese's solicitation, CHC provided Willow Creek with a "proposal to deploy $1 Billion into the 'multi-family' real estate market" (the "November 25, 2015 Proposal").  Therein, CHC thoroughly explained the economic benefits of purchasing

larger portfolios and the implementation of a "long-term hold utilizing very conservative leverage and applying opportunistic exits," went into detail about key terms, and not only suggested re-directing to Willow Creek a $28 million portfolio that CHC was already under contract to purchase, but also researched and identified two far more substantial portfolios – valued at $850 million and $900 million – that were also financially-promising options.

26.     Among the key terms in the November 25, 2015 Proposal, CHC was to earn (i) a management fee of one-and-a-half percent (1.5%) upon the allocation of the first $600 million and two percent (2%) upon and after the allocation of first $1 billion (the "Management Fee"), and (ii) a twenty-five percent (25%) "promote" or commission on the subsequent sale of any properties obtained as part of the allocation (the "Promotional Fee," or together with the Management Fee, the "Terms").

27.     In or about late December 2015, CHC provided the Willow Creek Defendants with a detailed explanation of the rationale behind the strategy of investing directly in real estate rather than through REITs.

28.     In early 2016, CHC contacted, met with, and/or vetted countless real estate professionals to assist in reviewing and researching certain investment opportunities for the benefit of the Willow Creek Defendants.

29.     By letter dated June 1, 2016, CHC reiterated its commitment and dedication to the venture, urging that Genovese would "not find a more sincere, capable, [or] trustworthy business partner and advisor," and reminding Genovese of the substantial "legwork" that it had already performed in anticipation of Genovese's entry into the real estate market, including (i) the drafting of an operating agreement that made Genovese the super majority member, (ii) detailing and distinguishing different approaches to funding (e.g., REIT, FUNDS, DIRECT), (iii) building

an inventory of deals sufficient to deploy the capital that Genovese had purportedly intended to invest within the first year, and (iv) presenting a fee structure, which, although CHC would be performing all the substantive work in managing the allocation and the portfolios acquired, provided for Willow Creek receiving a greater share of the return.

30.     At or about the same time, CHC had its attorneys prepare a Master Separate Account Agreement pursuant to which Willow Creek would entrust CHC with every conceivable aspect of the investment strategy, including: (i) "manag[ing] the Account in its sole and absolute discretion"; (ii) "providing investment advice and recommendations"; (iii) "enter[ing] into and/or execut[ing]" "offers to purchase or for the sale of Investments, purchase and sale agreements related to the acquisition and disposition of Investments, agreements for leverage in relation to Investments (including loan agreements secured by Investments, mortgages, pledges, and liens of all kinds and types) and lease or sub-leases for Investments as lessee or lessor"; (iv) "enter[ing] into and/or execut[ing] trust instruments, agreements of limited partnership and limited liability company agreements, subscription agreements, investor questionnaires . . . "; (v) "caus[ing] the [Separate] Account to: (1) purchase, sell, exchange, redeem, liquidate or dispose of some or all of the investments; (2) invest some or all of the Account Assets in Vehicles; or (3) take such action as [CHC] deems prudent under the circumstances when structuring an Investment"; and (vi) "compromis[ing] or settl[ing] any claim, debt, or obligation to [Willow Creek]."

31.     Throughout this exchange of information, Scibetta served as the "gatekeeper" for Willow Creek, facilitating communications from Genovese that ranged from scheduling meetings to the substance of the deal and strategies underlying its implementation.

32.     For instance, in or about December 2015, Scibetta, acting on behalf of Willow Creek, solicited an explanation of the rationale behind CHC's investment approach.

33.     Similarly, in email dated January 11, 2016, Scibetta advised CHC that he would be overseeing Willow Creek's review of the proposals submitted:

> I am working with the team at Willow Creek, reviewing your proposals and matching them against Corporate goals. I have to say that we appreciate your flexibility with the structure of this endeavor. I will not be able to meet tomorrow as the team is still working through it all. I will touch base with you later in the week to give you [a]n update.

34.     And, in or about April 2016, Scibetta fielded and purportedly reviewed one of the more complicated CHC investment proposals for the allocation – the potential purchase of a $3 billion to $4 billion multi-family portfolio consisting of 17,000 units contained in 68 communities across 13 states, as well as a business structure for that would-be monumental transaction.

**D.     The Willow Creek Defendants Advise CHC that It Was Selected to Manage the $2 Billion, and Acknowledge CHC's Intent to Move Forward with its Multi-Million Dollar Build-Out and Dedicate its Undivided Efforts and Attention to Willow Creek.**

35.     On July 7, 2016, Genovese delivered what then seemed to be great news for CHC when he informed CHC that it had been selected to manage a $2 billion allocation subject to the Terms set forth in the November 25, 2015 Proposal:

> I am pleased to announce that your firm has been selected as one of three final firms in the amount of 2 billion dollars to be part of our long term Capital Asset Allocation Plan. Each firm we chose has a different approach to Real Estate and the diversity in their programs allows us to diversify our family assets that we will deploy in Q4 2016.
>
> During Q3 we expect to meet with Colony to rough out how we want our legal structure to look and to verbalize our expectations from Colony. In Q4 we expect a formal plan to be in place as well as finalizing the legal end so we can place the funds by end of Q4.

The funds from our CAAP come entirely from our family's assets and not client funds. We currently do not have a vehicle for clients to participate with us on this nor do we have plans to do so. We are also excited to have our new GC Aimee Richter to assist us in this endeavor.

We are looking forward to working with Colony Capital in our CAAP.

36.    In response, CHC accepted the offer and promised to begin immediately the CHC Build-Out:

You giving us written commitment is a big help towards allocating our resources. We will begin immediately putting any necessary and or additional correct pieces in place to meet your expectations, needs and requirements.

37.    As such, (i) the parties entered a binding contract pursuant to which Willow Creek was obligated to allocate to CHC at least $2 billion and CHC was entitled to receive the Management and Promotional Fees, among other valuable compensation, in connection with that allocation (the "Contract"), and (ii) the Willow Creek Defendants knew with certainty that CHC was about to invest millions of dollars preparing for and implementing the expansion of its operations and infrastructure, and dedicate itself exclusively to the management of Willow Creek's monies.

38.    At or about the same time, Genovese announced that Richter would be serving as Willow Creek's outside general counsel, introduced her as Scibetta's replacement to spearhead the venture, and gave every indication, through Richter, that it was "all systems go."

39.    For example, by email dated July 19, 2016, Genovese stressed his desire to ensure that CHC kept pace with the other firms in the CAAP and made clear that he was entrusting Richter to coordinate and expedite that process:

For the sake of making sure Colony doesn't fall further behind than the other firms in our CAAP I have instructed [Richter] to

11

start on our end the wheels in motion on our CAAP program for
Colony Capital. I'm sure [Richter] will contact you for more
information as time progresses.

40.     CHC, in turn, made clear to Willow Creek its intent and eagerness to proceed

expeditiously. By email dated July 28, 2016, CHC provided Richter with a draft of the operating

agreement and further emphasized: "We look forward to working with you and your team on this

document, the legal structure and Willow Creek's expectations relative to this account. We are

available at your earliest convenience to meet and discuss."

41.     After July 2016, Genovese further induced CHC to advance its Build-Out and

pass on other investment deals through additional misrepresentations. For instance, at a meeting

during the fall of 2016 purportedly to discuss the logistics of the $2 billion allocation to CHC,

Genovese falsely claimed that funds designated for CHC were in the process of being repatriated

into the United States through transactions that would be completed by the end of 2016. In fact,

by December 2016, Genovese advised CHC that he was considering increasing CHC's allocation

of the Genovese Fortune from $2 billion to $2.5 billion.

42.     Relying upon those repeated – and, in fact, enhanced – promises, representations,

and assurances, CHC undertook significant and costly steps to effectuate the CHC Build-Out.

From July 2016 through January 2017, CHC, among other things, vetted (and negotiated

contracts with) eighteen consultants located throughout the country to assist with the

management and investment of the $2 billion allocation, devoted substantial resources and

incurred expenses to locate and secure a significant pipeline of real estate deals with an

aggregate value of $3.5 billion, paid more than $100,000 to attorneys to draft operating

agreements and deal documents, and committed substantial resources to traveling and attending

meetings with professionals, potential sellers, and counterparties.

43.     CHC's officers and personnel also devoted thousands of hours to both the Build-Out and the search for real estate portfolios befitting Genovese's investment objectives and requirements.

44.     In total, CHC expended more than $2.5 million implementing the Build-Out and performing due diligence efforts for the CAAP and the mezzanine platform investments.

45.     During that same period, CHC – a company that, each year, had been closing on an average of $100 million in transactions and returning tens of millions in profits on those portfolios – was forced to forego all other investment opportunities because its money and resources were devoted solely to servicing the Willow Creek Defendants and preparing for and effectuating its custom-tailored investment plan.

**E.      Genovese Introduces a New Condition to CHC's Receipt of the Allocation – CHC's Investment of $1 Million in a Fund Managed and Controlled by Willow Creek.**

46.     After informing CHC that Willow Creek would allocate more than $2 billion of the Genovese Fortune as part of the CAAP, Genovese introduced an additional condition that later proved to be the true motivation behind his fraud scheme – he directed that CHC, either on its own or with its business partners, invest at least $1 million in the Willow Creek Fund.

47.     To induce this investment, Genovese raved about the performance of the Willow Creek Fund and promised substantial returns.  In fact, Genovese, with and through the Genovese Attorneys, emphasized the recent success of the Fund and assured CHC that was just a sign of even better things to come.

48.     Because (i) CHC had invested millions of dollars pursuing the Build-Out, (ii) Genovese refused to move forward unless CHC invested in the Willow Creek Fund, (iii) the investment of $1 million paled in comparison to the unprecedented financial return anticipated from the multi-billion dollar allocation that the Willow Creek Defendants had promised, (iv) the

Willow Creek Defendants gave assurances about the performance of the Fund, and (v) the Willow Creek Defendants gave CHC every reason to believe that they intended to move forward with the real estate venture and funding the allocation, CHC created a separate affiliate entity, Blue Lobster, through which it paid $1 million into the Willow Creek Fund.

**F.  Genovese Insists that CHC Make an Even Greater Investment in the Willow Creek Fund and Again Employs Unscrupulous Tactics to Induce CHC to Do So.**

49.  Despite CHC's substantial sacrifices to prepare for the launch of the venture, the lucrative business opportunities that it forewent, and its investment of $1 million, Genovese demanded an additional, but unspecified investment of $2 million to $10 million in the Willow Creek Fund before it would release the allocation.

50.  To induce the additional investment, Genovese lied about the performance of the initial investment made through Blue Lobster.  He not only represented that it was already profitable, but also provided fictitious online statements showing more than $100,000 in gains that CHC later learned were non-existent.

51.  Throughout this time, Genovese also cunningly engaged in a continued ruse to gain and keep the confidence of CHC's principal, Glenn Hanson ("Hanson").  Among other things, he invited Hanson to join him in a sailing regatta on Lake George, attended a polo match with Hanson in Greenwich, Connecticut, and spent the bulk of those events forecasting the prosperity of their business relationship and extolling the virtues of their friendship.  Indeed, the trust and loyalty that Genovese underhandedly instilled in Hanson and, by extension, CHC, could not have been more evident:

> CHC to Genovese
>
> Thank you so much for including me in your personal life . . . .  I realize you have many choices and I remain loyal and honored for our friendship.

The Polo match in Greenwich, Connecticut was so much fun!

Genovese to CHC

This is why I love you as a friend and admire you as a business associate. What an amazing video!! It was funny as well as entertaining! Who knew you could get 10 ppl that know me to actually say something nice about me!!!??? This is definitely something to share. Feel free to share and I will do the same.

Thanks buddy. Be safe in LA lots of Libs out there! Hope to see you back on Lake George for one of the Regattas.

52.     In the meantime, Genovese and his team continued their hoax of moving forward with the transaction and readying the $2 billion for distribution.

53.     For instance, on or about December 9, 2016, in the wake of a meeting with CHC principals the night before and in anticipation of an imminent follow-up meeting, Richter instructed CHC to have its attorney send the deal documents to her so that she could review them over the upcoming weekend, thereby signaling not only that the Willow Defendants were proceeding in earnest, but also that CHC's participation in the CAAP was being given top priority.

54.     Likewise, by e-mail dated January 23, 2017, Genovese advised CHC as follows: "Just spoke to [Richter] and updated her about our CAAP discussion. I also impressed on her to get the ball rolling . . . today."

**G.     CHC Refuses to Make Any Additional Investments in the Willow Creek Fund and Genovese Abruptly Kills the Deal.**

55.     It was only when CHC communicated its unwillingness to invest any additional monies in the Willow Creek Fund – and after CHC had exhausted thousands of hours and millions of dollars planning and preparing, and refrained from pursuing other attractive business

opportunities – that Genovese first expressed any disinterest in moving forward with the CAAP and allocation, and began manufacturing pretexts to kill the deal.

56.     For example, in an email dated January 11, 2017, Genovese feigned great offense to CHC's desire to expedite the implementation of the investment strategies, forewarned that he, his counsel, and his company would not be rushed, and directed CHC to conduct all future communications exclusively through Richter:

> We had a meeting last week where I brought up 3 main topics (Structure, Fees, Participation) to keep the deal on the right track and during that discussion it was brought to my attention that my attorneys have not been available and I received a very hostile response to the participation topic as well.  Today we had another brief meeting where I was railed about my attorneys not being available in a hostile way.
>
> This deal is like me going to Buick to buy a car.  I negotiate what I want to buy and the dealer tells me what['s] available yet, yet I'm the customer and I expect me and my staff to be treated as one.  I feel there is a tone here that is rising and I am not liking it nor is my board and staff.
>
> I have done my best to keep all the kittens in the corral and I do not appreciate being accused or made to look as if we are not doing our party [sic] when WE are the client.  We are all working to explore the deal and see if we can reach one that we both like and will enjoy not matter if it takes 1 month or 6 months we all need to be treated with respect and given time to do our job.
>
> My counsel and I have decided any further meetings be with my counsel present so as to ensure the professionalism that we all expect and love.  I attempted to make my 3 points raised by my board and I to speed the communication along.  So now I will leave it up to counsel to do so as I have exasperated any energy left in this.
>
> Please contact Aimee Richter directly to continue the dialog[ue].

57.     Because of its significant investment of time and money, CHC nevertheless offered making substantial concessions in order for the deal to proceed.  For example, by email

dated January 24, 2017, CHC proposed reducing the amount of capital allocated to it until CHC proved its value. CHC also vowed to consider an additional investment in the Willow Creek Fund if the parties moved forward with the CAAP and the relationship was mutually beneficial.

58.     Entrenched in his fraud, Genovese held his ground. By or about January 24, 2017 email to CHC, he had already rejected the notion of proceeding with the CAAP without some additional investment from CHC and was about to advise his "Board" to do the same. And it did.

59.     Despite CHC's steadfast devotion to the venture and its willingness to compromise, and knowing CHC's profound sacrifices in reliance upon his unequivocal promise to allocate at least $2 billion, Genovese sent a single-line email to Hanson on February 6, 2017 stating: "Today we received communication from our board and they are unanimous in voting no to the 3 point plan you put forward."

**H.     CHC Learns that Genovese is a Fraud and Everything It Was Told about Genovese and Willow Creek Was a Lie.**

60.      It was not until after receiving the devastating news that Willow Creek was killing the deal, that CHC first surfaced information that Genovese is a con-artist and virtually every representation made by Genovese to CHC was fabrication.

61.     <u>First</u>, Genovese has no familial relation whatsoever to the Genovese family that founded and sold the Genovese Drug Store chain.

62.     <u>Second</u>, because he is unrelated to the founders of the Genovese Drug Store chain, Genovese has no claim to or control over the Genovese Fortune and is not the billionaire that he so vehemently proclaimed to be. In fact, Genovese maintains that he has no assets, previously filed for bankruptcy, and has recently claimed to be of "indigent status" to obtain a public defender in criminal matters.

63.    <u>Third</u>, Genovese never obtained a degree of any kind from either the University of Kentucky or Dartmouth.

64.    <u>Fourth</u>, Genovese was never a Partner at Goldman Sachs or licensed to serve in any capacity in the financial sector.

65.    And, <u>fifth</u>, Genovese is a career criminal with an extensive history of fraud and deceit.  By way of example, but likely not limitation:

- In March 1997, Genovese pled guilty in Illinois to theft by deception and received five years' prison time.

- In July 2003, Genovese was arrested in New York for multiple instances of attempted grand larceny and later pled guilty to the charges.

- In September 2003, Genovese was arrested again in New York for additional instances of attempted grand larceny and again pled guilty to the charges.

- In May 2004, Genovese was arrested in New York for identity theft.  He later pled guilty to the charges and was sentenced to two or three years in prison.

- In September 2004, Genovese was arrested in New York for forgery, third degree grand larceny, and second degree scheme to defraud.  He later pled guilty to those charges and was required to pay restitution to the victims.

In fact, after being sentenced to prison by a New York court in 2005, Genovese fled the state and was later captured in Florida, which extradited him back to New York to serve his custodial sentence.

## I.    CHC Suffers Extraordinary Damages.

66.    For CHC, the toll of the fraud perpetuated by Genovese and Willow Creek has been devastating.  In addition to the agony of chasing what, for years, was promised to be a game-changing opportunity, but ultimately proved to be a dead end, as well as the

Case 1:18-cv-00940-JGK-RCM Document 9-8 Filed 02/26/18 Page 20 of 27
Case 1:18-cv-00593-DAB Document 1 Filed 01/23/18 Page 19 of 20

immeasurably-adverse impact on its superior reputation in the real estate industry, the compensatory, consequential, special and incidental damages suffered by CHC are extraordinary, far-reaching, and, in some respects, ongoing.

67. Based on the Willow Creek Defendants' repeated promise to allocate at least $2 billion, CHC performed its obligations to prepare and implement a strategy for the management and investment of those funds in the multi-family residential market.

68. Had the Willow Creek Defendants fulfilled their end of the bargain and allocated the $2 billion as promised, CHC would have earned Management Fees, Promotional Fees, and other consideration exceeding $300 million.

69. CHC instead incurred more than $2.5 million in losses facilitating the Build-Out and developing and implementing the investment strategy for the allocation and, more particularly, researching and vetting a new team of real estate professionals, paying attorneys and other professionals to draft and review important documents, expanding its infrastructure, and identifying, visiting, and performing due diligence on real estate portfolios collectively valued at more than $3.5 billion, all without receiving a dollar from Willow Creek.

70. In addition, because of CHC's exclusive commitment to Willow Creek as demanded by the magnitude of the promised allocation, CHC forewent business opportunities for a period of nearly two years that would have conservatively yielded a return of tens of millions of dollars.

## FIRST COUNT
### (Fraud)

71. CHC repeats and re-alleges the allegations in the foregoing paragraphs as if fully set forth herein.

72.     Genovese and the Willow Creek Defendants knowingly and intentionally made false and fraudulent statements of material facts to, and concealed material facts from, CHC.

73.     As set forth above, the false and fraudulent statements of material facts included, but were not limited to, oral and written misstatements that: (i) Genovese was the grandson of Joseph Genovese, Sr.; (ii) Genovese was an heir to the Genovese Fortune; (iii) Genovese held supermajority decision-making authority over the management of the Genovese Fortune; (iv) Genovese earned a degree from the University of Kentucky; (v) Genovese obtained an M.B.A. from Dartmouth University; (vi) Genovese had been a "Partner at Goldman Sachs"; (g) Genovese had been a "Portfolio Manager" at Bear Stearns; (vii) Willow Creek managed substantial assets of "corporations, endowments, foundations, pension plans, private wealth, and sub-advisory relationships" through JPMorgan; (viii) Genovese managed the Genovese Fortune while at Goldman Sachs and Bear Stearns; (ix) Willow Creek managed over $32 billion in assets; (x) Willow Creek was the primary manager of the Genovese Fortune; (xi) Willow Creek needed managers to assist in investing $11.5 billion in real estate ventures; (xii) CHC was selected to be an outside manager of at least $2 billion of the Genovese Fortune to invest in and manage multi-family and other real estate projects; (xiii) the funds designated to CHC under the CAAP were in the process of being repatriated into the United States; (xiv) Genovese was considering increasing CHC's allocation of the Genovese Fortune from $2 billion to $2.5 billion; and (xv) CHC's initial investment, through Blue Lobster, had profited by more than $100,000.

74.     At all times relevant hereto, Genovese and the Willow Creek Defendants also consistently and repeatedly misrepresented that they had every intention of moving forward with the allocation (together, with the misstatements in Paragraph 73, the "Misrepresentations").

75.     Genovese and the Willow Creek Defendants knew, or recklessly disregarded, that the Misrepresentations were false at the time they were made to CHC.

76.     As set forth above, Genovese and the Willow Creek Defendants failed to disclose and/or concealed the following materials facts, including, but not limited to, the following: (i) Genovese has no familial relationship to the Genovese family that founded and sold the Genovese Drug Store chain; (ii) Genovese had no claim to or control over the Genovese Fortune; (iii) Willow Creek did not manage the Genovese Fortune; (iv) Genovese had no assets, previously filed for bankruptcy, and has claimed to be of "indigent status" to obtain a public defender; (v) Genovese never graduated from the University of Kentucky; (vi) Genovese did not obtain an M.B.A. from Dartmouth University; (vii) Genovese has never been licensed to serve in any capacity in the financial sector; (viii) Genovese was never employed by Goldman Sachs or Bear Sterns; (ix) Genovese previously pled guilty in Illinois to theft by deception and received a five-year prison sentence; (x) on at least two occasions, Genovese was arrested for and pled guilty in New York to multiple instances of attempted grand larceny; (xi) Genovese was arrested for and pled guilty in New York to identity theft and received a two- to three-year prison sentence; and (xii) Genovese was arrested for and pled guilty in New York to forgery, grand larceny, and scheme to defraud and was ordered to pay restitution to his victims (the "Omissions").

77.     Genovese and the Willow Creek Defendants each had superior knowledge of the facts that they mispresented or failed to disclose.

78.     Genovese and the Willow Creek Defendants intentionally made these false and fraudulent statements, and concealed these material facts, to induce CHC to invest in funds managed by Genovese and the Willow Creek Defendants, knowing that CHC was (i) exhausting

resources to prepare for the allocation, (ii) expending millions of dollars to identify new personnel, expanding its infrastructure, conducting due diligence, developing investment strategies, and otherwise preparing to manage the allocation, and (iii) foregoing other lucrative investment opportunities.

79.     CHC reasonably, justifiably, and detrimentally relied on the Misrepresentations and Omissions in, among other things, pursuing the allocation, expending millions of dollars for the Build-Out and otherwise preparing to manage the allocation, and foregoing other investment opportunities.

80.     Had the truth about these material facts been accurately disclosed and represented, CHC would not have, among other things, exhausted resources bidding for the allocation, expended millions of dollars effectuating the Build-Out and otherwise preparing to manage the allocation, and foregone countless other lucrative investment opportunities.

81.     As a direct and proximate result of these intentional and deliberate acts, CHC has suffered, and will continue to suffer, significant damages.

**WHEREFORE,** CHC demands judgment against Genovese and the Willow Creek Defendants, jointly and severally, for: (i) compensatory, special, consequential, and incidental damages, plus interest, (ii) punitive damages, (iii) pre-judgment interest as allowed by law, (iv) reasonable counsel fees and costs; and (v) such further relief as the Court finds to be fair and just.

**SECOND COUNT**
**(Promissory Estoppel)**

82.     CHC repeats and re-alleges the allegations in the foregoing paragraphs as if fully set forth herein.

83.     Genovese and the Willow Creek Defendants made a clear and unambiguous promise, affirmed repeatedly in discussions, emails, and other written communications and documents, that Willow Creek would allocate at least $2 billion to CHC to manage and invest in multi-family real estate.

84.     CHC reasonably relied on this promise in, among other things, incurring millions of dollars in costs related to the Build-Out, devoting virtually all its personnel and resources to the CAAP and anticipated allocation, and foregoing other investment opportunities.

85.     Genovese and the Willow Creek Defendants broke this promise by failing to allocate any funds to CHC to manage and invest in multi-family real estate.

86.     As a direct result of its reliance upon the broken promises of Genovese and the Willow Creek Defendants, CHC has suffered significant damages.

**WHEREFORE,** CHC demands judgment against Genovese and the Willow Creek Defendants, jointly and severally, for (i) compensatory, special, consequential, and incidental damages, plus interest, (ii) pre-judgment interest as allowed by law, (iii) reasonable counsel fees and costs, and (iv) such further relief as the Court finds to be fair and just.

### THIRD COUNT
**(Breach of Contract)**

87.     CHC repeats and re-alleges the allegations in the foregoing paragraphs as if fully set forth herein.

88.     CHC and the Willow Creek Defendants entered the valid and enforceable Contract, pursuant to which Willow Creek would allocate at least $2 billion to CHC to manage and invest in multi-family real estate, and CHC would earn, among other things, the Management and Promotional Fees.

89.     CHC performed its obligations under the contract by, among other things, implementing the Build-Out, developing investment strategies, identifying and investigating real estate portfolios collectively valued at more than $3.5 billion, and otherwise preparing to manage the allocation, as well as foregoing other business opportunities and instead devoting all its money and resources to Willow Creek.

90.     Genovese and the Willow Creek Defendants breached the contract by, among other things, failing to allocate any funds to CHC, and insisting that CHC make a multi-million-dollar investment in the Willow Creek Fund before it would allocate any funds to CHC.

91.     As a direct result of these breaches, CHC has suffered, and will continue to suffer, significant damages.

**WHEREFORE,** CHC demands judgment against Genovese and the Willow Creek Defendants, jointly and severally, for (i) compensatory, special, consequential, and incidental damages, plus interest, (ii) pre-judgment interest as allowed by law, (iii) reasonable counsel fees and costs, and (iv) such further relief as the Court finds to be fair and just.

## FOURTH COUNT
### (Breach of the Implied Duty of Good Faith and Fair Dealing)

92.     In the alternative to the Third Count, CHC repeats and re-alleges the allegations in the foregoing paragraphs as if fully set forth herein.

93.     Implied in the Contract between CHC and the Willow Creek Defendants is the covenant of good faith and fair dealing.

94.     Genovese and the Willow Creek Defendants breached the implied duty of good faith and fair dealing by, among other things, making the Misrepresentations and Omissions, and duping CHC into spending millions of dollars preparing to manage the allocation and foregoing other business opportunities.

95.     As a direct and proximate result of these breaches, CHC has suffered, and will continue to suffer, significant damages.

**WHEREFORE,** CHC demands judgment against Genovese and the Willow Creek Defendants, jointly and severally, for (i) compensatory, special, consequential, and incidental damages, plus interest, (ii) pre-judgment interest as allowed by law, (iii) reasonable counsel fees and costs, and (iv) such further relief as the Court finds to be fair and just.

## FIFTH COUNT
### (Tortious Interference with Prospective Economic Advantage)

96.     CHC repeats and re-alleges the allegations in foregoing paragraphs as if fully set forth herein.

97.     Genovese and the Willow Creek Defendants knew that, due to CHC's relatively modest size and limited bandwidth, the promised allocation of $2 billion or more dollars would require CHC to facilitate the Build-Out and devote virtually all its resources to Willow Creek, knowing CHC would be forced to forego other business opportunities.

98.     Genovese and the Willow Creek Defendants nevertheless tortiously interfered with CHC's ability to avail itself of other business opportunities by, among other things, falsely promising the allocation.

99.     As a direct and proximate result of Genovese's and the Willow Creek Defendants' tortious conduct, CHC forewent other business opportunities and has therefore suffered, and will continue to suffer, significant damages.

**WHEREFORE,** CHC demands judgment against Genovese and the Willow Creek Defendants, jointly and severally, for (i) compensatory, special, consequential, and incidental damages, plus interest, (ii) punitive damages, (iii) pre-judgment interest as allowed by law, (iv) reasonable counsel fees and costs, and (v) such further relief as the Court finds to be fair and just.

Calcagni & Kanefsky, LLP
One Newark Center
1085 Raymond Boulevard, 14th Floor
Newark, New Jersey 07102
(T) 862.397.1796
(E) eric@ck-litigation.com


By:   s/ Eric T. Kanefsky
         Eric T. Kanefsky, Esq.


Dated:  January 23, 2018