# EXHIBIT 1

Approved: _____          18 MAG      0835
SAMSON ENZER
Assistant United States Attorney

Before:   HONORABLE KEVIN NATHANIEL FOX
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :    **SEALED COMPLAINT**

          - v. -                  :    Violations of 18 U.S.C. §§
                                       1343 and 2; 15 U.S.C. §§
                                       78j(b) and 78ff; and 17
NICHOLAS JOSEPH GENOVESE,         :    C.F.R. § 240.10b-5

               Defendant.         :    COUNTY OF OFFENSE:
                                       NEW YORK
- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

    JORDAN ANDERSON, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

## COUNT ONE
### (Securities Fraud)

    1.   From at least in or about 2015 through in or about January 2018, in the Southern District of New York and elsewhere, NICHOLAS JOSEPH GENOVESE, the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, used and employed manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, to wit, GENOVESE solicited millions of dollars from several investors for the purchase of interests in a hedge fund through fraudulent misreprentations and omissions.

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
and Title 18, United States Code, Section 2.)

## COUNT TWO
## (Wire Fraud)

2. From at least in or about 2015 through at least in or about January 2018, in the Southern District of New York and elsewhere, NICHOLAS JOSEPH GENOVESE, the defendant, willfully and knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, GENOVESE solicited millions of dollars from several investors for investment in a hedge fund through fraudulent misrepresentations and omissions in a scheme employing the use of telephones, wire transfers, and other wire communications.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for deponent's knowledge and for the foregoing charges are, in part, as follows:

3. I am a Special Agent with the FBI and am one of the law enforcement agents with primary responsibility for the investigation of this case. I have been a Special Agent with the FBI since 2016. Prior to joining the FBI, I earned a bachelor's degree in accounting, a master's degree in professional accounting, and a license as a certified public accountant in Louisiana and Texas, and I also worked as a financial statement auditor for a global accounting firm based in the United States. I am currently assigned to a squad within the FBI responsible for investigating complex financial crimes, including crimes involving wire fraud, bank fraud, securities fraud, money laundering, and other white-collar crimes. As part of my work at the FBI, I have received training regarding these types of fraud and other white-collar crimes. The information contained in this affidavit is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources and agents, including documents and information provided to me by representatives of the United States Securities and Exchange Commission ("SEC"), documents provided by financial institutions and investors, and my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the

facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where dates, figures, and calculations are set forth herein, they are approximate.

**THE DEFENDANT AND RELEVANT ENTITIES**

The Defendant

4. Based on my review of law enforcement databases for information about NICHOLAS JOSEPH GENOVESE, the defendant, I have learned, in substance and in part, that GENOVESE is a 52-year old citizen of the United States who was born in Illinois and has resided in recent years in New York, New York and elsewhere.

5. Based on the facts set forth below, there is probable cause to believe that NICHOLAS JOSEPH GENOVESE, the defendant, in soliciting millions of dollars in investments in a hedge fund that he created, made false statements misrepresenting his educational and professional experience, credentials and qualifications, without disclosing that he lacked the experience, credentials and qualifications that he claimed to have, that he had previously been convicted of several felony offenses for crimes of deception or theft, or that he had previously obtained bankruptcy protection from certain debts while he was serving a prison sentence.

6. From my review of the criminal history record of NICHOLAS JOSEPH GENOVESE, the defendant, I have learned in substance and in part that GENOVESE has felony convictions for grand larceny, attempted grand larceny, forgery, identity theft, and criminal misuse of a credit card.

7. From my review of publicly-available federal bankruptcy court records, I have learned in substance and in part that in or about 1998, while NICHOLAS JOSEPH GENOVESE, the defendant, was incarcerated at the Big Muddy River Correctional Center in Illinois, GENOVESE filed a *pro se* petition in the United States Bankruptcy Court for the Southern District of Illinois seeking a bankruptcy discharge from certain debts under Chapter 7 of the United States Bankruptcy Code, and that the petition was granted in or about 1999.

The Defendant's Hedge Fund and Affiliated Entities

8. As set forth below, NICHOLAS JOSEPH GENOVESE, the defendant, was: (a) the founder and main portfolio manager of a hedge fund called Willow Creek Investments LP (the "Hedge Fund"); (b) the

founder and chief executive officer of an entity called Willow Creek GP LLC that served as the general partner of the Hedge Fund (the "General Partner"); and (c) the founder and chief executive officer of an entity that was in charge of the day-to-day management and investment of the Hedge Fund's capital (the "Investment Manager"). By virtue of his control of the General Partner and Investment Manager, GENOVESE also controlled the Hedge Fund.

9.  On or about April 22, 2016, a Form D Notice of Exempt Offering of Securities signed by NICHOLAS JOSEPH GENOVESE, the defendant, was filed on behalf of the Hedge Fund with the SEC notifying the SEC that the Hedge Fund intended to begin offering securities in the Hedge Fund (namely, securities in the form of "Pooled Investment Fund Interests" in the Hedge Fund) that GENEOVESE contended were exempt from registration with the SEC. Based on my review of this Form D disclosure document, I have learned the following, in substance and in part, about the Hedge Fund. According to the Form D, the Hedge Fund was formed in 2016 as a Delaware limited partnership with its principal place of business at One Liberty Plaza, Suite 2310 in New York, New York 10006. In the Form D, GENOVESE described himself as an executive of the Hedge Fund and as the Manager of the Hedge Fund's General Partner, and he gave notice that he intended to begin offering interests in the Hedge Fund to investors who would be required to make a minimum investment of $1 million to purchase such interests in the Hedge Fund.

10. I have reviewed a Private Placement Memorandum dated April 2016 that was issued by the Hedge Fund (the "PPM") in connection with the Hedge Fund's offering of securities in the form of limited partnership interests of the Hedge Fund to qualified investors. Based on my review of the PPM, I have learned that the PPM stated the following, in substance and in part, about the entities through which NICHOLAS JOSEPH GENOVESE, the defendant, controlled the Hedge Fund:

    a.  According to the PPM, GENOVESE was the founder and chief executive officer of the Hedge Fund's General Partner. The General Partner was a New York limited liability company that had its principal place of business at the same address in New York, New York as the Hedge Fund (namely, One Liberty Plaza, Suite 2310 in New York, New York 10006). The General Partner had primary responsibility for the management of the Hedge Fund, and delegated the investment management responsibilities of the Hedge Fund to the Hedge Fund's Investment Manager.

    b.  According to the PPM, GENOVESE was also the founder and chief executive officer of the Hedge Fund's Investment Manager. The Investment Manager was a Delaware limited liability company that

4

was affiliated with the Hedge Fund and was charged by the General Partner with the day-to-day investment of the Hedge Fund's capital.

      c.    According to the PPM, GENOVESE was the "portfolio manager/analyst with primary responsibility for making decisions for the [Hedge Fund]."

### The Terms of the Hedge Fund's Securities Offering

11. The PPM claimed that the Hedge Fund was formed on March 22, 2016 to operate as a private investment partnership with the goal of delivering returns to its investors through capital growth by investing in "opportunities that [were] considered by the Investment Manager to be trading below their intrinsic value and that offer the potential of being positively influenced by corporate earnings reports that are deemed by the market as favorable or non-favorable and taking advantage of the move with a combination of options, equities and CDS (credit default swaps)." (PPM at 8.)

12. The PPM purported to set out the terms of the Hedge Fund's offering of unregistered securities in the form of limited partnership interests of the Hedge Fund to qualified investors in exchange for a minimum initial capital contribution to the Hedge Fund of $1 million, including the following, in substance and in part:

      a.    According to the PPM, the Hedge Fund was accepting subscriptions from a limited number of qualified investors, "generally in minimum amounts of not less than $1,000,000." (PPM at 6.)

      b.    According to the PPM, after a qualified investor makes a capital contribution to the Hedge Fund, the investor cannot withdraw the capital for at least a twelve-month "lock-up" period. The PPM further provided that after the lock-up period, an investor would generally be permitted to make withdrawals of capital as of the close of business on the last day of each quarter so long as the withdrawing investor has given the General Partner of the Hedge Fund at least 60 days advance notice of his intent to make a withdrawal.

### **OVERVIEW OF THE SCHEME TO DEFRAUD**

13. Based on the facts set forth below, I respectfully submit that there is probable cause to believe that NICHOLAS JOSEPH GENOVESE, the defendant, solicited millions of dollars in investments in the Hedge Fund through the use of material misrepresentations and omissions about, among other things, his educational and professional experience, credentials and qualifications for managing a hedge fund. For example, as shown below, in soliciting such investments:

5

a. GENOVESE claimed to investors that he earned a bachelor's degree in finance from the University of Kentucky, when in fact, the University of Kentucky has no record of him ever having attended the University of Kentucky.

b. GENOVESE claimed to investors that he earned a master's degree in business administration from Dartmouth College's Tuck School of Business, when in fact, the Tuck School of Business has no record of GENOVESE ever having attended the Tuck School of Business at Dartmouth.

c. GENOVESE claimed to investors that he used to be a partner at the investment bank Goldman Sachs & Company ("Goldman Sachs"), when in fact, Goldman Sachs has no record of GENOVESE ever having been employed at Goldman Sachs.

d. GENOVESE claimed to investors that he used to be a portfolio manager at the investment bank Bear Stearns Companies ("Bear Stearns"), when in fact, a search of a database of employment histories of securities professionals found no record of GENOVESE ever having been employed by Bear Stearns.

e. In addition, in representing that he had both the educational and professional experience needed to successfully manage a hedge fund holding millions of dollars in assets, GENOVESE never disclosed to investors that he had several prior felony convictions for crimes of deceit or theft, or that he had previously obtained bankruptcy protection from certain debts while he was serving a prison sentence.

**THE DEFENDANT's FRAUDULENT MISREPRESENTATIONS AND OMISSIONS**

14. I have interviewed several witnesses who had dealings with NICHOLAS JOSEPH GENOVESE, the defendant, in connection with GENOVESE's operation of the Hedge Fund, including one of several investors ("Investor-1") who made capital contributions to the Hedge Fund as a result of solicitations by GENOVESE. I have spoken with an SEC official about his interviews of Investor-1 and of several other investors who invested funds in the Hedge Fund (including investors referred to herein as "Investor-2" and "Investor-3") and other SEC officials involved in the investigation of this case, and I have reviewed documents gathered by the SEC during the course of its parallel investigation. Based on the foregoing, I have learned the following, in substance and in part:

a. In or about September 2015, GENOVESE met at a location in New York, New York with Investor-1 and asked him to invest in the Hedge Fund. GENOVESE subsequently had multiple conversations, via

6

in-person meetings and via telephone communications, with each of Investor-1 and Investor-2, soliciting them to invest in the Hedge Fund. During the course of such solicitations, including during conversations in which GENOVESE was in New York, New York, GENOVESE represented to each of Investor-1 and Investor-2, among other things, that GENOVESE had graduated from the University of Kentucky and Dartmouth College's Tuck School of Business and that he had extensive Wall Street experience, in that he had been a Goldman Sachs partner and a Bear Stearns portfolio manager before forming the Hedge Fund. Investor-1 and Investor-2 subsequently each invested $2 million in the Hedge Fund, for a total of $4 million in capital contributions to the Hedge Fund, during the period from in or about November 2015 through in or about January 2016. According to Investor-1 and Investor-2, both of them made these capital contributions in the Hedge Fund by wire transferring funds from their own accounts to one or more accounts registered to the Hedge Fund's Investment Manager.

        b. According to Investor-1 and Investor-2, the representations that GENOVESE made to each of them about his educational credentials and his prior professional experience at two prominent investment banks played an important role in their decisions to invest $4 million in the Hedge Fund, and neither of them would have invested any funds in the Hedge Fund if GENOVESE had disclosed to them that he had a prior record of felony convictions for crimes of deceit or theft or that he lacked educational or professional qualifications to successfully manage a hedge fund.

        c. After Investor-1 and Investor-2 contributed those investment funds to the Hedge Fund but before they asked GENOVESE to withdraw any of those funds from the Hedge Fund, GENOVESE provided them with the version of the PPM dated April 2016 described above, which reiterated the representations that GENOVESE had previously made to those investors about his educational credentials and professional experience prior to forming the Hedge Fund. For example, with respect to the PPM's claims about GENOVESE's professional and educational experience, the PPM contained a section with his purported biography (the "Biographical Section") in which the PPM asserted the following, in relevant part:

> Nicholas Genovese ("**Mr. Genovese**") is the principal of the General Partner [of the Hedge Fund] (the "**Principal**"). A biography of the Principal is set forth below.
>
> [. . .]
>
> Nicholas Genovese is the founder and Chief Executive Officer of the General Partner and the Investment Manager and the

7

> main portfolio/analyst with primary responsibility for making investment decisions for the [Hedge Fund]. Prior to founding [the Hedge Fund] 8 years ago, Mr. Genovese was a Partner at Goldman Sachs and previous to that was Portfolio Manager, and member of the Investment Strategy Committee at Bear Stearns. He received a B.S. in Finance University of Kentucky and a M.B.A. in Finance from Dartmouth-Tuck Business School.

(PPM at 11.)[1]

        d.    In or about late 2016, several months after Investor-2 had requested and obtained from GENOVESE a withdrawal of $1 million of the $2 million that Investor-2 had previously invested in the Hedge Fund but before Investor-1 and Investor-2 sought to withdraw the balance of their investment funds in the Hedge Fund, GENOVESE met with Investor-1, an advisor to Investor-1 (the "Advisor"), and Investor-2 at a location in New York, New York. According to the Advisor, during this meeting, GENOVESE bragged about his background, claiming that he had extensive Wall Street experience and a pedigreed education, and made other claims to reassure Investor-1 and Investor-1 about the soundness of their investments in the Hedge Fund.

        e.    In or about May 2017, Investor-1 and Investor-2 heard from another Hedge Fund investor that GENOVESE had a criminal record, and as a result, both of them became suspicious of GENOVESE and asked him for a redemption of the remaining several million dollars they had previously invested in the Hedge Fund. According to Investor-1 and Investor-2, although GENOVESE initially promised to return their investment funds by January 2018, they have not yet received any of

---

[1] The PPM also contained language about the importance of GENOVESE's purported credentials and investment management skills to the Hedge Fund. For example, in a section of the PPM listing management risks associated with making investments in the Hedge Fund, the PPM cautioned that:

> The General Partner and Investment Manager [of the Hedge Fund] are dependent on the services of the Principal [*i.e.*, GENOVESE] and there can be no assurance that it will be able to retain the Principal, whose credentials are described [in the Biography Section of the PPM] . . . . The departure or incapacity of the Principal could have a material adverse impact on the Investment Manager's management of the investment operations of the [Hedge Fund].

(PPM at 27.)

8

these funds from GENOVESE.

    f. On or about December 21, 2017, SEC Compliance Examiners went to the Hedge Fund's reported address in Suite 2301 at One Liberty Plaza in New York, New York to perform an unannounced site-visit and inspection of the Hedge Fund. According to the SEC Examiners, upon arrival, GENOVESE declined to permit the Examiners into the Hedge Fund's office space in the suite or to speak with them without an attorney present. Later that day, the SEC sent a letter to GENOVESE informing him that the SEC was conducting an inquiry into whether the Hedge Fund's Investment Manager and its associated persons were in compliance with the federal securities laws, and made several requests for documents as part of that inquiry.

    g. According to Investor-1, during a telephone conversation on or about January 26, 2018 between him and GENOVESE, Investor-1 complained about GENOVESE's failure to return the funds to Investor-1 the funds that he had contributed to the Hedge Fund, and GENOVESE responded that the delay was Investor-1's fault for complaining to the SEC about GENOVESE and prompting an SEC inquiry in the Hedge Fund. He further asserted that he would return Investor-1's investment funds only after "the stars have aligned" or else there would be a risk that 95% of Investor-1's money would be lost as a result of the purported impracticalities of unwinding unspecified trading positions in which Investor-1's portion of the Hedge Fund's assets had purportedly been invested.

    h. According to Investor-1, during another telephone conversation or about January 30, 2018 between him and GENOVESE, Investor-1 asked GENOVESE about a civil complaint that had recently been filed in Manhattan federal court by another investor in the Hedge Fund (an entity controlled by Investor-3) against GENOVESE, the Hedge Fund, and several associated entities based on claims that GENOVESE had fraudulently induced investments in the Hedge Fund through lies about, among other things, his educational and professional experience, credentials and qualifications for managing a hedge fund, and through the concealment of his prior criminal record. In response, GENOVESE claimed, among other things, that the allegations in the civil complaint were lies; that all of Investor-1's funds were "intact"; and that the only problem delaying the withdrawal of Investor-1's investment funds from the Hedge Fund was scrutiny from the SEC. GENOVESE further claimed that if the SEC became involved, the Hedge Fund could collapse and Investor-1 could lose the millions of dollars that he had invested in the Hedge Fund.

    i. Neither GENOVESE nor the PPM disclosed to Investor-1 or Investor-2 that GENOVESE had a prior criminal record or that he had previously received bankruptcy protection from certain debts

9

while he was serving a prison sentence.

15. The information provided by Investor-1 and Investor-2 about NICHOLAS JOSEPH GENOVESE, the defendant, as set forth above, has been corroborated by other independent evidence, including information provided by Investor-3. Based on my conversations with an SEC official about his interviews of Investor-3, and my review of a memorandum by the SEC documenting information provided by Investor-3 and other witnesses during interviews by the SEC, and my review of a civil complaint that was filed earlier this month against GENOVESE, his Hedge Fund, and certain related entities in the United States District Court for the Southern District of New York by an entity controlled by Investor-3, I have learned the following, in substance and in part:

    a. During the period from in or about January 2014 through in or about September 2016, before Investor-3 invested any funds in the Hedge Fund, Investor-3 participated in meetings and conversations with GENOVESE in which GENOVESE claimed, among other things: (i) that he was the grandson of Joseph Genovese, Sr., the founder of the Genovese Drug Store chain and an heir to tens of billions of dollars from the sale of that company in the late 1990s;[2] (ii) that after attending college at the University of Kentucky and obtaining a master's in business administration from Dartmouth, he had made it "big" on Wall Street and had managed the Genovese family fortune while at Goldman Sachs and Bear Stearns before starting his own investment advisory firm; and (iii) that at least $11.5 billion in the Genovese family fortune was liquid and he needed managers to assist in investing such funds in real estate.

    b. Before Investor-3 invested any funds in the Hedge Fund, GENOVESE also provided Investor-3 with the version of the PPM dated April 2016 described above, which, as shown above, reiterated those claims about GENOVESE's educational and professional experience, credentials and qualifications.

    c. In or about November 2015, GENOVESE solicited Investor-3 to submit a proposal to the Hedge Fund's Investment Manager with terms under which a company run by Investor-3 would manage at least $2 billion of the Genovese family fortune by investing in multi-family and other real estate projects.

    d. In or about September 2016, GENOVESE informed Investor-3 that in order for Investor-3 and his company to obtain approval to manage billions of dollars from the Genovese family

---

[2] According to Investor-1 and Investor-2, GENOVESE made the same claim in conversations with each of them.

fortune, Investor-3 would have to invest at least $1 million in the Hedge Fund, and Investor-3 did so through an entity created by Investor-3 to serve as an investment vehicle for this capital contribution to the Hedge Fund.

    e. In or about December 2016 or January 2017, GENOVESE solicited Investor-3 to make an additional investment of between $2 million and $10 million. Following this solicitation, Investor-3 became aware that GENOVESE had misrepresented facts about his background and requested a full redemption of the $1 million in investment funds that his investment vehicle had contributed to the Hedge Fund. Shortly theater, the Hedge Fund returned those investment funds.

  16. Based on the facts set forth below, I respectfully submit that there is probable cause to believe that a number of the representations that NICHOLAS JOSEPH GENOVESE, the defendant, made in soliciting millions of dollars from investors for the purported purpose of raising capital for the Hedge Fund were false and that GENOVESE knew that these representations were false when he made them:

    a. With respect to the above-described representations by GENOVESE, the defendant, to investors that he earned a bachelor's degree in finance from the University of Kentucky, I have learned, based on my review of a letter dated January 29, 2018 from an employee of the University of Kentucky's registrar's office, that the University of Kentucky has no record of a "Nicholas J. Genovese" ever having attended the University of Kentucky.

    b. With respect to the above-described representations by GENOVESE, the defendant, to investors that he earned a master's degree in business administration from Dartmouth College's Tuck School of Business, I have learned, based on my review a letter dated January 26, 2018 from an employee of the Tuck School of Business' registrar's office, that the Tuck School of Business has no record of a "Nicholas J. Genovese" ever having attended the Tuck School of Business at Dartmouth.

    c. With respect to the above-described representations by GENOVESE, the defendant, to investors that he used to be a partner at Goldman Sachs, I have learned, based on my review of information provided on January 25, 2018 by an employee of Goldman Sachs, that Goldman Sachs has no records of a "Nicholas J. Genovese" ever having been employed at Goldman Sachs.

    d. With respect to the above-described representations by GENOVESE, the defendant, to investors that he used to be a

11

portfolio manager at Bear Stearns, I have learned, based on my review of a memorandum prepared by the SEC about this case, that the SEC conducted a search of the Central Registration Depository, an automated database maintained by the Financial Industry Regulatory Authority of records and information about registered securities employees including their employment histories, and found no record of GENOVESE ever having been associated with Bear Stearns.

## LOSSES FROM THE DEFENDANT'S FRAUD

17. Based on the facts set forth below, I respectfully submit that there is probable cause to believe that NICHOLAS JOSEPH GENOVESE, the defendant, transferred millions of dollars in funds provided by investors in the Hedge Fund to his own personal brokerage accounts at the online brokerage firm TD Ameritrade, and that he has sustained trading losses against those brokerage accounts that exceed the total value of all the assets under management by the Hedge Fund according to representations of the Hedge Fund's Investment Manager.

18. Based on my review of a letter submitted to the SEC on January 17, 2018 on behalf of the Hedge Fund's Investment Manager in response to requests from the SEC for information about the Hedge Fund and associated entities, I have learned, in substance and in part, that according to the letter, the Hedge Fund supposedly had a total of $5,380,813.30 in assets under management as of January 17, 2018.

19. As set forth above, Investor-1 and Investor-2 invested a total of $4 million in the Hedge Fund (of which only $1 million has been returned) by wire transferring funds from their own accounts to accounts registered to the Hedge Fund's Investment Manager.

20. I have reviewed records provided by TD Ameritrade, an online broker that allows its customers to engage in securities trading via computer over the Internet, concerning TD Ameritrade brokerage accounts of NICHOLAS JOSEPH GENOVESE, the defendant. Based on my review of these records, I have learned, in substance and in part, that during the period from in or about January 2015 through in or about December 2017, approximately $5.775 million in funds were wire transferred from various bank accounts registered to the Hedge Fund's Investment Manager to TD Ameritrade brokerage accounts registered to GENOVESE, and approximately $2.4 million were wire transferred from various bank accounts registered to GENOVESE to TD Ameritrade brokerage accounts registered to GENOVESE, for a total of approximately $8.175 million in funds. These records also show, in substance and in part, that GENOVESE's TD Ameritrade brokerage accounts have suffered trading losses of approximately $8.2 million during the same period.

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of NICHOLAS JOSEPH GENOVESE, the defendant, and that he be imprisoned or bailed, as the case may be.

*[signature]*
JORDAN ANDERSON
Special Agent
Federal Bureau of Investigation

Sworn to before me this
1st day of February 2018

S/Kevin Nathaniel Fox
---
THE HONORABLE KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK