# EXHIBIT 4

K2BEGENS

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        18 CR 183 (WHP)

5    NICHOLAS GENOVESE,

6              Defendant.

7    ------------------------------x

8                                        New York, N.Y.
                                         February 11, 2020
9                                        2:30 p.m.

10   Before:

11              HON. WILLIAM H. PAULEY III,

12                                       District Judge

13
                          APPEARANCES
14

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     SAMSON ENZER
17        Assistant United States Attorney

18   ALEXANDER EISEMANN
          Attorney for Defendant
19

20

21

22

23

24

25

K2BEGENS

1

2              MR. ENZER:  Good afternoon, your Honor, Samson Enzer

3      for government, and with me at counsel table is Special Agent

4      Kristin Allain from the FBI.

5              I will also note for the record, and I have informed

6      your Honor's deputy of this, there are several victims in the

7      courtroom.

8              THE COURT:  Thank you Mr. Enzer.

9              MR. EISEMANN:  Good afternoon, your Honor, Alex

10     Eisemann for the defendant, who is sitting beside me.  And I'd

11     also like to introduce the only person in the room that I know,

12     who is my client's mother.  She is sitting in the second row,

13     in the black-and-white striped shirt, and she came from Chicago

14     for this.

15             THE COURT:  Good afternoon, Mr. Eisemann.  And I note

16     the presence of the defendant, Nicholas Genovese, at counsel

17     table.

18             This matter is on for sentencing.  Are the parties

19     ready to proceed?

20             MR. ENZER:  Yes, your Honor.

21             MR. EISEMANN:  Yes, your Honor.

22             THE COURT:  Mr. Eisemann, have you reviewed the

23     presentence investigation report with your client?

24             MR. EISEMANN:  I did not review it him, but prior

25     counsel, I guess Mr. Halperin represented to me that Mr.

K2BEGENS

1    Genovese has the report and has reviewed it.  He's reviewed the

2    recommendation as well.  I didn't go over it personally because

3    that was done long before I came into the case.

4              THE COURT:  Are there any factual matters in the

5    report that the defendant believes warrant modification or

6    correction?

7              MR. EISEMANN:  There are, your Honor, some technical

8    things in there.  One, if you have the report, paragraph 5.

9              THE COURT:  Why don't take the podium.  It will be

10   much easier.

11             MR. EISEMANN:  I think paragraph 5 is where we start.

12   There is a restitution figure there and, as your Honor knows,

13   the government and the defense have revised that figure.

14             THE COURT:  Yes.

15             MR. EISEMANN:  The new figure is 11 point something

16   million.

17             THE COURT:  I'll physically change that in paragraph

18   5L and 5M.

19             MR. EISEMANN:  All right.  I'm going to paragraph 9

20   then.  These are prepared by Mr. Halperin and I'm trying to

21   make sure I'm understanding this particular one.

22             If I could have one moment.

23             The first sentence I'm going to tell you what the

24   objection is and what I think it should read as.  Which words I

25   would change to do that are a little hard for me to go through

K2BEGENS

1   because it's not black lined.

2           The first sentence should read:  During the relevant

3   period, Genovese was the founder and manager, not a managing

4   director, of the general partner of Willow Creek Investments,

5   LP, which should be defined as not the Willow Creek hedge fund,

6   but the partnership, or the limited partnership in quotes.

7           That's because the investment of the partnership's

8   capital was through a hedge fund, which is a category of pool

9   investment funds, so the suggestion is the term partnership or

10  limited partnership should replace Willow Creek hedge fund

11  there and throughout the PSR.

12          THE COURT:  What about that, Mr. Enzer?

13          MR. ENZER:  No objection.

14          MR. EISEMANN:  Your Honor, if you would like, I can go

15  through after the sentencing the PSR and highlight the areas so

16  that you don't have to go through and find them, and I can send

17  that to chambers.

18          THE COURT:  That would be fine.

19          MR. EISEMANN:  Paragraph 15.  The first word of the

20  third line of the third sentence should read "issuers," not

21  "SEC."

22          THE COURT:  That line should read:  Issuers, notifying

23  the SEC that the Willow Creek hedge fund intended to begin

24  offering securities?

25          MR. EISEMANN:  Give me one second to catch up with

K2BEGENS

 1   you.  It should be issuers notifying the SEC.

 2           THE COURT:  That's what I just said.

 3           MR. EISEMANN:  And the penultimate sentence should

 4   read:  In the second form, Genovese marked the box for

 5   executive officer to identify his relationship with the issuer

 6   and further identified himself as the manager and general

 7   partner of Willow Creek Investments, LLP.  As a technical thing

 8   I will make that change.

 9           THE COURT:  Any objection?

10           MR. ENZER:  No, your Honor.

11           THE COURT:  All right.

12           MR. EISEMANN:  Paragraph 129 purports the sight --

13   I'll let your Honor read it to yourself first, if that's

14   helpful.

15           THE COURT:  You can proceed.

16           MR. EISEMANN:  It purports to cite information from

17   the private placement memorandum.  For example, it identifies

18   Grant Thornton as "the auditor of the Willow Creek hedge fund."

19   However, that private placement memorandum identifies Grant

20   Thornton as the accountant for both partnerships which

21   "reserves the right to use other and additional firms for other

22   audit services."  That's in the private placement memorandum at

23   20.

24           In addition, the auditor subsection of the services

25   provider section states that the partnership's books of account

K2BEGENS

1   shall be treated as of the close of each fiscal year by Grant

2   Thornton or any other independent accounting firm designated by

3   the general partner, and that's at the private placement memo

4   at 37.

5           So information concerning the amount of assets managed

6   from the family of the Willow Creek investment advisor or

7   number of employees employed at the various entities does not

8   appear to be reported in the private placement memo, so the

9   entire second sentence and the remainder of paragraph 19 should

10  be deleted.  Frankly, I am reading more than I am fully

11  capturing it.  Unless it's clear to your Honor, I would be

12  willing to talk to Mr. Enzer about this and see whether we can

13  reach agreement.

14          THE COURT:  What's the government's view with respect

15  to those changes and deleting the last sentence of paragraph

16  19?

17          MR. ENZER:  The last sentence, Genovese managed 4

18  billion in assets?

19          THE COURT:  Yes.  That is the last sentence.

20          MR. ENZER:  Can I confer with defense counsel for one

21  second?

22          MR. EISEMANN:  Your Honor, I think all these technical

23  things, as we don't have some of the information we need, the

24  government doesn't have it, they are technical, so is it

25  possible to defer this and put a joint letter in saying what we

K2BEGENS

1    agree to be changed and what we agree not to be changed and try

2    and set the argument so your Honor can just make a decision

3    based on that joint letter, as opposed to calling us back in to

4    argue about something.

5         THE COURT:  Why weren't these issues raised with

6    probation?

7         MR. EISEMANN:  They apparently were raised only by --

8    there were three main lawyers in here.  There was Ed Little,

9    Jonathan Halperin, and there was me.

10        Ed Little raised one objection, which is in the

11   presentence report and was addressed by the probation officer.

12        When Halperin took over the case, he looked and saw

13   these technical things that weren't right and was planning on

14   putting them in at the time of sentencing, and I adopted that

15   as well.  It's a little bit of a problem with handing off from

16   one lawyer to the next.

17        THE COURT:  There have been so many lawyers in the

18   case.

19        MR. EISEMANN:  At least when the main work was done

20   there were three lawyers.  And the handoff from the first

21   lawyer, who didn't put in the objections the second lawyer

22   thought should be put in, and I'm fairly agnostic about those

23   things.  I trust the work that they did.  But because of doing

24   this in court, the government is at a disadvantage because they

25   don't have some of the documents saying that the private

K2BEGENS

1    placement memo is not consistent with.  I don't think it's

2    going to make a difference with a sentence, frankly, all the

3    ones I have in front of me, so if you allow me to defer these

4    late objections to following the sentencing, I think we can

5    move forward on it.  I don't think they will make a difference.

6    None of them are material.

7            THE COURT:  How many more are there?  Just give me a

8    summary.

9            MR. EISEMANN:  The next one talks about --

10           THE COURT:  Let's press ahead so that I know what the

11   objections are.

12           MR. EISEMANN:  OK.  I'll give you a quick snapshot of

13   what they are.  Paragraph 32 has something about the

14   restitution figure which has been corrected.  Your Honor's

15   going to correct that with my assistance.

16           There's an issue about -- I addressed this in my

17   sentencing memorandum, the second letter I just put in.  It is

18   about Colony Hills Capital.  It's a civil litigant and should

19   be struck from the PSR because their funds were returned, so

20   they shouldn't be included.  That's paragraph 32 to 38 under

21   the victim impacts.  It's all before your Honor as to what

22   happened.

23           THE COURT:  Let me inquire of the government.  With

24   respect to victim impact relating to Colony Hills Capital, what

25   does the government want to do with that?

K2BEGENS

1          MR. ENZER:  I don't have an objection to it being

2    removed from the PSR, which is the immediate issue before the

3    Court.

4          The broader issue of whether Colony Hills should be

5    treated as a victim for restitution is something that is not

6    clear yet.  I have conferred with their counsel, but there is

7    an open issue between us and between the defense as to whether

8    they, A, are a restitution victim, and if so, B, what is the

9    right amount of any restitution loss that they should be

10   getting a recovery for.

11         THE COURT:  But it seems to me for an entity to say

12   that they forewent other opportunities is, one, rather

13   speculative and, two, the defendant pled guilty in October of

14   2018.  If it's not worked out by the time of sentencing, when

15   is it going to be worked out?

16         MR. EISEMANN:  It's a restitution issue.

17         THE COURT:  Lawyers love to put restitution over.  Oh,

18   Judge, we'll take care of it another time.  It really doesn't

19   work that way.  I guess I'm going to let it work that way in

20   this case because it's been such a struggle to get Mr. Genovese

21   to sentencing.

22         So I'm going to strike paragraphs 33 through 38 from

23   the presentence report.

24         MR. EISEMANN:  I think also the end of paragraph 32

25   where it says:  To date one victim Colony Hills Capital.

K2BEGENS

1          THE COURT:  No.  That's an accurate statement.  Their

2  law firm sent a letter to me.

3          MR. EISEMANN:  One claimed victim then?  Unless you're

4  going to adopt that they are, in fact, a victim of the offense.

5          THE COURT:  No.  I'm leaving it the way it is.

6          MR. EISEMANN:  OK.

7          THE COURT:  That objection is overruled.

8          MR. EISEMANN:  Paragraph 109, your Honor, talks about

9  Mr. Genovese's health.  It lists some problems with him.  It

10  says:  Otherwise is in good health.  But he has other problems

11  that I've described in the submissions that you have and I'm

12  going to amplify them a little bit here today as well.  If you

13  said, suffers at least from sinuses asthma, and struck the last

14  sentence, he's otherwise in good health, that would be

15  accurate.

16          THE COURT:  Any objection?

17          MR. ENZER:  No, your Honor.

18          THE COURT:  All right.  I'm making those changes to

19  paragraph 109.

20          MR. EISEMANN:  In the criminal history, to the extent

21  that -- this is paragraph 81 and going forward.

22          THE COURT:  Hold on.  Go ahead.

23          MR. EISEMANN:  In looking at paragraph 83 and 84, for

24  example, stricken off, leave reinstated, I don't know what that

25  means.  I propose that notations be taken out of the report and

K2BEGENS

1    just leave it blank.

2              MR. ENZER:  No objection.

3              THE COURT:  All right.  Those notations are stricken

4    at paragraphs 83 and 85.

5              MR. EISEMANN:  Believe it or not your Honor, that's

6    it.

7              THE COURT:  All right.

8              MR. EISEMANN:  The other ones, I'll write a letter and

9    try and get the government's cooperation to be clear of what it

10   is that we agree upon.  I expect they'll probably agree on

11   these things.  If not, I'll highlight the area of disagreement

12   and give it to your Honor to decide that on submission.

13             THE COURT:  We've covered in substance the objections,

14   right?

15             MR. EISEMANN:  Yes.

16             THE COURT:  OK.  You'll submit such a letter to me by

17   February 18, next Tuesday.

18             Mr. Enzer, are there any factual matters set forth in

19   the presentence investigation report that the government

20   believes warrant modification or correction?

21             MR. ENZER:  No, your Honor.

22             THE COURT:  All right.  Now, with respect to this

23   sentencing, I plan to proceed as follows:

24             First, I intend to hear from any victim who wishes to

25   address the Court.  After that, I'll entertain argument from

K2BEGENS

```
 1    defense counsel and then the government concerning sentencing

 2    and the 3553(a) factors.  Finally, I will hear from the

 3    defendant, Mr. Genovese, if he wishes to address the Court.

 4          So at this time I'm informed by the government that

 5    there are victims who wish to come forward and address the

 6    Court.

 7          At this time I would call on Mitchell Levine to come

 8    forward to the podium.

 9          Good afternoon, sir.  If you could just state your

10    name for the record.

11          MR. LEVINE:  Mitchell Levine.

12          Thank you for the opportunity to make a statement

13    regarding Nicholas Genovese, my relationship to him.  I did

14    submit a written statement which I assume that you have some

15    familiarity with.

16          THE COURT:  I have received that, yes.

17          MR. LEVINE:  Thank you.

18          I just would like to give a little background on how I

19    came to know Mr. Genovese and why I think he should be

20    sentenced to the maximum that the law allows.

21          I actually came to meet Mr. Genovese through my

22    hospital.  I work at Lenox Hill Hospital.  I'm a neurosurgeon

23    in the department of neurosurgery.  I received an email, which

24    I'll just quickly read, which comes from an official email from

25    my company email saying:  Hi, everyone.  I want to thank you
```

K2BEGENS

1    for taking time out to meet with my friend tomorrow.  I share

2    some of the amazing things we do at Lenox Hill Hospital with

3    him, and he requested to consider neurosurgery for

4    philanthropy.  He is interested and that's why I want to

5    organize a hospital OR tour for him, him being Nicholas

6    Genovese, and then spend some time sharing our key projects

7    that can benefit from philanthropy.  This was sent by an

8    administrator in the neurosurgery department.

9           It says:  Below is a short bio.  This is, I think,

10   what speaks to the fraud.  It says:  Nicholas Genovese,

11   managing director and founder of Willow Creek Advisors LLC, is

12   the main portfolio manager analyst who is primarily responsible

13   for all of Willow Creek funds.

14          Mr. Genovese was a partner at Goldman Sachs, and prior

15   to that was a portfolio manager and member of the investment

16   strategy committee at Bear Sterns.  He received a BS in finance

17   from the University of Kentucky and an MBA in finance from

18   Dartmouth Tuck Business School.  We will send an agenda

19   shortly.  Please let me know if you have any objections.

20          This came to me through my official email from my

21   hospital.  We subsequently had a meeting with Mr. Genovese

22   which was attended by myself and four of my colleagues in my

23   department and the development office from Northwell Health and

24   its Lenox Hill point person, so to speak, where we all talked

25   with Mr. Genovese, and he presented himself as a manager of a

K2BEGENS

1   very successful hedge fund with a lot of money.

2          He also stated -- because we asked him why, all of a

3   sudden, is he giving us money.  And he made the point that the

4   charitable donations of his sizeable family charities were

5   previously given to Salvation Army and that he wanted to divert

6   some of these funds to a department where it would have a big

7   impact, which makes sense.  Because as a neurosurgery

8   department, the proposed gift of about $5 million would have

9   been a transformative gift in terms of allowing us to endow

10  chairs and further our academic mission.

11         So, from that point onward I started a relationship

12  with Mr. Genovese, which he cultivated, and, to me, just not

13  getting into the details, this was like quite a good con, if

14  you had to say, the con being he presents himself as a

15  prominent donor.  He has this completely set of false

16  credentials.

17         Whether he knew it or not, in the philanthropy

18  business, because I went over this with my hospital, they do

19  very little due diligence.  They don't check that Nicholas

20  Genovese really had all this money.  They don't do any

21  background check.  They don't run the social security number.

22  They do nothing.

23         And they are perfectly willing to take his money,

24  which I didn't know about the lack of due diligence, but I

25  think Nicholas did.  And he then went along this path as

K2BEGENS

1    presenting himself as a potential donor.

2              We treated him like royalty, obviously, because he was

3    giving us a lot of money.  We gave him private tours of the

4    hospital.  I took him to my laboratory and showed him my

5    laboratory and scientists and all the good work that we are

6    doing.  And all this was done with the thought that he was who

7    he said he was.  It wasn't as if we were looking for a hedge

8    fund to throw some money into and make more money.  We were

9    doing this as a source of philanthropy.

10              Through that, it validated in my mind that this guy

11    was who he said he was.  I am very naive and in my own head I

12    was thinking, if Northwell Health believes him and they are

13    pursuing them and made him an honored guest at our fundraising

14    gala -- I believe he was actually in Florida, where he was

15    apprehended, to attend a Northwell event.  I'm not sure.  I

16    can't speak to that directly.

17              Essentially, what he did was he used that position as

18    a potential donor, which went on and on for a long time,

19    including letters of intent between his attorneys to give money

20    to the hospital, which never materialized or always kind of

21    delays that the money never came.  But during that entire

22    period, I stayed involved with him and he gained my trust and

23    we became friends, I guess, and I was naive.

24              At some point, in terms of the fraud, he offered to me

25    to buy shares in a pre-IPO, Pinterest investment.  And he said

K2BEGENS

1    that if I invested $500,000, which is a hell of a lot of money

2    for me, I've never done anything like this before ever, all my

3    money has been managed by real money managers, and that was a

4    lot of money for me, that I would get pre-IPO shares in

5    Pinterest.

6            And, unfortunately, I did do due diligence, but not

7    into Nicholas Genovese.  I did due diligence into Pinterest and

8    whether it's a good investment or not.  And I found out it's a

9    very good investment and it was rare for private individuals to

10   get pre-IPO shares, and he explained to me how he was getting

11   $20 million worth of shares, this transfer of shares of Willow

12   Creek, and he would then, because he liked me kind of, allow me

13   to invest this money, and my friend invested a million dollars.

14           And basically he took this money for pre-IPO shares,

15   which was a total fraud.  He didn't have pre-IPO shares.  He

16   wasn't legally able to sell pre-IPO shares.  This was a

17   complete fraud.

18           It's not like he lost money.  He took money to sell

19   something like selling the Brooklyn Bridge.  He didn't own it,

20   he didn't have the shares.  It was a complete 100 percent

21   fraud.  When I asked him about it, I said:  Why don't I get

22   certificates?  Why don't I have some legal piece of paper

23   saying I own these shares?  He said:  No.  At Willow Creek

24   everything is held in Willow Creek, and I logged onto my

25   account and I saw there is money listed for Pinterest.  But in

K2BEGENS

the end, it was an absolute 100 percent fraud.  He had no

shares.  He had no access to shares.  It was a complete fraud.

        The next fraud that came about was that he started

asking me, persistently asking about, what are you doing with

your -- don't you have any cash?  What are you doing with your

money?  Where is your IRA money?  I mentioned to him that I had

my IRA money with Schwab and that it was in cash.  I kept it in

cash.  And why would I keep it in cash?  Because I was scared.

I actually kept it in cash.  It wasn't even making any money.

Because after 2008, I lost money, so I took a big portion of it

and I went to cash, and I left it there as my security.

        Well, Nick worked on me and worked on me and worked on

me.  And the sad part of it is, I gave him $1.4 million.  Not

to him, theoretically, but to this, to the Willow Creek IRA

fund.  And my thinking was, I had some money with Schwab, my

other investment, I would diversify a little bit.  I thought he

was a real guy.  He told me about his returns on his

investment.  It seemed like a real IRA, according to his

literature, and my accountant asked me -- yeah.  I said that's

fine.  It's an IRA rollover.  No problem.  You can do that.  He

said, I don't advise it because I don't know this guy, but just

make sure he's a legal custodian, make sure he's legally able

to have an IRA custodial account, or else the government, when

you withdraw that money, is going to take that as a cash

withdrawal.

K2BEGENS

1            And I spoke to Nick and I have in writing his

2      response:  Of course I'm a legal custodian.  Of course I'm

3      good.  Of course the government lets me do this.  How can I run

4      an IRA?  How can I run an IRA account without being a legal

5      custodian?  That's the next fraud.

6            He was never a legal custodian.  He had no right to

7      run an IRA.  The IRA money was viewed by the government as a

8      cash disbursal.  And I had to pay another $253,000 in tax to

9      New York State because of that disbursal.  My tax attorney took

10     the position that it was a tax fraud loss, which is recognized

11     by the IRS but not by New York State and New York City.  So in

12     the case it cost me another $253,000, and that was his fraud.

13     His fraud was that he was the IRA custodian and this was an IRA

14     account and it wasn't.  It was just nothing.  He was not in any

15     way registered, he had no right to take IRA money, and the

16     government views it -- even though I was defrauded and it's a

17     crime, the IRS and their attorneys and the law is, they felt

18     sorry for me, but you still owe the money.  Those were the two

19     main frauds that were placed on me, so my total loss with him

20     was well over $2 million.

21            And in terms of the IRA money, that was money that I

22     contributed to since 1983.  I've been a neurosurgeon for many

23     years.  I'm 68 years old now.  I started when I was 31.  And

24     every year I put $30,000 into this account, $30,000, $30,000.

25     This isn't money I made in some deal.  This wasn't money I made

K2BEGENS

1    a couple weeks ago when I sold a building and got all this

2    money and give it to this fund.  This was money that accrued

3    over 25, 30 years of work and that because of the stock market

4    and the way it was invested, it grew, as it should have grown.

5           And that's what he took from me.  He took my life

6    savings from me, money that was hard earned and incrementally

7    earned.  I didn't do a good deal and just put the money to him.

8           In the end, my sad story -- and I don't now how much

9    this impacts on things, but I was recently diagnosed with

10   cancer.  I underwent -- part of reason I'm speaking this way is

11   the left side of my face doesn't work.  I had malignant cancer

12   in my salivary glands discovered shortly after I found out

13   about this fraud, so 2018 was not a particularly good year for

14   me.

15          I had extensive surgery, radiation, chemotherapy at MD

16   Anderson Cancer Center.  I was out of work for six months.

17   Luckily, this past January I was able to return part time to

18   work.  But what I can't do, I don't have a future that's going

19   to recoup this money.

20          Unfortunately, this past December, my cancer returned.

21   I have terminal cancer right now.  It's difficult for me to be

22   here.  Yesterday I had to go to extensive treatments at Sloan

23   Kettering.  Radiation, immunotherapy.  My survival is quite

24   uncertain.

25          And in planning my estate planning, which I had to do,

K2BEGENS

1    it's clear that $2 million taken out of my estate, to my

2    children and my wife my family is a big hit.  It's a major part

3    of my money.  It's less for my children.  It's not going to

4    affect me.  It's going to affect my family.  I'm not going to

5    be here very long.

6           But I expect from the Court and what I want from the

7    Court is, I have no chance of recouping this money.  If I was

8    well and healthy over the next 10 years, I could probably make

9    it back, but I'm not going make it back.  It's a loss.

10          And what I'm asking from the Court is this a predator,

11   this is a con man, this is a fraud.  He took my money.  He knew

12   that the IRA money was not good.  He knew that the Pinterest

13   shares were not real.  It's not a question of him losing a lot

14   of money trading.  It's a matter of him taking the money on a

15   fraudulent basis.  His credentials were completely fraudulent.

16   He reiterated to me over and over again, when he was at Goldman

17   Sachs, when he was at Bear Sterns.  He wore a Dartmouth cap all

18   the time.

19          This is a complete fraud and I think he should be

20   punished as such.  My goal of being here is less about getting

21   money back, but protecting society from the predatory behavior

22   of a man like him.  I couldn't imagine a person to be this

23   evil.  It's beyond my imagination to think that someone could

24   be so without conscious and such a sociopath and befriend

25   people, run this con, take the money, and have no remorse

K2BEGENS

1    nothing.

2            That's my statement.  I want the government to protect

3    the citizens of the United States from future actions of this

4    predator.  That's my goal.  Thank you.

5            THE COURT:  Thank you, Dr. Levine.

6            At this time I would call on Granville Beals to come

7    forward.

8            MR. BEALS:  Thank you, your Honor, and the Court for

9    allowing me to speak.  My name is Granville Aimes Beals.

10           I will be 65 in April, and I am a victim, also, of a

11   life-altering terrible fraud inflicted upon me, my wife, and

12   many other decent people by Nicholas Genovese, who I met nearly

13   eight years ago on a flight to New York.  He then shared with

14   me his position as an heir to the Genovese drugstore chain

15   family fortune, his time as a partner at Goldman Sachs, with

16   Bear Sterns as a portfolio manager, as well as his Dartmouth

17   college days etc., all leading up to his managing the family's

18   fortune with his multibillion dollar hedge fund, Willow Creek

19   Advisors.

20           He told me about his home that he had in a very tony

21   part of Greenwich, Connecticut and his polo pony, which he had

22   purchased in Kentucky for his sport that he so loved to watch,

23   as well as play.  He was impeccably dressed in a fine suit,

24   Gucci shoes, Rolex watch.  He certainly fit the part.

25           So what's a billionaire doing sitting next to me I

K2BEGENS

asked him.  Without missing a beat, he explained it was a
last-minute booking that his secretary had made for him and
that no first-class seats were available.  It's a short
connecting flight, so that seemed pretty reasonable to me.  But
as I would later learn, that was all just a mountain of
unscrupulous deception and emotional manipulation.

He had law offices which are down at 1 Liberty Plaza
with spectacular views of Wall Street and lots of beautifully
printed pamphlets.  There's a lot of stuff in here that I got
suckered into.  He had brochures and marketing materials
extolling Willow Creek Advisors.

He had a private, armed, salaried driver, former NYPD,
armed, sitting in his Cadillac out front waiting to whisk him
around.  His other cars, a Bentley and Mercedes, were primarily
for his personal use.  So after a long workday chances are good
that he'd be driven to the Four Seasons for cocktails, where he
was well known by the attentive staff, who always treated him
like royalty.

He lived an extravagant lifestyle, which he always
justified for me for all the hard work that he was doing on a
daily basis to manage his clients and his family's money.

On his occasional business trips to California, which
is where I live, he told me that he was there to meet with
executives at Google and Apple about investments they were
making, or had already made, with Willow Creek Advisors and to

K2BEGENS

1    meet with his Los Angeles clients, which included the

2    prestigious Kerkorian and Chandler families, to name a few.

3            He would always stay at the Ritz-Carlton on the VIP

4    club level, and he would either drive himself to our house in a

5    Maserati, or arrive in a large Suburban with his two armed

6    off-duty LAPD security men.

7            He often told us that he was very hands on and his

8    clients always come first.  This, along with all of his other

9    well-documented fabrications, was just a huge lie, a lie which

10   was revealed to us on the evening of February 2, 2018, while we

11   were parked outside of a house where we would be attending a

12   dear friend's 60th birthday party.

13           I attempted for over a week to reach Mr. Genovese

14   without success.  I spoke to him frequently, texted him almost

15   daily.  And alarmed that I had not heard a word from him in

16   response to the numerous messages that I had left him, I was

17   truly quite concerned about his safety, and I thought well

18   maybe he had been in a terrible car accident or was in the

19   hospital.

20           So while sitting with my wife in our car, I searched

21   the news online.  And that's when I learned that he had just

22   been apprehended and arrested in Florida by the FBI.  My wife

23   and I, we just sat that in our car just staring at each other,

24   in a state of shock, an unfamiliar panic.  It was a horrible

25   moment where right away we felt a terrifying sense of the harsh

K2BEGENS

and devastating effects this would no doubt have on our life.
Our life savings from years of hard work was stolen.  With that
stunning revelation we went in to celebrate our friend's 60th
birthday.

The anxiety brought on by the loss of our savings is
enormous.  The burden which has been placed upon us by this
calculating criminal is immeasurable.  Money that we thought
was wisely invested and growing is gone, stolen.

It's hard for us not to feel like fools, even though
we know well we are victims of a horrible crime.  And as much
as we've tried to put it behind us, this nightmare, the damage
that he has inflicted upon our life makes that quite
impossible.  Our finances and future plans for a safe and
secure retirement are shattered.  It scares us to think what
life's going to be like from here on out.

He's proven himself to be a serial thief of others'
life savings.  There is no remorse.  There is just a
hibernation period in prison, eating, sleeping and requiring
public staffing, plenty of time for him to plot what's next on
our dime again.

We were not shot with a gun.  We were not stabbed with
a knife.  We were not bludgeoned with a hammer or a club.  But
make no mistake.  My wife and I were stalked and attacked as
were all the other good people who believed that Nicholas
Genovese was a trusted financial advisor and truly caring

K2BEGENS

1    friend with nothing but the best interests in mind for our

2    financial well being.  His despicable crimes, although

3    bloodless, are maliciously aggressive, leaving gaping wounds

4    that last a lifetime.

5          A disturbing example of how much he cared.  Greeting

6    cards and flowers my wife would receive from for the good news

7    I would share about your her bimonthly checkups following the

8    surgery and chemotherapy treatments she had gone through for

9    ovarian cancer.  It's blatantly obvious that his motivation for

10   these kind and loving gestures had nothing whatsoever to do

11   with any care or concern for the health and welfare of my wife.

12   Excuse me.

13         It is a despicable example of his cunning

14   manipulations, and I'm disgusted, as is she, by the pretense of

15   care and concern showed to her by our, quote, friend Nicholas

16   Genovese, when in truth he couldn't care less.

17         If that wasn't enough, she lost her job of 19 years

18   just one week before learning that our financial caretaker is

19   an ex con and our money's gone.  His calculated plan was to

20   take us for all he could.  We were just another couple of

21   perfectly targeted victims to exploit in the big con game that

22   has been his sole vocation for the entirety of his adult life,

23   one that led to numerous felony convictions for fraud-related

24   offenses, including forgery, theft by deception, identity

25   theft, grand larceny three times, along with time spent in

K2BEGENS

1    prison.

2           And, still, he has not change his criminal ways.  He

3    has flagrantly broken our laws and our trust.  He is not

4    ignorant.  Oh, no.  He is blatantly dishonest and brutally

5    predatory.  He steals, he lies, he manipulates and, most of

6    all, he leaves people in ruin, people who uphold our laws and

7    believe in our civilization, people who have worked hard all of

8    their lives, only to have him promise that he will put that

9    hard-earned money to work while actually stealing it.

10          In February of 2017, roughly a year before Mr.

11   Genovese was arrested, we were notified by the IRS that someone

12   had attempted to impersonate us, using our name and social

13   security numbers to file an early tax return, requesting that

14   the refund be wired in an expedited manner.  We've never filed

15   early or requested an expedited return in our 29 years of

16   filing our joint tax returns.  Thankfully the IRS noticed this

17   and contacted us first.  We were victims of identity theft.

18   Once again, we stood to lose even more of our money.  Perhaps

19   it's no coincidence that this is a felony crime for which

20   Nicholas Genovese has previously been convicted, given what he

21   has done to us.  I think not.

22          There's not punishment enough for all the suffering

23   that he has caused.  He has proven himself to be a danger to

24   society, whose lavish lifestyle derived from a lifetime of

25   crime, which suits him just fine.

K2BEGENS

1          I'm well aware that Nicholas Genovese has made a plea

2     deal and no doubt expects to receive a sentence agreeable to

3     him.  He's a master manipulator and his manipulations have not

4     ceased, even during his incarceration.

5          After pleading guilty, he delayed the sentencing over

6     and over and over again, going through multiple attorneys,

7     getting sick, needing more time, over and over again to

8     prepare, prepare.  Prepare for what?  He's guilty.  The

9     numerous crimes that he has committed are plain-as-day facts,

10    and yet his games and manipulations continue.  He has dragged

11    this out, inflicting further abuse upon his victims and upon

12    this court.

13         I have lost count of how many times I have forfeited

14    money for canceled tickets that I have purchased for flights to

15    attend this sentencing.  I submit he was just employing one of

16    the many techniques in his playbook, counting on victims, such

17    as myself, who have gone out of their way to speak in court to

18    become so frustrated that they finally give up and decide not

19    to appear for this sentencing.

20         He may not be too worried.  Well, I am.  I am worried

21    that my retirement years, which are just around the corner,

22    will be fraught with financial insecurity.  I'm worried that

23    our healthcare expenses might be unaffordable when we need it

24    most.  I worry about things I never would have worried about

25    were it not for Nicholas Genovese.

K2BEGENS

1          Well, I have a plea too.  And that plea is that

2     Nicholas Genovese be given a sentence that meets, at the very

3     least, a maximum allowed by the guideline set forth for the

4     plea that he agreed to.  I plea for more, in fact.  He stole

5     freedom from our retirement years.  Why should he someday be

6     free to enjoy his life.  May he never experience true freedom

7     again and may he forever be prevented from bringing harm to

8     another individual.  He does not deserve anything from this

9     community.  It is the community that deserves protection from

10    him.

11          Thank you, your Honor.

12          THE COURT:  Thank you, Mr. Beals.

13          I call now on Mr. Orley to come forward.

14          MR. ORLEY:  Thank you.  My name is Geoff Orley.

15          I find no reason to repeat what the prior two victims

16    have already said.  I can't agree more.  I was a little

17    dismayed that the proposed sentencing guidelines were only 10

18    to 13 years, which was a surprisingly light sentence to me.

19          On the other hand, I have been in court now in the

20    civil court trying to find a way to recover some of my

21    hard-earned monies and, unfortunately, there's nothing to

22    recover from Mr. Genovese.  I'm trying to win a suit against

23    his attorney, Mr. Schiavetta, who the Court acknowledged did

24    have scienter, but I now need to prove that Mr. Genovese had

25    funds in the account at the time of the fraud.

K2BEGENS

1          And because of the grand jury and other reasons, I've

2     been unable to attain paperwork to help prove that the funds

3     were in the account, so I have a potential opportunity maybe to

4     recover something in a civil court.  His attorney did mention

5     they had paperwork, maybe it can help me.  I don't know if

6     there is something that can help.

7          But I can say that I tried to have a personal

8     relationship with Nick.  We had a personal relationship.  He

9     went with me on a trip to South America.  And as we were riding

10    horses he was talking about all of the funds he was making on

11    the telephone up in the mountains to his attorney or his other

12    partner in crime that I could just hear enough to salivate and

13    be excited about the opportunities that he was creating.

14         But, unfortunately, I was duped like the others.  I

15    was also naive.  My MBA son doesn't even want to talk to me

16    anymore.  He doesn't trust in my judgment.

17         And, unfortunately, I introduced Nick to my family, to

18    my friends.  He slept in my house.  And outside of the loss in

19    Willow creek, I advanced monies for us to take a fishing trip

20    together in the Amazon, which to this date he never paid for

21    and I had to pay for out of my pocket and never took the trip,

22    in addition to the loss in Willow creek.

23         Everything was a lie.  Everything was a fraud,

24    everything, including going to see his horses out in Greenwich

25    with the sign over his booth at center court, and,

K2BEGENS

1    unfortunately, it was all bullshit.  The restaurant that we

2    celebrated his birthday in, knew the matrie d' and everybody

3    knew him and knew his mother and knew this and that, and I was

4    just another naive victim that he took advantage of.

5              I'm hoping I might have a recovery in the civil court,

6    but I'm not too optimistic, and I only ask the judge to do what

7    he thinks is correct.  But Nick should not be out on the

8    streets with an opportunity to go after more people.  I know he

9    likes pinstriped suits and I see he's not wearing one today.

10   Maybe he'll never get to wear one, I hope not, unless that's

11   the order of the prison.

12             So thank you for your time, and he deserves everything

13   he's got coming.

14             THE COURT:  All right.  Thank you Mr. Orley.

15             I now call on Mr. Blank to come forward.

16             MR. BLANK:  Thank you for this opportunity allowing me

17   to read my statement.

18             THE COURT:  Would you just state your full name for

19   the record.

20             MR. BLANK:  Aaron David Blank.

21             THE COURT:  Thank you.

22             MR. BLANK:  What my fellow victims have said, it pales

23   in what I have to say here, so I'm going to cut to the chase a

24   little bit.

25             This is what I have to show for my grandfather,

K2BEGENS

```
 1   working almost to his dying day and giving me a meager

 2   inheritance that was then swindled away from me by a

 3   fast-talking con man.

 4          It breaks my heart more that he also most probably

 5   defrauded my most favorite institution, the Metropolitan Opera.

 6   And more disgusting, I am very certain he used those funds to

 7   hire prostitutes, which breaks my heart and my family's legacy.

 8          This whole affair has made me extremely distrustful of

 9   everyone.  I've suffered from a great depression from it.  I

10   ask to you please exercise no leniency.

11          Thank you.

12          THE COURT:  Thank you, Mr. Blank.

13          Are there any other victims in the courtroom who wish

14   to come forward and address the Court?

15          MR. ENZER:  No.

16          THE COURT:  Seeing no one coming to their feet, I'll

17   turn now, Mr. Eisemann, to you.  Do you want to be heard?

18          MR. EISEMANN:  I do.  Can I have just a minute to look

19   at -- my client has made some notes while the victims were

20   talking.

21          THE COURT:  Take a moment.

22          MR. EISEMANN:  Thank you, your Honor.

23          First, just as a housekeeping matter, I have the

24   signature page of Mr. Genovese's letter to your Honor, which

25   I'm going to hand up to you.
```

K2BEGENS

1          THE COURT:  That's fine.  But please take the podium

2     in addressing the Court.

3          MR. EISEMANN:  I'm going to start with reacting to the

4     painful statements that you just heard from the victims.

5          I mean, there is no getting away from the fact that

6     this crime, like every economic crime, is painful and tragic.

7     And when I hear something like Dr. Levine's diagnosis and think

8     that he has to go through this while he's going through that,

9     and the other problems that people talk about -- and I do want

10    to address some of that on the merits.

11         But their anger and their sense of betrayal is

12    understandable.  This was their friend.  And despite the

13    suspicion, the understandable suspicions that it seems like

14    that's all part of the manipulation, Mr. Genovese has written

15    your Honor about how these were real friendships to him, and

16    you have a report that talks about how this filled a need in

17    him.

18         So it's a complicated situation.  If I were in the

19    victims' shoes, I would be saying just what they said.  I

20    wouldn't expect them to try to take a broader view, which is

21    obviously your Honor's responsibility here because you are not

22    just going to go by what the victims say.  Otherwise, everyone

23    would go to jail forever.

24         Mr. Genovese, as one of the speakers noted, didn't

25    hurt anyone and, obviously, there has to be some measured

K2BEGENS

1    sentence because your Honor sentences not just people who

2    affected the victims in this case, but across all spectrums of

3    the crimes that come before a federal judge, and there are

4    norms that have developed out there as well, and I briefed your

5    Honor somewhat on that.  I'll talk about that.

6          But it's difficult.  I won't envy your Honor sitting

7    in the position if you decide that under the guidelines and

8    just the legal analysis that you have before you that something

9    less than the guidelines is warranted.  It's not going to be

10   easy to do that with the victims here, who don't fully

11   understand why you might do that, but, obviously, that's your

12   job and that's the responsibility that's given to you as an

13   Article III judge with lifetime tenure.  You have to make those

14   judgments.

15         And anyone who is a judge or wants to be a judge knows

16   that people are always going to be angry when they leave the

17   courtroom if they didn't win, if they didn't get what they

18   expected; but, hopefully, with your Honor's explanation and

19   hearing my presentation, will at least let the people who have

20   been betrayed understand that there is a another side to the

21   person before your Honor.  I am not taking away from what he

22   did, but the guidelines recommend a certain sentence.  They are

23   mechanical.  They are criticized.  People who have stolen far

24   more got lower sentences, so your Honor has to fit this case in

25   with the matrix of all the cases that are out there and not

K2BEGENS

just react to what is heartfelt, painful to listen to, and,
frankly, difficult for me to respond to the statements from the
victims.

I will comment on them to get it out of the way, and
I'm not sure that any victim will be happy with the
countervailing facts I'm trying to put on the table, but it's
my job and I'm going to do that.

When Dr. Levine was talking -- well, just generally,
there is no excuse -- I'm going to say this many times,
probably -- for the untruths that Mr. Genovese told these
people to get them to invest.  My memorandum, the submissions
I've made, the letter from Mr. Genovese, make clear something
which I don't think anyone can refute, and that is that he did
that as -- in his mind it was a threshold issue, and then he
thought he would make money.  He didn't make money.  But he
didn't intend to steal their money.  They feel that way.  I
understand it.  But the objective facts are that he invested
the money.  Maybe he didn't do it very well.  Maybe there are
other people who could have done better, but he did invest and
that's a mitigating factor that your Honor has to consider, as
I briefed in my submissions.

It's not as if he's a person who -- people lost $11.2
million, the loss figure here -- because he said, how can I get
that money into my pocket so I can have $11.2 million.  He
didn't do that.  He said, how could I get $11.2 million so I

K2BEGENS

1    can invest it because I think -- and there's a lot of support

2    for why he thought that way -- I think I'm a talented investor,

3    and I'll make them money -- because I'm leveraging other

4    people's money, I'll make money as well.

5           He lost it all.  Other hedge funds went belly up.  I

6    have the names of them.  Maybe other hedge funds wouldn't have

7    gone belly up.  But to the victims who feel betrayed, if your

8    Honor does, to a more measured approach under the guidelines,

9    by talking to your Honor, I want them to understand that as

10   well that there is a difference between -- as bad as what Mr.

11   Genovese did, a difference between someone who said, and there

12   are many of them and your Honor has sentenced them, who started

13   from the getgo to say how can I fleece these people and put it

14   in my pocket.  He didn't do that.  He put some in his pocket.

15   He lived a higher lifestyle than he should have, but he didn't

16   start out to do that.

17          Just in the order of my notes, Mr. Beals saying that

18   he felt that Mr. Genovese wasn't a caring friend.  With all due

19   respect, he doesn't know whether that's a case or not.

20   Perfectly reasonable assumption for him to make.  It was all

21   part of a manipulation.  I don't think your Honor is going to

22   be able to resolve that.

23          You have Mr. Genovese's letter talking about how he

24   feels pained by what he did to people who were his friends.  I

25   think we have to leave it at that, that there are two sides to

K2BEGENS

1    the story.

2            But because he invested money, I think you can't make

3    the leap of logic to say that everything he did, all the

4    friendship he showed, all the times they had together that they

5    felt warmth with each other it was all a betrayal -- sorry --

6    it was all a manipulation.  I just don't think anybody knows

7    that.  The only person that really knows that is Mr. Genovese.

8    But there is objective evidence showing that his statements

9    that it wasn't like that are backed up by the record of him

10   trading and how he has talked in his heartfelt letter about the

11   impact he feels about what he did.

12           By the way, Mr. Beals, I just would like to tell him

13   something through your Honor.  The canceled sentencing

14   hearings, at least on my watch, were not done by any

15   instructions by Mr. Genovese.  That's my own workload and what

16   I had to do.  The last time we adjourned the sentence I

17   learned -- only when I was making the 11th-hour request to

18   adjourn it, that's when I learned that victims were coming in

19   here to speak.

20           And if your Honor remembers, at that hearing I said I

21   will make this a firm date.  I don't want to inconvenience the

22   victims.  I will try to look into whether they could actually

23   be compensated by the victim funds for the cost of their

24   airfare.

25           But to Mr. Beals I want you to know -- I am not going

K2BEGENS

1    to turn around and face him, because I can only speak to your

2    Honor -- that that was on me and not on my client, and I

3    apologize to the extent you had to do that.  For my time I

4    don't know the answers, but most adjournments are done because

5    lawyers need them, not because the clients are asking for the

6    lawyers to get them.

7              Mr. Orley says that when they took a trip to Colombia

8    that Mr. Genovese was talking about the money he was making

9    while he was on top of a mountain.  Your Honor knows -- I

10   didn't give you all the records going back, but there were

11   times when he was making money, and he made some very good

12   deals.  He turned $50,000, $51,000 into about $600,000 in a

13   matter of days.

14             So, again, it's one of these things we don't know.  I

15   could go back forensically and reconstruct the date of the trip

16   and say that, look, he did actually make money there, but he

17   was actually working this fund.  Despite how he got the money

18   to invest, he was working the fund with analysts, with reports,

19   with keeping up with news, keeping up with social media.  They

20   developed algorithms to be able to pick their stocks.

21             They did not work out for sure, but it's just a little

22   bridge too far to say that everything he did was a concoction,

23   because it wasn't, and the record establishes that.

24             So justifiable anger should go as far as the

25   justifiable anger is deserved, and it's well deserved because

K2BEGENS

1    the impact of this is that they've lost their money.  And who

2    cares whether Mr. Genovese thought he was going to make money

3    or not.  To them they lost their money, and they are going to

4    bring that to your Honor's attention and talk about how painful

5    it is, and there is no doubt about it.

6         That's why Mr. Genovese is going to go to jail and not

7    walk out a free man, as somebody who nobody lost money on might

8    do, or as someone who had a much lower degree of crime will do.

9    But he won't spend the rest of his life in prison, as someone

10   who has murdered people have done or who ran a huge drug ring

11   and probably resulted in deaths of many people.  There is a

12   continuum, and he is in the continuum, but only at a certain

13   level.

14        All of the investors signed -- all of them talk about

15   the impact of losing money, and there is no doubt that losing a

16   million or $2 million is painful, unless you are Mike

17   Bloomberg.  To anybody who has got a modest amount of money

18   it's painful.

19        But all of them did sign subscription agreements that

20   said -- it looks like boiler plate, but it means something --

21   that the fund has no track record, that they need to be

22   prepared to lose their money.  There are regulations that

23   determine who can invest in a hedge fund and that's what goes

24   into these subscription agreements that say you got to have at

25   least X amount of income, this much assets.  I may have

K2BEGENS

reached, your Honor, on the numbers, but if not, it's in the

regulations.  You have to be a qualified investor, one who

acknowledges that you can lose the money.

Certainly, nobody agrees to lose money because of

deception.  But to the extent that any of the victims here are

testifying that this has made an impact on their life, again,

I'm not saying it doesn't make an impact.

But to the extent that other information I have or

things that people wrote in subscription agreements or

information that was provided to Mr. Genovese, like Dr. Levine

who had -- I'm told that he had a townhouse worth $10 million

in Tribeca, or maybe more than that.  I don't know what has

happened to that.  Maybe that's been spent since he got sick.

But at the time he invested he had assets that were

sufficient.  He represented -- and to some extent it was

corroborated -- to be able to take a loss like this.  So to the

extent that it's affecting their lives now, that may have

happened between the time of their investment and now that they

are in worse positions.

But if you look at it from my client's perspective,

when he's taking money, if there's a person who came and said,

this all my retirement savings, maybe he wouldn't have taken it

because the regulations didn't allow it.  Maybe he would have

treated those funds differently and put them in a safer

investment.  But all these people said, essentially, that they

K2BEGENS

1    were, for lack of a better word, high rollers who can afford

2    the risk.  They took the risk and they lost their money.  I

3    just wanted to bring that to your Honor's attention.

4              The Pinterest shares that Mr. Orley, I think, talked

5    about.

6              MR. LEVINE:  Levine.

7              MR. EISEMANN:  That Dr. Levine talked about.

8              He said that they were never there.  It's not the

9    information that I have.  And, again, I couldn't tell you

10   what's right or not because I haven't looked at it.  But,

11   according to my client, that offer was withdrawn.  Probably had

12   the same impact whether they were never there or they were

13   withdrawn, but it's a little bit less culpable if that's the

14   way it happened.

15             On the IRA, it's a very bad result that he had to pay

16   the taxes on that, the city or state taxes, whichever one he

17   had to pay.  My understanding is that Mr. Genovese researched

18   it, felt because Dr. Levine administered his own IRA that he

19   had the power to put it into this fund and it would still be

20   covered.

21             I don't know what the research showed.  And who cares

22   if you are Dr. Levine because the fact is that it wasn't

23   supported by the research.  But to the extent that Mr. Genovese

24   rationalized taking it, he certainly made statements that were

25   overblown from what he had done, but there is a kernel of

K2BEGENS

1    justification in his mind for doing that, and it's only a

2    kernel because it doesn't justify the result that Dr. Levine

3    experienced.

4            The Maserati that Mr. Genovese rented, he told me he

5    rented that.  He didn't own it.  It doesn't appear in any of

6    the assets in the presentence report about what he owns.  He

7    rented that a couple of times.  I'm sure a lot of it was show.

8    That's part of being a hedge fund manager, that you want to

9    show that you are successful.  I don't know how much it cost,

10   but I don't think it was a substantial amount of money that

11   went into renting that on a couple of occasions.

12           Mr. Beals at one point represented that he owned his

13   house free and clear and had other assets that his wife had

14   cashed out of her company.  Again, I don't know the situation

15   today, but at the time that Mr. Genovese took the money, or

16   while he had the money, that was his understanding.

17           With respect to the Orleys -- and I know Mr. Orley has

18   written this in his letter and has acknowledged it when he

19   stood here -- they are suing -- when you're doing what the

20   Orleys are doing, which is to try to recoup your losses, you

21   look for the deep pocket.  And one of the deep pockets that I

22   know by speaking to their counsel is perhaps the malpractice

23   policy of Schiavetta, who was the lawyer who worked with Mr.

24   Genovese, maybe the partners of the law firm that he was in at

25   the time.

K2BEGENS

1      And so it's important for Mr. Genovese to help, and I
2  have been helping, as prior counsel helped, Mr. Orley to try to
3  recoup his losses.  There is no money in Mr. Genovese's pocket
4  that he can come into and just give to Mr. Orley, but he can do
5  what he can do, which he tried to do with his cooperation with
6  the government on the criminal side, is to give as much
7  information as he can about Mr. Schiavetta, the lawyer
8  Schiavetta.  I just spoke to his lawyer yesterday to try and
9  get more information, and I had provided that information to
10  them.  Hopefully that will help.  It's something.  It's not
11  everything, but it's something to try to recoup the losses.
12      That and the efforts that Mr. Genovese made to
13  cooperate with respect to Mr. Schiavetta is worth factoring in,
14  with all due respect.  It is an effort he's making to make good
15  on it.  And the fact that the Orley's brother's lawyer doesn't
16  face Rule 11 sanctions for making a case against the lawyer
17  Schiavetta indicates that there is a basis to say that he was
18  involved in it, and so we are doing our best to try to help on
19  that front.
20      By the way, I'm told by my client right here that the
21  trip to Colombia with Dr. Levine -- I forget -- with Mr. Orley
22  was $500, that my client hadn't paid, but it's $500 that -- he
23  didn't mention the amount when he spoke.  My understanding, it
24  was a small amount.  I just don't want it to be left
25  unaddressed that it was some large amount of money that he owed

K2BEGENS

1    for the trip.  And if that's wrong, I apologize.  That's my

2    client's recollection of that.

3          I think I have addressed what I wanted to say to the

4    victims on my own behalf and on behalf of Mr. Genovese.

5          Your Honor, turning to the more general arguments that

6    I wanted to make -- I'm sorry.  I'll make one other statement.

7    There's another person in the room who is affected by this.

8    Not just Mr. Genovese, who faces the loss of his liberty for an

9    extended period of time, but his mother, who, as in all these

10   offenses, especially when it comes to someone losing their

11   life, everyone's family is affected by this.

12         So his mother, Mr. Genovese is the one that she's

13   closest to, the one who provides her the most support.  She's

14   afraid of losing her son for a long period of time.  That's an

15   impact, as well as the impact on the victims.

16         Your Honor, as the judge, is going to take that into

17   account as well and it is a very big thing.  She flew all the

18   way from Chicago.  She is 75.  Seventy-five may be the new 55,

19   but she flew here all the way from Chicago to be with her son

20   to show her support and to let your Honor that she cares about

21   him.  She's disappointed in what he did, of course, but she

22   cares about him.  And if he goes away for longer than I think

23   the case warrants, that's another person who it will be a

24   tragedy on.

25         I'm just going to go back over some of the history and

K2BEGENS

circumstances which I did not put in the letter.  This was

mostly new information.  I may touch on other aspects of it.

        My client worked for a number of years.  It is easy to

look at someone like Mr. Genovese and look at his criminal

record, and your eyes start to glaze over if you see a number

of priors and you don't pay strict attention to the years.

        But there was a period of time from 2007 -- from the

mid 2000s to the time he was arrested that he wasn't in classic

trouble.  I know that he committed this offense.  It was in an

effort to try to make a living at something he had been doing

on his own.  He had been trading on his own since he was 18

years old.  He had some success in it.  He had success in his

hedge fund.  When hedge funds started to get bigger as a result

of Dodd-Frank being passed, that made it more advantageous from

a tech standpoint.

        THE COURT:  I've got to interrupt you for a moment.

You made this point in your letter submission as well, that he

was doing things that were productive from the mid 2000s, yet

he was extradited from Florida in the spring of 2005 to face

charges here in New York that had been lodged against him in

the spring of 2004, and he pled guilty and was sentenced to

three to six years in prison.  That was on August 5, 2005.

        So I just can't square your observation that he was

leading a productive life in the mid 2000s with his criminal

history.

K2BEGENS

1          MR. EISEMANN:  I'll try and see when he was released

2     from that sentence.  If you will give me a moment.

3          THE COURT:  July 31, 2007.

4          MR. EISEMANN:  Right.  The point I was making was from

5     2007 to 2017, that period once he got out, that he was trying.

6     It's tough with a criminal record to make the kind of progress

7     in your employment front.  My point is, I don't want to

8     collapse that 10-year period and lose it and say, well, he did

9     something bad in a decade that begins with two zero and we are

10    at another decade beginning with two zero, so he has just had

11    an endless string of criminal behavior.

12         As you get older you have to find other ways to

13    support yourself.  He didn't just support himself through

14    criminal things.  He was working.  He had a variety of jobs.

15    He was working at O'Hare Airport at one point.  He was a person

16    who was responsible when they were building terminal 5 at

17    O'Hare to put together a database.

18         THE COURT:  Where is that in the presentence report?

19         MR. EISEMANN:  I know it's not there.  I wasn't there

20    during the interview.  This actually was when he was working as

21    a freelance database designer, so for himself.  So he wasn't

22    really employed.

23         But for a year and a half he was, through a temp

24    agency, assigned to help build this terminal at the airport,

25    help in terms of, he was the person who ran the punch list so

K2BEGENS

that when contractors said, I've completed this work, I need to get paid, they would have to go through Mr. Genovese to make sure that the database reflected that that particular work they did was performed before they were paid.

So it's not like he was out there.  I know it's not in the presentence report.  I wasn't present during the interview, so I don't know what question was asked, why this was missed, but he did that for a year and a half.

So he was trying to make money legitimately.  And when he was trading on his own he was making money legitimately on his own, and he saw this as a way to bring himself beyond the sort of 60, $80,000 a year he might make as a day trader to be very successful, and he took a shortcut, a tragically terrible shortcut, but that's what he what doing, pursuing something he thought was going to be a legitimate way to make money, cutting some very bad corners along the way.

I'm trying to make the point that he's not been a person who has just been in and out of jail constantly and this is just but the latest episode.  It is more nuanced than that. He was trying.

You've got letters saying he's a caring person.  He went back and lived at home to take care of his father when he had cancer.  Any child would do -- not any child.  Some kids wouldn't do that.  But he did that, took care of his father. Supported his mother.

K2BEGENS

1          You can't fault him for wanting to turn his life

2     around and live the American dream.  But you can fault him for

3     making some selfish decisions to say he was going to lie about

4     his background to be able to do that.  If he didn't make those

5     statements, he's entitled to try and he's entitled to fail.

6     It's not a crime to fail in a hedge fund.  It is a crime to lie

7     to get the money to be put into it, and he did that.

8          He was laid off.  He was working at -- during that

9     freelance period he worked as a programmer at something called

10    the Harlan School for the Arts in Chicago, and he tracked

11    student records of what classes they took.  He was in charge of

12    that database.  Again, I think that's when he was a freelancer.

13         He worked for the company.  So if that's not in the

14    presentence report  --

15         THE COURT:  Actually, that is in the presentence

16    report.  From 2007 to 2008 and it characterizes his work hours

17    as "irregular."

18         MR. EISEMANN:  I hope your Honor is not assuming that

19    means that he was supposed to be regular, but, in fact, he was

20    only irregular.  To me it suggests that it was a part-time

21    thing that didn't require him to be there all the time.  We

22    don't know anything other than what's in the narrative.

23         THE COURT:  It's a narrative that he provided to

24    probation.

25         MR. EISEMANN:  But irregular would be his own

1    statement to them that it was irregular hours, not that it was

2    40 hours a week.  I think it would be wrong to read into that

3    that somehow he was remiss in his work and it shows that he has

4    a spotty record because he worked at a job that required

5    regular hours.

6            THE COURT:  No.  In other jobs he was perfectly

7    capable of reporting that he worked 40 hours a week.  Irregular

8    means something far less to me than 40 hours a week, and he

9    couldn't remember what his compensation was.

10            MR. EISEMANN:  He tells me it was part time three days

11    a week.

12            THE COURT:  There you go.

13            MR. EISEMANN:  Your Honor, there's enough here for you

14    to factor in and to draw an inference that I think is not a

15    warranted one, since it came from my client himself during his

16    interview, to say that he worked irregular hours three days a

17    week.  Maybe that's the probation officer's --

18            THE COURT:  The only reason I raise it, and it's a

19    minor point and let's move on, is that you were suggesting that

20    to say it's irregular, Judge, means, oh, it's 40 hours but not

21    at regular times.

22            MR. EISEMANN:  I didn't mean to say that.

23            THE COURT:  That's the inference you were asking me to

24    draw.  I don't draw that inference, and the defendant has just

25    confirmed why I would be wrong to draw that inference because

K2BEGENS

1    he only worked two days a week.

2              MR. EISEMANN:  Three.

3              THE COURT:  Three.  I wish I could get a job like

4    that.

5              MR. EISEMANN:  I must have misspoken because --

6              THE COURT:  Move on, please.  You are chopping a lot

7    of chicken liver.

8              MR. EISEMANN:  OK.

9              When he did get into the business here, he had studied

10   options in college, taking classes in it.  Brokerage houses

11   gave tutorials in it.  He had traded on his own coffee, soy

12   beans, Swiss francs, and yen in options and equities.

13             The emails that are in the possession of the defense

14   have screenshots of Bloomberg information screens with stocks

15   on them and analysis of that.  There were PowerPoint analysis

16   put together by his company --

17             THE COURT:  I've got to interrupt you again.  I'm

18   sorry.  But there has to be a good-faith basis for you to make

19   the argument that you just made that he studied options and

20   finance in college.

21             First, you submitted his transcript from the Community

22   College district number 508 in Chicago, which he did not

23   complete a degree.  And when I look at his grades, they are

24   largely Ds, incompletes.  Econ 1, he withdrew.  Econ 2, he got

25   a D.  So please don't stand here and tell me that he studied

K2BEGENS

finance in college.  The only course he seems to have done well

in was in his first semester for one credit called career

planning.  Wow.  I wonder what that course was about.

          MR. EISEMANN:  Then, your Honor, let's just look at

the proof.  I've given examples of the trades he did.  Options

are not for the faint of heart, and he had some very big

successes.  He had others I didn't put in there.

          The investors here will know about something called an

Alibaba, I think, that he made over a million dollars, and he

invested a hundred thousand dollars in late 2014.  Held options

for two weeks.  They rose from a dollar to about the price of

$19 and made a lot of money.

          So whether it was acquired through formal education or

watching brokerage things, or maybe I weighted too much what he

did in college, he had enough knowledge to be able to do this.

          The only point I'm trying to make, and maybe I'm

making this harder for myself, is to say that he was trying and

he often succeeded but he often failed.  I guess I'll leave it

at that.  I don't need to give more than I put in the

memorandum about that.

          I've given you other cases, your Honor, where there

are other losses much, much higher than this where the

defendants received lower sentences than the guidelines

recommends hear.  All of them involved either a variance or a

departure from the guidelines.

K2BEGENS

1          One of the things your Honor has to consider is, TO

2     what extent did Mr. Genovese loot his own company for his own

3     benefit?  The most aggressive figure, the SEC says is $200,000.

4     The most aggressive figure I could come up with, and that is

5     drawing all inferences against Mr. Genovese, this is on page 16

6     of my main sentencing submission, is about a million dollars.

7          I think that 400,000 of that is probably legitimately

8     charged to the business expenses and entertaining clients.  He

9     may have done it lavishly, but there is an argument that they

10     can be deductible in taxes.  Maybe it is closer to 600,000, but

11     it is certainly nowhere near the tens millions of dollars that

12     people usurp for themselves in the cases I cited for your

13     Honor.  That is a mitigating factor because if he were a thief,

14     he would have taken it all from the get-go because he was

15     trying -- he lost a lot, but of the losses, maybe, at most,

16     10 percent of the losses went into his own pocket.  90 percent

17     of his losses were just through his efforts to trade that

18     didn't work.

19          I'd like to turn just to the comparable cases, your

20     Honor, unless you have questions about them.  I understand

21     every case as --

22          THE COURT:  Every case requires an individualized

23     assessment, doesn't it?

24          MR. EISEMANN:  I understand.  But every case, the

25     rigidity of the guidelines and the overly formulaic way that

1    they operate and the mounting of various adjustments in there

2    has no empirical evidence.

3            And like the defendant or not, it is your job, as a

4    judge who's passing judgment on him, to say when you start the

5    guidelines, as you should as the starting point, to say, now,

6    under the Supreme Court line of cases to say, am I satisfied

7    that that really reflects the punishment someone like that

8    should get.  If I couldn't make that argument I couldn't ask

9    your Honor to go below the guidelines.

10           But you could personally despise Mr. Genovese.  And if

11   the guidelines still say that his sentence should be 70 months,

12   for instance, and that's the heartland that you work from, you

13   would do it because you would say, I don't like what he did, I

14   find it painful.  And if you're the victims, it's painful.  But

15   if the guidelines said that is the heartland, that would be

16   your starting point.

17           My submission is geared towards telling you that the

18   heartland should be around the five, six, seven-year range and

19   not the 10-year range that the guidelines choose their

20   application of, including one adjustment that I disagree with

21   philosophically.  Without that, you're in that range.

22           So the application of this one adjustment, for

23   example, investment advisor adjustment, I think this is a case

24   where over time, if it is litigated -- maybe your Honor felt we

25   had to write on this to help advance it -- in time I think

K2BEGENS

1    there is going to be this argument that I have developed that

2    may come to the forefront, and that is that investment advisor

3    is construed broadly in the civil context and in the civil

4    enforcement context, but the sentencing commission is just

5    putting in a definition section that investment advisor under

6    these guidelines has the same definition as it has under the

7    Investment Advisors Act, that is just nothing to support that

8    it should be read that way and it doesn't serve the purposes to

9    read it broadly here.  In fact, it jacks the sentence up by

10   50 percent to read it that way.

11       Again, it's understandable if you find Mr. Genovese's

12   offenses to be unforgivable and yet still -- I'm just asking

13   you not to be whipsawed by the guidelines, use of a four-point

14   adjustment that I believe logically doesn't apply and shouldn't

15   apply because it doesn't fit the definition except for the fact

16   there are some cases construing it broadly in other contexts

17   without any analysis.  It's just been adopted by a couple of

18   courts in here.

19       Mr. Genovese, for all he's done wrong, no one should

20   be subjected to what he's been subjected to in his time at the

21   local federal jails, and some of this is known.  I just want to

22   highlight some things which I didn't put in in detail in the

23   letter.  I didn't want to gild the lily, but I think I would

24   like to gild it a little bit here and go over the impact that

25   those things had on him.

K2BEGENS

1           He was part of the blackout at the MDC where the

2      temperature was down as low as 13 degrees.  There was no

3      ventilation for 10 days or so at that temperature.  Fans were

4      still blowing without heat.  The officers wouldn't let them

5      turn off the fans.  They wouldn't let them block the vents.

6           So they would be in their cells with nothing but their

7      own body warmth for that period of time.  He was given cold

8      sandwiches.  And maybe to the victims that feels like justice

9      served, but that's not the way our society works.  Only cold

10     sandwiches.  No liquids, no juice, no milk at breakfast, no

11     bottles of water.  They had to drink out of the sinks that had

12     freezing cold water coming out of them.

13          After the blackout ended, by the way, they still

14     didn't get bottled water for about another a week or 10 days.

15     There was rusty water coming out of the taps, and they had to

16     drink that.  It was inhumane.

17          They didn't have any extra blankets.  Mayor de Blasio

18     arranged to have blankets brought to the jail, and the warden

19     turned them away.  And only through pressure by Mayor de Blasio

20     did any of the inmates -- not just Mr. Genovese, but others --

21     get those.

22          They didn't get hot water, and they haven't had hot

23     water even since, except maybe once a week.  Maybe nine out of

24     10 showers they have to take are cold, and once in a while they

25     get warm water, and right now the water is scalding hot.

K2BEGENS

1          It's not a well-run institution and it's not receptive

2    to the problems that the inmates have unless the inmates

3    somehow make it into a court where the judge takes personal

4    interest in this, or maybe Judge Irizarry of the Eastern

5    District or the Federal Defenders makes a bigger issue of it

6    than they made of the blackout.  It's a very difficult

7    existence to be there.

8          There are frequent lockdowns out there at the MDC,

9    where he is right now.  The jails are fairly air tight.  So

10   they turn off the ventilation because if there is something

11   involving noxious odors that's part of an incident on another

12   floor, they'll turn off the ventilation so nobody gets it, so

13   the lockdowns lasts for hours.  I know because I have waited to

14   see somebody at the jail for hours.  They forget to turn the

15   ventilation on afterwards.  You have inmates locked in their

16   cells that have black mold in the cells, with no ventilation,

17   for hours and hours, and those lockdowns are becoming more

18   frequent.

19         There's no razors being handed out for the last three

20   months.  Inmates can only buy them through commissary.  Not

21   everybody can afford to do that through the commissary.  They

22   are supposed to do that and give soap and shampoos every two

23   months, but they're not doing that.

24         He's part of the lawsuit about what happened at the

25   MDC in the blackout, and you're not allowed to be part of that

K2BEGENS

1      lawsuit, they won't take you unless you have an actual injury.

2                So Mr. Genovese had an injury from there.  He has

3      asthma.  He came into it.  He was at the MDC and the MCC.  They

4      both have black mold growing.  It's a perennial problem there.

5                During the blackout my client developed a fever of 103

6      degrees.  He was shivering from the cold.  He was shivering

7      from his fever, and they couldn't do anything about it.  They

8      wouldn't and they couldn't do anything about that.  So he ended

9      up getting full-blown pneumonia.  He got x-rayed for that

10     pneumonia.  The x-ray showed calcified growth in his lung.  It

11     is not because of the pneumonia, but they happened to see it

12     and it's been -- the blackout was over a year ago, two years

13     ago at this point, and nothing has been done about that.  He

14     may have a growing cancer in him.  I don't have to preach to

15     your Honor about the terrible medical care that you get in both

16     the institutions, but that is not what we want as a free

17     society to do.

18               He has a torn ACL ligament that has not been treated

19     for the whole time he's been there.  He came in there with it.

20     Finally, after nine months of having to climb up to the top

21     bunk, they finally gave him a pass to be on the bottom bunk.

22     It's just an example of the sort of callousness that the

23     institutions have.

24               At the MCC there is rat feces there.  They have to

25     live in that.  They can't control the rat problem.  There is

K2BEGENS

mold everywhere.  He was on 11 south.  It had black mold.  No
vents.

        The union officers, even at the MCC, sued the Bureau
of Prisons because of the lack of ventilation because they have
to work in the same environment.  There are cockroaches
swarming around there.  There is ventilation in one unit.  He
was talking about 5 south that had ventilation, but no air
conditioning, so it became sweltering hot.

        I know your Honor has followed the cases that have
come out of this, and I know you are aware that judges have
granted some sort of consideration, a variance to account for
the horror that all these people went through.  They are
captive, they can't leave, and I submit to you that is your
role as a judge looking at the bigger picture.  You should take
that into account.  Obviously, it's your call.

        Can I have just a moment with my client?

        THE COURT:  A moment.

        MR. EISEMANN:  I just want to note initially that only
has Mr. Genovese worked with the victims, or at least with the
Orleys, counsel for the Orleys.  He's available to work with
anyone else.  He has agreed to forfeiting property to help make
restitution.

        At the time of his initial presentment here in the
Southern District of New York, he actually got bail set, and it
would have required his mother to sign a $500,000 personal

K2BEGENS

1   recognizance bond and probably pledged his property.  I don't

2   know.  He decided to stay in and he told his counsel, it was

3   Federal Defenders at that point, that he wasn't going to put

4   his mother through it.  I understand that the government had

5   thoughts of maybe appealing that bail decision, but it's my

6   understanding, because I did get this second hand, that Federal

7   Defenders notified the government that Mr. Genovese was not

8   going to sign the bond and sign himself out, so that became

9   moot.  So, in a sense, he punished himself right away to spare

10  his mother to the victims who would have been galled to see him

11  walking the street, maybe.  He spared them that as well.  So

12  it's a little piece, but it's a piece that I put in for your

13  Honor to consider.

14          Let me look at my notes.  I think I am close to

15  finishing.

16          On the technical aspects of the loss amount, I have

17  spoken about this with Mr. Enzer.  I know we don't see eye to

18  eye on this.  But to the extent that the guidelines are driven

19  by the loss figure and that we jump into the category of $9.5

20  million, I don't see any reason why the $718,000 sitting in a

21  TD Ameritrade account that was there.  It would have been maybe

22  $600,000 greater had there been some more planning on the

23  government, the SEC, and the FBI side, maybe the government,

24  when he was arrested, because there were options that were

25  expiring.  I briefed your Honor about it.

K2BEGENS

1          To the extent that there still is $718,000, I don't

2     see any reason why that should not be taken off the loss

3     figure.  That doesn't bring it down to the next category, but

4     if you then take off the profits that he would have made if the

5     arrest had been handled a little differently, he gets close to

6     that figure.

7          Then with the business expenses, I touched on this,

8     but it's hard even for a hedge fund that loses money.  An

9     investor can't come and say to the hedge fund, I know that of

10    the million dollars I gave you, $150,000 went towards expenses

11    over the five years that I was in the fund, I want that back.

12    You're not entitled to that.  There's a reasonable amount that

13    no investor expects to get back because of commissions, because

14    of management fees and because of the expenses of running the

15    hedge fund.  Everybody is in it together.  If the hedge fund

16    has to spend money on entertainment and other expenses -- and

17    now I'm just not talking about entertainment.  I'm talking

18    about things like legal expenses, accounting fees, web fees,

19    hosting fees, all of the things I detailed in there.

20         THE COURT:  Please.  $180,000 in legal fees?  For

21    what?  To impede the SEC's investigation?  I mean, look at the

22    legal fee compared to the accounting fee for the three years

23    the hedge fund was purportedly in business.  $1100 in

24    accounting fees?  You couldn't get an accountant to do your tax

25    return for $1100.

K2BEGENS

1              MR. EISEMANN:  This is assuming that was all captured

2      in the analysis done by Mr. Halperin's firm.  I was trying to

3      show you what I had documented.

4              THE COURT:  I got it all.

5              MR. EISEMANN:  The point is only the broader one.

6      Because if I'm going to come down to dollars, I'm not going to

7      know enough to be able to answer a question like your Honor

8      posed.  By going up two levels, his sentence increases by two

9      years or so, whatever I briefed your Honor on.  Just advocating

10     for a more measured approach than that and to understand that

11     there is nothing about that magic jump point that makes him

12     have to go up that much.

13             Just looking through my last set of notes, and I think

14     I'll be done.

15             Your Honor, in sum, I hope that you will obviously

16     take into account the powerful statements from all four of the

17     investor victims who testified here, but that you will use your

18     judgment and decide how much of that outweigh the

19     countervailing arguments, particularly the ones about the

20     arbitrariness of the guidelines, and look at the norms that

21     have been established by other cases.

22             And with that, even if it's disappointing to the

23     victims who are in court -- and I understand anything less than

24     life or even less than the 10 years recommended by the

25     guidelines will be disappointing -- that I hope your Honor

K2BEGENS

1    understands and that they will understand that your job is

2    broader than just to listen to how they've been pained, and

3    they have been pained and legitimately are angry, but there's a

4    whole spectrum of facts, circumstances before you, and I hope

5    that you'll use that to give a more modest sentence than the

6    guidelines recommend.

7              THE COURT:  Thank you, Mr. Eisemann.

8              Mr. Enzer, does the government wish to be heard?

9              MR. ENZER:  Yes, your Honor.  Briefly.

10             I know your Honor is familiar with my sentencing

11   submission and with the victim impact statements, so I'm not

12   going to repeat what's in there.

13             I just want to address a few key points that the

14   defense made, points that I think are drawn from Mr. Genovese's

15   letter to your Honor.

16             Defense counsel has done the best he can with this

17   record, he's been very effective, but there are certain

18   arguments that he made to your Honor that are drawn directly

19   from Genovese's letter that are either a fraud on this Court or

20   reflect such a distorted view of reality that, either way,

21   whether Mr. Genovese now is trying to lie to the Court or

22   whether he is so delusional that he believes these claims,

23   either way, he is a danger to the community, a danger to the

24   public, the type of recidivist fraudster, conniving con artist,

25   predator, be it a delusional one or an intentional one setting

K2BEGENS

out to deceive people, who needs to be incapacitated.

And that is one of the Section 3553(a) factors that your Honor must consider, that your Honor should appropriately consider. And regardless of what the guidelines are, they call for a very serious, severe sentence that will keep him incarcerated long enough to the point where he will not pose such a great danger.

And the facts on this point are very troubling because he embarked on this scheme in this case at the age of 50. That is a time when many offenders are aging out of crime. But for him, this was the greatest crime of his career as a con artist.

Your Honor knows he had nine prior convictions, several of them for fraud-related crimes. And after those, after multiple stints in prison, including a stint in prison for a sentence, the high end of which is longer than what the defendant is asking for now, he embarked on this elaborate scheme posing as a hedge fund magnate, telling a web of lies to convince people, using expenditures of money, money stolen from his victims, to support the elaborate claims of fraud. And as the scheme continued over time, creating fake documents, fake account statements, to sell the lie to victims.

One of the central tenets of the defendant's letter to your Honor is that he didn't set out to do this crime, that he thought this was just a threshold lie about his background, and that he was actually going to do a great job for his victims,

K2BEGENS

his clients, and that he had no intention of wasting their

money, and it's just really market losses that caused his loss.

That's in his letter.  I'm paraphrasing.  His words:  I thought

it was a harmless lie, only a threshold falsehood that would

get my business going.  That is unsupported by the facts in

this case.

          Here are the facts.  I'm basing this not only on

records that were produced to the defense, but a summary

analysis that we provided to defense counsel of the losses that

Mr. Genovese incurred.

          In 2015, the first year of the fraud, he lost

$266,918.  2016, the second year, $4,179,999 was his trading

loss.  2017, his trading loss was 3.7 million.

          It is not as though he took all of the investor money

at one moment, traded it and then lost it.  What happened is

that he told lies, got money in, spent some of it on trading

and lost it, spent some of it on lavish expenses that your

Honor has heard about, and I will account some of them in a

moment.

          Then, when he needed more, he told more lies to more

victims.  So as an example, Dr. Levine, who your Honor heard

from, he was recruited into this fraud in 2017.  That is after

more than 4 million in losses had already been incurred by Mr.

Genovese.

          At that moment, when he decided to tell Mr. Levine a

K2BEGENS

1   series of lies about his personal qualifications, this was no

2   longer a threshold lie as part of a good-faith effort to test

3   out his personal trading skills.  He knew at that point his

4   personal skills, if there were any, had failed.  He had lost

5   millions.  And, yet, he lied about his qualifications to get

6   Mr. Levine to give his money.  And he provided documents with

7   fake account numbers about his returns.  He gave them a

8   document representing that one of his hedge funds had quarterly

9   returns varying from 4 to 18 percent.

10          Mr. Genovese says in his letter to your Honor that

11  there is boilerplate disclosures.  He says:  My subscription

12  agreements contained standard boilerplate language which made

13  clear that our fund had no track record and that investors

14  should be prepared to lose everything.

15          Boilerplate language is not an excuse when you know of

16  facts to the contrary.  His boilerplate -- in addition to the

17  boilerplate, he had marketing materials he gave to Mr. Levine

18  that said risk level with a scale of one to 10, and he had a

19  red circle around one putting his fund, one of his funds, at

20  the lowest risk level.  You don't get to put generic

21  boilerplate language in while simultaneously misrepresenting

22  this is a low-risk investment.

23          MR. EISEMANN:  May I take a look at that.  Thank you.

24          MR. ENZER:  Mr. Genovese says he doesn't think he can

25  fairly be blamed entirely for all the losses.

K2BEGENS

1          His lies concealed a risk.  What they concealed was

2     that he was incompetent and incapable of managing these

3     people's money and that he would steal a significant portion of

4     it, and that risk materialized.  He is absolutely responsible.

5     Market losses are not.

6          And as a frame of reference, your Honor, according to

7     one commonly used hedge fund index, the HFRI, fund weighted

8     composite index, the hedge funds that are encompassed within

9     that index, in the years in question, 2015, 2016, 2017, grew at

10    12 percent, 13 percent, 14 percent, compared to an $8.2 million

11    loss.

12         Separate and apart from the money he lost, he spent a

13    significant amount on his own lavish expenses.  You have heard

14    some of that from the victims, and I've documented some of it

15    in the government's sentencing submission.

16         The defense does not seriously dispute, if you look at

17    the numbers in their two sentencing submissions, that at least

18    a million was spent by the defendant on inappropriate expenses,

19    what I'm calling luxury items.  That's a million dollars over

20    the course of two years, 500,000 each year.  He was not

21    entitled to do that.  That is an example of greedy behavior.

22    It is aggravating.  And it goes to why he is a predator, it

23    goes to why he is a danger, and it goes to why a serious

24    sentence is warranted here.

25         Some of that money, 448,000 was spent on boats,

K2BEGENS

according to the defense's analysis.  According to records the

government produced, $77,000 was spent on a private jet company

that the defendant used to travel in.  He had not given returns

to investors that warranted these kind of expenditures.  A

responsible money manager wouldn't do that.  This is the

behavior of a con artist stealing from his clients.

Much of the expenses that the defense characterizes as

legitimate business expenses are really expenses that go to the

fraud, like spending over $400,000 on office space.  The

purpose behind that is so that you can have meetings with

victims to convince them of the con.  That is not a legitimate

business expense, especially when the defendant, when he raised

money from victims, he told them what he would take out of

their money as a fee was 2 percent a year, unless he had great

success, which he never did.  2 percent a year.  Generous to

the defendant?

If you take 2 percent times two years of the scheme

out of 11 million, that comes to about 448,000.  That is the

most that could possibly have been expected by the victims in

terms of money that would have gone into his pocket for the

management of this hedge fund.  The rest of it is

misappropriated, under his own representations.

Your Honor, the factors that are relevant here, the

first is that this is an egregious and troubling predatory

scheme.  Because of that, the serious of the offense warrants a

K2BEGENS

sentence at the high end of the guidelines range, which is what
the government is asking for.  The guidelines range, there is
no dispute here, is 121 to 151 months.  That comes out to
roughly 10 to 12 and a half years.  Probation has recommended a
sentence of 132 months, or 11 years.

And probation is an independent arm of the Court.
They did their own investigation.  They see cases day in and
day out.  They have the ability to compare offenders that they
interview and make determinations about how one person stacks
up to another.  Their recommendation is 132 months.  We submit
it should be higher.  But, in any event, it certainly should
not be below guidelines.  It shouldn't be five years, what the
defense has asked for, a sentence that is lower than the last
sentence the defendant got in some of his New York State
convictions.

The history and characteristics of the defendant.  As
your Honor has heard, he's had virtually no legitimate
employment over the course of his adult life.  And that is not
a product of a bad upbringing.  He grew up in a relatively
privileged upbringing.  We have set that forth in our
submission.  The facts of it are in the presentence report.

Compared to the average defendant who appears before
your Honor, he had extreme privilege growing up.  There was no
reason he needed to turn to crime and certainly no reason he
needed to embark on this fraud after the nine other convictions

K2BEGENS

1    he had, and yet he did anyway.  That tells you a lot about who

2    he is, his history, his characteristics.  He is someone who is

3    either evil or completely deluded.  Either way, he is the type

4    of danger to the community that needs to be incarcerated for a

5    very, very long period of time.

6            He has said that he has had success in day trading.

7    That appears to be based only on Mr. Genovese and nothing else.

8            Finally, your Honor, deterrence and the need to

9    protect the public.  Deterrence generally is important.  It is

10   important for the public and for anyone who would emulate Mr.

11   Genovese to know that a recidivist con artist with nine

12   convictions doesn't get to fleece a bunch of other victims and

13   walk out of here with a light sentence.  And it's important to

14   deter him because he has demonstrated, through his conduct over

15   the course of his adult life, that no prison sentence, no

16   supervision is going to stop him unless it's serious.  None of

17   the other ones did.  It's important that this sentence stop him

18   in his tracks.

19           He's now 54.  He is just as capable today of spinning

20   lies to raise money.  Only a serious and long sentence has a

21   chance of putting a stop to him, at least until he gets out

22   again.

23           With that, your Honor, I'll sit down.

24           THE COURT:  Thank you, Mr. Enzer.

25           MR. EISEMANN:  Can I reply briefly to the government's

K2BEGENS

1    argument?

2              THE COURT:  Two minutes.  All right.  The record

3    should reflect that you already have addressed the Court for

4    just shy of an hour.  Mr. Enzer just addressed the Court for 10

5    minutes.

6              MR. EISEMANN:  I'll take two minutes, your Honor.

7              THE COURT:  That's all I'm giving you.

8              MR. EISEMANN:  Give or take a few seconds.

9              The government uses rhetoric:  Danger to the

10   community, predator.  It's all rhetoric, your Honor.

11             The fact is that on supervision Mr. Genovese could be

12   controlled, to the extent that he's out there.  He's not

13   someone who can't be monitored.  It's a fallacious argument.

14             Retribution I understand.  That aspect I understand.

15   Not because he's a danger to the community.  He said he started

16   a scheme at 50.  I addressed this.  He started a scheme that

17   despite everything he did to keep it going -- and that's not an

18   unusual thing that happens in fraud cases.  The fraud gets

19   perpetuated by more fraud to keep it going.  When it started to

20   fail he still set out to do a legitimate thing and it's still

21   proven by the fact that he invested.

22             The statement, the bold statement that he was either

23   incompetent or incapable of investing the money, the track

24   record doesn't show that he had some superior skill in it, but

25   it also doesn't show that other hedge funds that were doing the

K2BEGENS

1    same types of tradings were losing money.

2              There were other hedge funds besides the ones in the

3    index that Mr. Enzer purports that went belly up, big hedge

4    funds that failed.  These were spectacular failures and it

5    wasn't because everybody was a criminal going into it.  It is

6    because it's a very risky thing to go in and trade on options,

7    and it didn't work out.

8              But for the fact that there was fraud to get the

9    money, he wouldn't be prosecuted for it not working out.  It

10   just meant that either market forces did it, or he wasn't as

11   good as others, and there are some aspects he's touched on in

12   his letter to your Honor about why it didn't work out.  He's

13   admitting there was inexperience he had, that if he had, for

14   instance, a dedicated broker in there, he could have executed

15   trades faster, wouldn't have been at the whim of the market.

16   There were things he did wrong, but that doesn't make

17   everything a fraud.

18             The million dollars, just in terms of money that was

19   taken out, that's the maximum figure.  I'm asking your Honor to

20   assume that to be true and yet still follow my guidelines

21   arguments.

22             Our position is, about $600,000 of that is probably

23   fairly characterized as Mr. Enzer did, but 400,000 is not.

24   He's entitled to take out $400,000 over the two years using the

25   2 percent rule, which is standard in the industry.  He's making

K2BEGENS

1    200,000 over that.  Maybe he is 600,000 over it.  That's not

2    our position, and we are not conceding that point.

3         The last point I'll make is that in saying that he

4    turned to crime at 50, I won't belabor the point that he was

5    turning to a threshold and then a perpetuating lie to do

6    something he thought would make a legitimate living for him.

7         You have a report from a psychiatrist talking about

8    the factors that also drove him to do this.  It's not an abuse

9    excuse.  It's simply a fact that not everybody goes into things

10   with venality, and Mr. Genovese did not go into this with

11   venality.  There were certainly selfishness in it in the

12   decisions he made, but it is not as if he were some

13   pathological, amoral, incapable of doing anything other than

14   preying on victims and intending to steal their money.  That's

15   not the situation you have, and, with all due respect, I think

16   you shouldn't sentence him as if it were.

17        THE COURT:  Mr. Eisemann, does your client wish to

18   address the Court before sentence is imposed?

19        MR. EISEMANN:  Briefly.

20        THE COURT:  He can do so from counsel table and he can

21   remain seated.  If you would pull the microphone toward him so

22   that everyone in the courtroom can hear.

23        THE DEFENDANT:  Excuse me, your Honor.  I've got an

24   upper respiratory infection right now.

25        I want to touch on two things.  The smallest of

K2BEGENS

1    importance first and then the biggest importance last.

2              The first thing I wanted to address is something

3    you've brought up several times that I've been in court,

4    including today with much colorful admonition.

5              The good thing is that my mother is here today to

6    attest to the truth and veracity of what I'm going to say.

7              That is, my first counsel, Sabrina Shroff, who was

8    only my lawyer for one or two appearances, we removed because

9    my family offered to help me out with counsel.

10             Then we hired Mr. Little.  Mr. Little, as you well

11   know, was not prepared for sentencing just before the blackout

12   occurred or right after.  I don't recall.  The bottom line is,

13   Mr. Little defrauded my mother of tens of thousands of dollars

14   by not performing the work.  I have numerous emails begging him

15   to do the job that he did not do, and we will address that in a

16   civil matter later on.

17             The other matter I wanted to bring up is Mr. Halperin.

18   He was referred to us through my mother's attorney in Chicago,

19   and we thought he was an immensely qualified person and, sadly,

20   he defrauded my mother of tens of thousands of dollars as well.

21   On top of that, there is some fraudulent billing that we are

22   claiming, some massive fraudulent billing that is

23   unsubstantiated by Mr. Halperin, and we will address that.

24             That's where the delays have been and why I've had to

25   change counsel, because none of them have been up to the job.

K2BEGENS

And, sadly, my mother, being 75 years old, my father passing away, she is living on a fixed income and that money she could have used in her retirement, and now she's living week by week because of the money she had to pay out, the over a hundred thousand dollars in real money that she's had to pay.

But the main point I wanted to address to your Honor is to give you the courtesy -- because you're not a mind reader.  You're a very smart guy, but you are not a mind reader.  That is, my two previous counsels were completely not up to the job, and they were very disingenuous with you, and there was not much I could do other than listen to their constant promises that were not fulfilled for me.  I apologize for any misunderstanding you might have in that.

Unfortunately, my mother is suffering greatly from this and, of course, my case is suffering because you think it might be some kind of scheme or something, and I think we are all frustrated by it, including myself, and I know you are, and I apologize to you for that.  I apologize to the government and to everyone else, that it was not our intent to waste money and waste the Court's time.

With that, I would like to move onto the more important issue.  And, that is, I'd like to address the Court. I would like to thank your Honor for the courtesy.  I'm not much of a public speaker, but I'm going to try and put forth my thoughts from my heart.

K2BEGENS

```
1          I said a lot in my letter to you, your Honor, and I
2     think a lot -- I'm going to diverge from this, what I wrote, a
3     little bit because we do have some ex-clients here today.  And
4     I'm not going to look at them, but I want to say that for them
5     to say that they think that our friendship was a fraud is
6     wrong, and that I loved them then, I love them today, and I
7     think that I'm very hurt by that feeling.  But I take full
8     responsibility for how they feel and what I've done, and I have
9     allocuted that, and I admitted to that.  And I wanted to say
10    that I apologize to them from my heart.  And I know that's not
11    going to bring back money or anything from what I've done.
12         I want to apologize to my mother as well for putting
13    her through this.
14         I want to apologize to the SEC and the government, the
15    FBI.
16         But, more importantly, and number one, I want to
17    apologize to the victims, that they entrusted me with their
18    money, and I broke that trust.  I want to make that very clear,
19    that that's the number one thing in my mind right now.
20         Thank you very much, your Honor.
21         THE COURT:  All right.
22         The defendant, Nicholas Genovese, comes before this
23    Court having pled guilty to securities fraud, a serious crime
24    against the United States that strikes at the heart of our
25    nation's financial system.
```

K2BEGENS

1          This Court reviewed the presentence investigation

2     report.  I adopt the findings of fact in the report as amended

3     today on the record as my own, and I will cause the presentence

4     report to be docketed and filed under seal as part of the

5     record in this case after I receive counsel's joint letter

6     regarding the specific changes that were discussed on the

7     record here earlier today.

8          Turning to the guidelines calculation, this case

9     sounds in fraud, and so the base offense level is 7.  Because

10    the total loss from the offense is more than $9,500,000 but

11    less than $25 million, 20 levels are added.

12         Because this crime involved 10 or more victims and

13    resulted in substantial financial hardship to one or more

14    victims, a further two-level enhancement is warranted.  And

15    because the offense involved a violation of the securities law,

16    and at the time the defendant was an individual holding himself

17    out as a broker or dealer or investment advisor, a further

18    four-level enhancement is appropriate under the guidelines.

19         Now, Mr. Genovese, did come forward before the Court

20    and plead guilty.  Accordingly, I grant him a three-level

21    reduction for acceptance of responsibility, and so that yields

22    a total offense level of 30.

23         Now, considerable ink was spilled in the parties'

24    presentence submissions concerning the defendant's criminal

25    history.  Suffice it to say, for the purposes of this record,

K2BEGENS

1    this Court finds that his criminal history was properly

2    calculated by probation and yields a criminal history category

3    of III.  So with a total offense level of 30 and a criminal

4    history category of III, the defendant's guideline range is 121

5    to 151 months of imprisonment.

6          Now, of course, as the parties have acknowledged in

7    their arguments, the guidelines are a starting point for the

8    Court's consideration here.  The defendant argues for a

9    substantial variance down from the guideline range.  The

10   government urges the Court to sentence Mr. Genovese at the top

11   of the guideline range.

12         Mr. Genovese's fraudulent scheme unraveled when the

13   SEC examiners went to Willow Creek's offices at One Liberty

14   Plaza in late December 2017 to perform a surprise site visit.

15   Mr. Genovese refused to let the SEC examiners into Willow

16   Creek's office space.  And later that day the SEC formally

17   advised Mr. Genovese and his hedge fund that they were the

18   subject of an SEC investigation.  The SEC issued a subpoena

19   compelling Mr. Genovese to appear for a deposition on

20   January 30, 2018.

21         When Genovese failed to appear, the FBI opened a

22   parallel criminal investigation and, on February 1, 2018,

23   attained an arrest warrant for Genovese.

24         On February 2, FBI agents located and arrested

25   Genovese while he was sitting in a vehicle at a Starbucks

K2BEGENS

parking lot in Fort Lauderdale, Florida.  During a search of
the vehicle, the agents discovered $148,000 in cash, travel
bags, and luggage, Mr. Genovese's passport, and his dog.

Since that time, he's been detained.  From early 2015
until his arrest, Mr. Genovese raised millions of dollars from
victims for investments in Willow Creek Advisors by making
fraudulent misrepresentations about his background, his
professional qualifications, by concealing that he had a number
of prior felony convictions for fraud-related claims, that he
had previously filed for bankruptcy, a whole litany of
misrepresentations and omissions.

How Mr. Genovese managed to fly under the radar of
securities regulators and trusting investors for so long is a
difficult question to answer.  Perhaps it's because he is a
serial fraudster who knows how to manipulate people and the
system.

In any event, were it not for the quick work of SEC
and law enforcement agents, this Court has no doubt that Mr.
Genovese would have fled the country.

Securities fraud is a crime that screams for general
deterrence.  If swindlers think that they can get away with it,
innocent investors and hard-working individuals are the ones
who suffer.

As the victim-impact statements that were submitted to
the Court and the poignant remarks by various investor victims

K2BEGENS

1    here today make clear, many trusting and decent individuals

2    have been deeply injured by Mr. Genovese's fraud, and a number

3    of them may not recover from their financial and psychological

4    losses.

5         There's also a compelling need for specific deterrence

6    because Mr. Genovese is a serial fraudster.  He has 17 arrests

7    and nine convictions dating back to December 1989, when he was

8    only 24.  Virtually all of them relate to fraud of one kind or

9    another, with the dollar amounts escalating each time.

10        It appears to me that he became quite an expert at

11   credit card fraud and sentences of 10 months in prison and 30

12   months in prison didn't deter him.

13        Then he graduated to fraudulent schemes on eBay that

14   led to a sentence here in New York of three to six years

15   prison.

16        And of course there was his scheme to sublet an

17   apartment in Manhattan on Craigslist to multiple individuals in

18   which he collected more than $20,000 for an apartment he

19   himself was not paying rent on and was prohibited from

20   subletting.

21        As I've previously indicated in a question to counsel,

22   in 2005, he earned the distinction of being extradited from

23   Florida to face arrest warrants here in New York that had been

24   issued nearly a year earlier.

25        His prior arrests and convictions are relevant to this

K2BEGENS

Court's individualized assessment under 3553(a).  Mr. Genovese
has assembled quite a body of work as a fraudster and the need
for specific deterrence is compelling given that prior terms of
imprisonment do not have appear to have dissuaded him from
further criminal conduct.

          Now, in the submissions Mr. Genovese's attorney and
forensic psychologists suggest that his criminal conduct stems
from his lack of self-esteem and his personal disappointment
that his grandfather did not give him a manufacturing business
in Chicago and chose instead to sell it to a third party.  This
Court cannot swear that assessment with the facts.

          Mr. Genovese was raised in a firmly middle-class
environment.  His mother and father provided a caring home for
him, and his mother continues to worry about him and provides
support, even though he's now almost 55.  Unlike many
defendants who come before this court, Mr. Genovese had
abundant opportunities to make something of himself and become
a productive member of society.

          His conduct at Willow Creek suggests anything but
someone who lacks self-esteem.  He exuded self-confidence,
renting Maseratis when he visited clients in Los Angeles,
cruising with clients in his Mahogany power boats on Lake
George, dropping $50,000 on a table at a New York Philharmonic
fundraiser, and wining and dining people wherever he went.

          Of course, to those investors, I guess it all looked

K2BEGENS

great, but little did they know it was all their money.

Indeed, even in Mr. Genovese's letter to this Court
for sentencing he immodestly says that he thinks he was
"talented, but recognizes that talent alone wasn't enough."

The reality is that he had no idea what he was doing
investing, but it was all just a great ride for him.

He argues that the loss amount should be reduced
because he didn't steal it; he just lost almost all of it in
the market.  Defendant's arguments are galling.

First, Genovese suggests that but for his arrest, he
would have made an additional and $526,195 on Facebook options
that he purchased on January 31, 2018, after he failed to
appear for a deposition and knew the weight of the federal
government was coming down on him.

The defense attributes this 526,000 loss not to Mr.
Genovese, but"because of the unfortunate timing of his arrest
and the apparent lack of planning by law enforcement on how to
handle an account that likely contained time-sensitive options
with hundreds of thousands, or perhaps millions, of dollars at
risk."  Talk about chutzpah.

Two days after he purchased the options he was
arrested in an automobile in Florida with $148,000 in cash.
Only Mr. Genovese knows what his travel plans were, but they
certainly didn't include exercising an option for the benefit
of his investors at the optimal moment.

K2BEGENS

1          His other arguments have also been thoroughly

2     considered and lack merit.  The notion that the business of

3     Willow Creek was legitimate turns the world upside down.

4          What are the legitimate expenses of a fraudulent

5     investment company?  180,000 in legal expenses to keep

6     regulators at bay, and only $1100 in accounting fees, $18,000 a

7     month for an office.  None of it makes any sense.

8          What does make sense is that he used Willow Creek

9     investors' money for his own personal gratification and was

10    totally reckless, spending more on power boats than anything

11    else.  None of it warrants any reduction in the loss amount.

12          I mean, among the misrepresentations, Mr. Genovese

13    concealed his criminal record, and prior bankruptcy, claimed to

14    have graduated from Dartmouth's school of business and to hold

15    a finance degree from the University of Kentucky, and to have

16    been a partner at Goldman Sachs and a portfolio manager at Bear

17    Stearns, and that he had the backing of the Genovese drugstore

18    chain fortune.  He never had any of that, and he told at least

19    one victim that he managed a $30 billion fund and another

20    victim that his returns were between 30 and 40 percent.

21          It was all a fraud.  Defense counsel's reliance on a

22    couple of decisions by other judges to grant dramatic variances

23    from the sentencing guidelines are not persuasive.

24          The law requires a judge to make an individualized

25    assessment of a defendant.  And to cite cases where defendants

K2BEGENS

had no criminal history and whose lives were otherwise marked
by good works is just not relevant to Mr. Genovese.  Those
individuals in the cases cited by counsel are unlikely to
recidivate, a conclusion that this Court cannot draw with
respect to Mr. Genovese given his 30-year history of fraud.
This Court is concerned that when Mr. Genovese is released from
prison he'll concoct another more outrageous scheme because
that's been his trajectory for the last 30 years.

In short, he is a danger to the community, truly a
predator, unlike any I've encountered in more than 21 years on
the bench.

Now, looking at his history and characteristics and,
as I said, the compelling need for specific deterrence here, I
find that a sentence within the guideline range is entirely
appropriate.  And weighing all the material that's been put
before this Court, I'm now prepared to impose sentence on the
defendant, and I'd ask him to stand.

Mr. Genovese, I don't know whether the sentence I'm
about to impose is going to deter you from future conduct.  I
hope so, but I don't know.

It's my judgment, sir, that you be sentenced to a term
of 140 months of imprisonment, to be followed by three years of
supervised release, subject to all the standard conditions of
supervised release, and the following special conditions that
I'll impose on you in a moment.

K2BEGENS

1          I'm also going to enter an order for restitution in

2     the amount of $11,211,704.  I'm going to also impose the

3     mandatory special assessment.  And I'll enter an order of

4     forfeiture that I understand the government will be handing up.

5          As for the special conditions of supervised release,

6     I'm going to require to you provide access to any requested

7     financial information, not to incur any new credit card charges

8     or open additional lines of credit without the approval of your

9     probation officer unless you're in compliance with the

10    installment payment schedule that I'm going to fix.

11         You'll participate in an outpatient treatment program

12    approved by probation to include testing to determine whether

13    you've reverted to using drugs or alcohol, and I'll require to

14    you contribute to the cost of services rendered based on your

15    ability to pay and the availability of third-party payments.

16    In that regard I authorize the release of available drug

17    treatment evaluations and reports, including the presentence

18    investigation report, to the substance abuse treatment

19    provider.

20         Fourth, I'm going to require you to submit your

21    person, residence, place of business, vehicle, and any property

22    or electronic devices under your control to a search on the

23    basis that your probation officer has a reasonable suspicion

24    that contraband or evidence of a violation of the conditions of

25    your release may be found.  That search may be conducted at a

K2BEGENS

1   reasonable time and in a reasonable manner, and you're failure

2   to submit to such a search may be grounds for revocation.  You

3   must inform any other residents of the premises where you

4   reside upon your release that those premises may be subject to

5   search pursuant to this condition.

6          Fifth, you are not to own or have any control of any

7   business that functions as an investment hedge fund or

8   investment advisory firm, nor are you to be employed or act in

9   any capacity or represent yourself as a financial advisor, fund

10  manager, securities trader, or financial broker.

11         With respect to restitution, I'm requiring you to pay

12  15 percent of your gross monthly income towards the

13  satisfaction of restitution.

14         Now, this Mr. Genovese constitutes the sentence of

15  this Court.  I advise you that to the extent you've not

16  previously waived your right to appeal, you have the right to

17  appeal.  I advise you further that if you cannot afford

18  counsel, counsel will be provided to you free of cost.

19         Mr. Eisemann has done an excellent job representing

20  you, but, quite frankly, sir, you didn't give him much to work

21  with.

22         You are going to go away now for a well-deserved term

23  of imprisonment.  And when you're released on supervised

24  release, God willing, I'll still be sitting right here.  And if

25  you violate the terms of your supervised release and are

K2BEGENS

1    brought back, I can assure you, sir, that whatever the maximum

2    statutory sentence is that I can impose for a violation of

3    supervised release, I will impose it.  So don't put yourself in

4    the position of coming back before me.  And maybe, for the

5    first time in your life, when you get out, you could get an

6    honest job and actually tell the truth when you talk to people

7    about anything.

8              You may be seated.

9              Is there anything any further applications?

10             MR. ENZER:  Nothing further from the government, your

11   Honor.  Thank you.

12             THE COURT:  Anything further, Mr. Eisemann?

13             MR. EISEMANN:  A few, your Honor.

14             The restitution amount.  The 15 percent, can that be

15   after his release so that he -- the meager amount he makes in

16   jail to pay for commissary, things like that, doesn't get

17   applied towards restitution.  It's not going to make much of a

18   difference to the victims.

19             THE COURT:  I will grant that application.

20             MR. EISEMANN:  In terms of a recommended designation,

21   his mother is the person who will be coming to visit him.  I

22   think he is eligible for a camp because he has less than 10

23   years to go.  She can't see him.  The closest one to Chicago I

24   think is in South Dakota, and that's a long drive for her.  In

25   looking to find institutions that are easily accessible from

K2BEGENS

airports, a flight from Midway to Baltimore is an easy flight
for her to make, and there is a camp at Cumberland, FCI
Cumberland.  That also happens to have a residential drug
treatment program, which I'm going to ask your Honor to
recommend for Mr. Genovese.  So I'm asking if you could make a
recommendation that he be designated to that institution and
also that he be in a residential drug treatment program.

          THE COURT:  First, I don't make the recommendation to
the Bureau of Prisons about any specific institution.  That is
a security decision that only the Bureau of Prisons can make.

          I will recommend that he be housed at a facility as
close to the Baltimore area as possible, and I will make a
recommendation that he be considered for the drug treatment
program.

          MR. EISEMANN:  Thank you.

          One other thing, your Honor.  This is still uncharted
waters for me somewhat.

          The Second Chance Act I think allows your Honor at the
time of sentencing to recommend an additional six months of
either halfway house or home confinement to help integrate
someone into society, and I'd ask that you make that
recommendation, to the extent have you the power to do it, so
the Bureau of Prisons can consider that.  I believe it's a
warden's call, but they will be guided by your recommendation.

          THE COURT:  No, I'm not going to make that

K2BEGENS

1    recommendation.  He needs to be out of society, period.

2              MR. EISEMANN:  OK.  Nothing further, your Honor.

3              THE COURT:  All right.  This matter is concluded.

4              MR. EISEMANN:  Your Honor, one application.  His

5    mother has not seen him in a long time.  She's here in the

6    courtroom.  If the marshals would permit it, can he be at the

7    rail and give her a hug?

8              THE COURT:  No.  That's a security issue.  I am not

9    going to direct the marshals to do that.

10             MR. EISEMANN:  May I have a moment to ask them if

11   they'll do it?

12             THE COURT:  No.  The marshals take directions from the

13   judge.  It's a security issue.

14             I regret it.  I feel sorry for his mother.  His mother

15   is obviously suffering, like victims suffer.  I know from her

16   own letter to me that she knew nothing of what Mr. Genovese was

17   up to until she got a message from the Bureau of Prisons

18   inviting her to join the chats so that she could communicate

19   with her son.  That was the first that she heard about his

20   arrest.

21             She has every reason to be disappointed in him.  I'm

22   sure she loves him, but he hasn't done much to earn that.

23             (Adjourned)

24

25