UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7-14-2021
```

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

        - against -

NICHOLAS J. GENOVESE, WILLOW CREEK
INVESTMENTS, LP, AND WILLOW CREEK
ADVISERS, LLC,

                Defendants.

18-cv-942 (JGK)

<u>MEMORANDUM OPINION
AND ORDER</u>

JOHN G. KOELTL, District Judge:

    The Securities and Exchange Commission ("SEC") has brought suit against Nicholas J. Genovese, and two entities under his ownership and control, Willow Creek Advisers, LLC ("Willow Creek") and Willow Creek Investments, LP (the "WC Fund"), alleging that Genovese and the WC Fund violated the antifraud provisions of the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"), and that Genovese and Willow Creek violated the antifraud provisions of the Investment Advisers Act of 1940 ("Advisers Act"). In related criminal proceedings, Genovese has already pleaded guilty to securities fraud, pursuant to a plea agreement. Genovese, who is incarcerated and appearing <u>pro se</u>, has filed objections challenging certain orders by Magistrate Judge Moses, to whom the case was referred for general pre-trial purposes. Genovese

has also requested that this Court grant sanctions against counsel for the SEC.

The SEC has moved for summary judgment on its claims, and Genovese has opposed the motion. No counsel has appeared to represent Willow Creek and the WC Fund at any stage of this proceeding.

For the reasons that follow, Genovese's objections to the Magistrate Judge's orders and his request for sanctions are **denied**, and the SEC's motion for summary judgment is **granted**.

I.

The following facts are taken from the Complaint, declarations and exhibits filed in connection with the parties' motions, and the SEC's Local Rule 56.1 statement, and are undisputed unless otherwise noted.[1]

A.

The SEC brought this action on February 2, 2018, alleging that the defendants had engaged in a scheme to defraud investors by knowingly or recklessly making false statements regarding

---

[1] Although Genovese filed an Answer on his behalf, the defendants have not filed a Local Rule 56.1 Statement. Although the Court of Appeals has instructed that facts in Local Rule 56.1 Statements that are uncontested may be deemed admitted as a matter of law, Gubitosi v. Kapica, 154 F.3d 30, 31 & n.1 (2d Cir. 1998), district courts have broad discretion to determine whether to overlook a party's failure to comply with Local Rule 56.1 and "to 'conduct an assiduous review of the record' even where one of the parties has failed to file such a statement." Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001). Moreover, the Court has an independent obligation to assure that statements in a Local Rule 56.1 Statement are supported in the record. See id. at 74. A careful review is appropriate in this case. See, e.g., Liverpool v. Davis, 442 F. Supp. 3d 714, 723 (S.D.N.Y. 2020); Hayes v. Cnty. of Sullivan, 853 F. Supp. 2d 400, 406 (S.D.N.Y. 2012).

Genovese's background, including his money-management and securities experience, and by distributing a private placement memorandum containing such false statements. Compl. ¶ 1, ECF No. 1; Pl.'s 56.1 Stmt. ¶¶ 7-9. The SEC alleged such activity constituted violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, by the WC Fund and Genovese, as well as violations of Sections 206(1), 206(2), and 206(4) of the Advisers Act, 15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4), and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8, by Genovese and Willow Creek. Id. ¶ 7. On the same day, the United States Attorney's Office for the Southern District of New York ("USAO") filed a criminal complaint against Genovese, who was arrested on that same day in Florida. United States v. Nicholas J. Genovese, 18-cr-183 (S.D.N.Y.), ECF No. 1. Also on the same day, this Court granted emergency relief, including imposing a temporary restraining order and asset freezes against the defendants. Pl.'s 56.1 Stmt. ¶ 9; ECF No. 4.

On March 1, 2018, the USAO obtained and filed an indictment ("Indictment") based on the same conduct and circumstances that underly the SEC's complaint. Pl.'s 56.1 Stmt. ¶ 12. The Indictment charged Genovese with one count of securities fraud under Section 10(b) of the Exchange Act and Rule 10-b thereunder

and one count of wire fraud, based on allegations that Genovese had falsely obtained millions of dollars from investor victims through the WC Fund, a purported "hedge fund" and Willow Creek. Pl.'s 56.1 Stmt. ¶¶ 12-13.[2] On June 21, 2018, this Court stayed this action pending determination of the criminal proceedings against Genovese. ECF No. 21. On October 19, 2019, Genovese pleaded guilty to one count of securities fraud in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and he admitted to committing securities fraud from at least 2015 until the time of his arrest by misrepresenting his employment history, relevant experience, and education in order to induce investments. Pl.'s 56.1 Stmt. ¶¶ 14-15. On February 11, 2020, Genovese was sentenced principally to a term of 140 months' imprisonment. Id. ¶ 17. The sentencing court entered a criminal judgment against Genovese and a restitution order, finding Genovese responsible for restitution in the amount of $11,211,704. Id. ¶¶ 19-20.

B.

At the time of his arrest, Genovese was the sole principal, owner, and managing director of Willow Creek, and the sole owner of Willow Creek GP, LLC ("WC GP"), the general partner of the WC Fund. Id. ¶ 2. The WC Fund is a Delaware limited partnership

---

[2] Unless otherwise noted, this Memorandum Opinion and Order omits all alterations, omissions, emphasis, quotation marks, and citations in quoted text.

with its principal place of business in New York, and is controlled by Genovese through WC GP. Pl.'s 56.1 Stmt. ¶ 4. The WC Fund's bank accounts are controlled by Genovese. Pl.'s 56.1 Stmt. ¶ 5; Decl. of James Hanson in Support of Summary Judgment, ECF No. 62 ("Hanson SJ Decl."), Ex. 2. Willow Creek is a Delaware limited liability company with its principal place of business in New York. Pl.'s 56.1 Stmt. ¶ 6; Hanson SJ Decl., Ex. 2. In filings to this Court, Genovese described both the WC Fund and Willow Creek as his "alter egos." ECF No. 26, at 2.

Since at least 2014, the WC Fund has sold over $5 million worth of limited partnership interests. Pl.'s 56.1 Stmt. ¶ 4; Hanson SJ Decl., Ex. 2. On April 22, 2016, Genovese caused WC Fund to file Form D with the SEC, which described the WC Fund as a "hedge fund" and "pooled investment vehicle." Pl.'s 56.1 Stmt. ¶ 5; Hanson SJ Decl., Ex. 2. Although Genovese is listed on the Financial Industry Regulatory Authority's Central Registration Depository database, it is uncontested that Genovese holds no securities licenses and has never been associated with any registered broker-dealer or investment adviser. Pl.'s 56.1 Stmt. ¶ 3; Hanson SJ Decl., Ex. 2. Between 1990 and 2004, Genovese was convicted of theft by deception, grand larceny, identity theft, and second-degree scheme to defraud, in five separate criminal actions. Pl.'s 56.1 Stmt. ¶ 3; Decl. of James Hanson in Support of TRO, ECF No. 9 ("Hanson TRO Decl."), Ex. 9. In 1998 and 1999,

while serving a prison sentence, Genovese filed for and received
a bankruptcy discharge under Chapter 7 of the United States
Bankruptcy Code. Hanson TRO Decl., Ex. 9, at 40-41.

On December 21, 2017, Edward Janowsky, a Staff Accountant
with the SEC's Office of Compliance Inspections and
Examinations, visited Willow Creek's offices located at 1
Liberty Plaza, and provided Genovese with a document request
list. Decl. of Edward Janowsky, ECF No. 8 ("Janowsky Decl.")
¶¶ 1, 3-4. At Genovese's direction, Janowsky contacted
Genovese's lawyer. Id. ¶ 4. On January 17, 2018, in response to
Item 5 on the document request list, Genovese's lawyer provided
Janowsky with a document that purported to list the WC Fund's
seven current and former investors, and the document described
Willow Creek's total assets under management as totaling
approximately $5.3 million. Id. ¶ 5; Janowsky Decl., Ex. 2. When
the SEC staff conducted a search of the Bluesheet Management
System, described by Janowsky as the "primary means by which
trade data is transmitted from broker-dealers to the SEC and
Self Regulatory Organizations," no brokerage accounts were found
for Willow Creek, but three accounts under Genovese's name were
identified with TD Ameritrade. Janowsky Decl. ¶ 9. Based on the
brokerage records for Genovese's TD Ameritrade accounts for the
period from January 2015 to January 2018, Janowsky determined
that the accounts received wire transfers totaling approximately

$8.5 million, and that between 2015 and 2017 the accounts appear to have "sustained trading losses of more than $8 million, primarily through options trading." Id. ¶ 10; Janowsky Decl., Ex. 5. Genovese has not denied that no Willow Creek brokerage accounts exist. The SEC has also introduced evidence, including brokerage account statements for the accounts in Genovese's name, to suggest that Genovese withdrew money from the brokerage accounts containing money received from the WC Fund investors, for ATM withdrawals, and food, hotel, and transportation expenses. Pl.'s 56.1 Stmt. ¶ 42; Janowsky Decl. ¶ 10, Ex. 5.

The SEC has also provided a sworn affidavit from Geoffrey Orley who has stated that, after being introduced to Genovese through a mutual friend, Genovese told Orley that Genovese had previously worked at Bear Sterns and Goldman Sachs, and that Genovese had graduated from the University of Kentucky and the Dartmouth Tuck School of Business. Hanson TRO Decl., Ex. 2 ¶ 2. Orley has stated that Genovese said that he founded Willow Creek after leaving Bear Sterns, bringing along three former Bear Sterns traders with him, and that Genovese's fund was worth "approximately $30 billion" with "investment returns of around "30 to 40" percent per year. Id. ¶¶ 3-4.

The SEC has provided a copy of a "Confidential Private Placement Memorandum" ("PPM"), dated April 2016, for limited partnership interests, worth $1 million, in the WC Fund. Hanson

TRO Decl., Ex. 1. In his affidavit, Orley stated that Orley and

Orley's brother received a copy of the PPM after making their

investment in the WC Fund. Hanson TRO Decl., Ex. 2 ¶¶ 7-8. The

PPM describes Genovese's background as follows:

> Nicholas Genovese is the founder and Chief Executive
> Officer of the General Partner and the Investment Manager
> and the main portfolio manager/analyst with primary
> responsibility for making investment decisions for the
> Partnership. Prior to founding Willow Creek 8 years ago,
> Mr. Genovese was a Partner at Goldman Sachs and previous to
> that was Portfolio Manager, and member of the Investment
> Strategy Committee at Bear Stearns. He received a B.S. in
> Finance from University of Kentucky and a M.B.A. in Finance
> from Dartmouth – Tuck Business School.

Hanson TRO Decl., Ex. 1 at 11. The SEC has provided a letter

from Goldman Sachs, stating that there is no record of Genovese

ever having been employed at Goldman Sachs, as well as letters

from the registrars of both Dartmouth Tuck School of Business

and the University of Kentucky, both stating that there is no

record of Genovese ever attending either school. Hanson TRO

Decl., Exs. 3, 5, 6. Genovese does not deny that this

description is inaccurate, or that he caused the PPM to be

delivered to at least some clients. ECF No. 82, at 1-2. However,

in his Answer, Genovese has now asserted that his "attorney and

general counsel" put this description in the PPM and that the

PPM was only delivered to "5%" of his clients, but does not

provide any support for this statement or explanation of how the

five percent figure is derived. Id.

8

The PPM also states that Grant Thornton is the
partnership's "independent certified public accountant" and
auditor. Hanson TRO Decl., Ex. 1, at 7, 20, 37. The SEC has
provided a letter from a representative of Grant Thornton
stating: "Grant Thornton searched its client database for the
following entities/individuals: Willow Creek Investments LP[,]
Willow Creek GP LLC[,] Willow Creek Advisers LLC[, and] Nicholas
J. Genovese." Hanson TRO Decl., Ex. 4. The Representative stated
that "[b]ased on the results of [the] search, . . . [Grant
Thornton] ha[s] no record of any of these entities or
individuals ever being a Grant Thornton client." Id. In his
Answer, Genovese incorrectly states that this letter from Grant
Thornton "does not state that we never used [Grant Thornton]"
and only states that the entities "currently are not their
client." Answer, ECF No. 66, ¶ 20. However, Genovese never
alleges that the WC Fund was ever a client of Grant Thornton,
such that this statement in the PPM was correct as of April
2016, nor does Genovese ever state that any other auditor was
used.

Genovese does not deny that he never disclosed his past
personal bankruptcy or criminal convictions to his clients,
including Orley, but claims that he was "under no obligation to
divulge to anyone" details regarding his bankruptcy and prior
criminal convictions. Id. ¶ 19. Orley has stated that he learned

of Genovese's criminal history from another investor and that
after discovering Genovese's background, Orley and his brother
sought to redeem their funds. Hanson TRO Decl., Ex. 2 ¶ 11.
Orley stated that in May 2017, he and his brother requested a
complete redemption of their investment in the WC Fund, and
that, even following the withdrawal time periods provided in the
PPM, their funds had not been returned to them as of the time of
the plaintiff's arrest. Id. ¶¶ 11-13. Orley stated that Genovese
told Orley that Orley would have to wait "until the stars are
aligned" to redeem his investment, or risk losing "95%" of his
investment. Id. ¶ 13. Genovese denies using those words but does
not deny that Orley and his brother were told that they could
not redeem their investments. Answer ¶ 14.[3] Similarly, Genovese
denies telling Orley "in late 2015 and 2016 in a meeting" that
he worked for "2 wall street firms" and that "the fund had
assets of about $39 billion"; yet, he does not deny ever having
made such misleading statements to Orley, nor does he deny
having ever stated the fund had assets under management of
between $30-39 million as Orley had stated. Answer ¶ 12; Hanson
TRO Decl., Ex. 2 ¶¶ 2, 4.

---

[3] The SEC has alleged that Genovese engaged in similar solicitations from at
least three other investors—in addition to Orley and his brother—based on
similar misrepresentations about his background. Pl.'s 56.1 Stmt. ¶¶ 29-31.
The SEC notes that these investors' identities match the response provided by
Genovese's lawyer to Janowsky, but the SEC has redacted the names of the
investors other than Orley in their exhibits. Compl. ¶¶ 15-22; Janowsky
Decl., Ex. 2. However, the SEC appears to identify them in its reply brief.
Pl.'s Reply Br., ECF No. 84, at 5-6.

In his plea allocution, Genovese admitted to misrepresenting his background and level of experience to prospective investors, beginning in 2015, to induce their investment, with the knowledge that such misrepresentations were illegal. Specifically, the Court engaged in the following allocution:

> THE COURT: . . . Mr. Genovese, please tell me what you did in connection with the securities fraud to which you are entering a plea of guilty.
> THE DEFENDANT: I misrepresented my background in order to induce people to become my clients and invest in my fund.
> THE COURT: When, sir, did you do that?
> THE DEFENDANT: Possibly 2015. Around there.
> THE COURT: And, over what period of time did you do that?
> THE DEFENDANT: Two years.
> THE COURT: Can you be a little more specific with me as to how you misrepresented your background in order to induce people to invest with you?
> THE DEFENDANT: My employment experience and education.
> THE COURT: What did you tell people?
> THE DEFENDANT: I told people I worked for -- that I had worked for and gained experience from various firms, and I had told people that I had a higher education than what I actually have.
> THE COURT: And, with respect to the firms you described, had you ever worked for those firms?
> THE DEFENDANT: No, sir.
> THE COURT: What firms in particular did you tell people you worked for?
> THE DEFENDANT: Goldman Sachs and Bear Stearns.
> THE COURT: When you made those representations, did you make those representations with the intent to induce people to invest with you?
> THE DEFENDANT: Yes, sir.
> THE COURT: And, what was the name of your investment vehicle?
> THE DEFENDANT: It was called Willow Creek Advisors.
> THE COURT: Did you understand, sir, that at that time what you were doing was wrong and illegal?
> THE DEFENDANT: I assume. Yeah.

> THE COURT: Is there any doubt in your mind that what you
> were doing was wrong and illegal?
> THE DEFENDANT: Oh no. No doubt whatsoever.

Hanson SJ Decl., Ex. 3, at 16-17. Genovese admitted that he made

such false statements in Manhattan, and he estimated that he

obtained "close to $13 million" from investors. Id. at 19. In

later submissions, Genovese has contested this $13 million

figure, but in this suit, the SEC is only suing on the basis of

the approximately $5.3 million in sales of interests to

individuals. See Janowsky Decl., Ex. 2.

Similarly, at his sentencing, Genovese stated, after

several of his victims, including Orley, read statements to the

Court:

> [W]e do have some ex-clients here today. . . . I take full
> responsibility for how they feel and what I've done, and I
> have allocuted [sic] that, and I admitted to that. And I
> wanted to say that I apologize to them from my heart. And I
> know that's not going to bring back money or anything from
> what I've done. . . . I want to apologize to the victims,
> that they entrusted me with their money, and I broke that
> trust. I want to make very clear, that that's the number
> one thing in my mind right now.

Hanson SJ Decl., Ex. 4 at 74.

Despite his guilty plea, Genovese now claims to have "never

verbally misled clients," and similarly claims that the PPM's

false description of his expertise was added "without [his]

knowledge." Answer ¶¶ 13, 18.

C.

Following Genovese's conviction, by letter dated April 23,
2020, the SEC requested the Court lift the stay in this case,
and noted that the defendants were served with the summons and
complaint on April 11, 2018 and that no answer had been filed.
ECF No. 24. The Court ordered the defendants to respond to the
complaint and the parties to submit a Rule 26(f) report, both by
June 26, 2020. ECF No. 25. On May 19, 2020, at Genovese's
request, the Court extended the defendants' time to file an
answer by 6 months, to October 2, 2020. ECF No. 26.

On June 17, 2020, this Court referred the case to
Magistrate Judge Moses for general pretrial and extended the
time to file the Rule 26(f) report until July 24, 2020. ECF No.
30.

On August 20, 2020, the SEC requested leave to file a
motion for summary judgment, arguing that collateral estoppel
made further discovery unnecessary. ECF No. 37. Magistrate Judge
Moses granted the SEC's request, denied various procedural
applications by Genovese, and noted that neither Genovese nor
the two corporate defendants had answered the Complaint and that
the two corporate defendants could only appear in this
litigation with counsel. ECF No. 35, 44.

On October 19, 2020, Magistrate Judge Moses denied
Genovese's application for a stay, noted that Genovese had

repeatedly failed to answer or otherwise respond to the
Complaint, and that the WC Fund and Willow Creek had failed to
appear or respond to the Complaint through licensed counsel. ECF
No. 50. Magistrate Judge Moses further noted that the SEC was
entitled to seek certificates of default, pursuant to Local
Civil Rule 55.1 against the defendants, without prejudice to its
right to move for summary judgment. Id. The SEC filed for
certificates of default, and the Clerk's Office issued such
certificates to the SEC for Genovese, Willow Creek, and the WC
Fund, on October 20, 2020. ECF Nos. 57, 58, 59.

On October 23, 2020, the SEC filed its motion for summary
judgment. ECF Nos. 61-63. On November 10, 2020, the Pro Se
Office docketed an "Answer" from defendant Genovese, as well as
two letters, dated November 3, 2020 and September 20, 2020,
raising broad objections to the Magistrate Judge's prior orders.
ECF No. 45, 64-66. In an Order, dated November 10, 2020
("November 10 Order"), Magistrate Judge Moses construed
Genovese's two letters as a motion for reconsideration of
earlier discovery orders (27, 35, and 44), and denied relief.
ECF No. 67 (citing Fed. R. Civ. P. 56(d)).

On January 19, 2021, this Court issued an Order, denying
Genovese's request to vacate the Magistrate Judge's prior Orders
and noting that Genovese had failed to explain why the prior
Orders of the Magistrate Judge were "clearly erroneous or

14

contrary to law." ECF No. 76 (citing Fed. R. Civ. P. 72(a)).
Further, this Court explained that Magistrate Judge Moses had
properly noted that Genovese's argument that he was entitled to
further discovery could be raised in his opposition to the
motion for summary judgment. Id. Nevertheless, the Court granted
Genovese's request for an additional extension to file
objections to the Magistrate Judge's Orders and his opposition
to the SEC's motion for summary judgment. Id. Genovese filed
both renewed objections and his opposition, and the SEC has
responded to Genovese's objections and filed its reply brief.
ECF Nos. 80, 81, 82, 84, 85. In his brief opposing the SEC's
motion for summary judgment, Genovese requested that the Court
sanction counsel for the SEC, pursuant to Rule 37. ECF No. 82,
at 7.

II.

Genovese has filed renewed objections to four Orders by
Magistrate Judge Moses. Genovese's objections appear to focus
primarily on his assertions (1) that he is entitled to further
discovery from the SEC, (2) that permitting the SEC to move for
summary judgment was improper, (3) that Magistrate Judge Moses
was incorrect in noting that the WC Fund and Willow Creek have
failed to appear through licensed counsel and that the failure
of Genovese, Willow Creek, and the WC Fund to file a timely

answer entitled the SEC to a default judgment. Each of these objections is without merit.

Genovese's objections relating to his request for further discovery and his request to stay the SEC proceeding including the motion for summary judgment are both "non-dispositive" matters, and were within the scope of this Court's Order referring the case to Magistrate Judge Moses. See ECF No. 29; see also 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a). Upon receiving timely objections from a party regarding such non-dispositive orders, this Court is required to consider the objections and modify or set aside any portion of the orders that is "clearly erroneous or is contrary to law." Fed. R. Civ. Pro. 72(a). An order is clearly erroneous if the reviewing court is "left with the definite and firm conviction that a mistake has been committed." Easley v. Cromartie, 532 U.S. 234, 242 (2001). "An order is contrary to law when it fails to apply or misapplies relevant statutes, case law or rules of procedure." Thompson v. Keane, No. 95-cv-2442, 1996 WL 229887, at *1 (S.D.N.Y. May 6, 1996). The standard of review under Rule 72(a) is "highly deferential." Thai Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic Republic, 924 F. Supp. 2d 508, 511-12 (S.D.N.Y. 2013).

Genovese argues that he is entitled to further discovery from the SEC of "pre-February 2, 2018 Discovery" documents,

16

beyond the materials that have already been provided to him. ECF
No. 44. As Magistrate Judge Moses noted, the plaintiff has not
specified what materials in any potential "pre-February 2, 2018
Discovery" could be relevant to his defense in this case.
Further, the SEC has already stated that the SEC has no other
non-privileged documents, and has provided a declaration
explaining the privileges that the SEC has asserted. See ECF No.
83. Finally, Genovese's claim that the SEC has not provided any
statements from witnesses, victims, or evidence is inaccurate—
because the SEC has provided, among other things, relevant sworn
affidavits from Orley and the SEC Compliance Examiner. See
Janowsky Decl.; Hanson TRO Decl., Ex. 2.

In any event, apart from the merits of the SEC's summary
judgment motion, Magistrate Judge Moses did not err in
permitting the SEC to file its motion and correctly noted that
Genovese was free to argue in his responsive brief that he could
not "present facts essential to justify [his] opposition" to the
SEC's motion for summary judgment. Fed. R. Civ. P. 56(b), (d).
Accordingly, Magistrate Judge Moses's denial of Genovese's
"Motion to Stay" the proceedings, based on the conclusion that
no stay was warranted, was not clearly erroneous or contrary to
law.

Further, to the extent that Genovese seeks to object to
Magistrate Judge Moses's observations that Genovese, the WC

17

Fund, and Willow Creek had failed to file an answer despite numerous extensions and that the WC Fund and Willow Creek can only appear through licensed counsel, such an objection is unfounded. As Magistrate Judge Moses noted, if a defendant that has been properly served is in default, the plaintiff is entitled to seek a default judgment. Fed. R. Civ. P. 55. Further, Magistrate Judge Moses correctly noted that the WC Fund and Willow Creek, as an LP and an LLC respectively, can only appear through a licensed attorney and have never done so. See Lattanzio v. COMTA, 481 F.3d 137, 139–40 (2d Cir. 2007); Eagle Assocs. v. Bank of Montreal, 926 F.2d 1305, 1310 (2d Cir. 1991). Genovese eventually filed a late answer and therefore the Court will vacate the certificate of default against him and consider the merits of the motion for summary judgment against him. Accordingly, Genovese's objections to the Magistrate Judge's Orders are overruled, except the certificate of default against Genovese is vacated.

III.

In his papers, Genovese has requested sanctions against counsel for the SEC, pursuant to Rule 37, seeking "[a]ll exculpatory and inculpatory evidence . . . immediately," as well as "monetary damages" incurred. ECF No. 82, at 7. Genovese has not demonstrated that the SEC has engaged in sanctionable conduct, nor failed to comply with a discovery order. Moreover,

sanctions under Rule 37 are not warranted, based on the record
before the Court at this time. Therefore, Genovese's request for
sanctions is denied.[4]

## IV.

The SEC has moved for summary judgment on its claims for
violations of Section 10(b) of the Exchange Act and Rule 10b-5,
Section 17(a) of the Securities Act, and Section 206 of the
Advisers Act and Rule 206(4)-8. Defendant Genovese has opposed
summary judgment by denying several of the factual allegations
made by the SEC and arguing that further discovery is needed to
resolve what he asserts are questions of fact.

## A.

The standard to be applied to a motion for summary judgment
is well-established. "The court shall grant summary judgment if
the movant shows that there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter
of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v.
Cartrett, 477 U.S. 317, 322-23 (1986). "[T]he trial court's task
at the summary judgment motion stage of the litigation is

---

[4]  In his Answer, Genovese has filed three "counterclaims." See Answer,
Counterclaims ¶¶ 1-3.  Two of his counterclaims are not claims, but denials
of allegations by the SEC.  The remaining counterclaim appears to allege that
the SEC knowingly "caused [the defendants'] clients a verifiable loss of over
$700,000." Id. ¶ 1. To the extent that Genovese has sought to raise this
"counterclaim" against the SEC, such a claim is frivolous and without merit.
Genovese has failed to provide any factual support or any legal authority to
suggest such allegations could be the basis for a claim brought by Genovese
against the SEC in this action.  Accordingly, to the extent that Genovese
sought to raise such a claim against the SEC, the claim is dismissed.

carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). If the moving party meets its burden, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City of N.Y., 996 F.2d 522, 532 (2d Cir. 1993).

It is well-established that courts must afford pro se litigants a special solicitude in connection with motions for

summary judgment. Tracy v. Freshwater, 623 F.3d 90, 101 (2d Cir. 2010). A pro se party's papers opposing summary judgment are to be read liberally and interpreted so as to "raise the strongest arguments that they suggest." McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999). However, the special solicitude afforded pro se litigants does not "relieve" them of the "duty to meet the requirements necessary to defeat a motion for summary judgment." Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50 (2d Cir. 2003).

B.

Section 10(b) of the Exchange Act makes it "unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe . . . ." 15 U.S.C. § 78j(b). Rule 10b-5, promogulated by the SEC to implement Section 10(b), prohibits the use, "in connection with the purchase or sale of any security," of "any device, scheme, or artifice to defraud" or any other "act, practice, or course of business" that "operates . . . as a fraud or deceit." 17 CFR § 240.10b-5. See SEC v. Zandford, 535 U.S. 813, 819 (2002). To establish liability under Section 10(b) and Rule 10b-5, the SEC must demonstrate that a defendant "in connection with the purchase or sale of a security," "acting with scienter, made a material misrepresentation (or a material omission if the

21

defendant had a duty to speak) or used a fraudulent device."
SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir.
1996); see also SEC v. Monarch Funding Corp., 192 F.3d 295, 308
(2d Cir. 1999).

Section 17(a) of the Securities Act prohibits "any person
in the offer or sale of any securities" from "directly or
indirectly" either (1) "employ[ing] any device, scheme, or
artifice to defraud; (2) "obtain[ing] money or property by means
of any untrue statement of a material fact or any omission to
state a material fact necessary in order to make the statements
made, in light of the circumstances under which they were made,
not misleading"; or (3) "engag[ing] in any transaction,
practice, or course of business which operates or would operate
as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a).
Courts in this Circuit have understood that "the same elements
required to establish a section 10(b) violation and a Rule 10b-5
violation suffice to establish a violation under sections
17(a)(1)-(3) of the [Securities] Act, with the exception that
scienter is not required for the SEC to enjoin violations under
subsections (a)(2) or (a)(3)." SEC v. Nadel, 97 F. Supp. 3d 117,
122 (E.D.N.Y. 2015); see SEC v. Monarch Funding Corp., 192 F.3d
295, 308 (2d Cir. 1999); see also SEC v. Mattera, No. 11-cv-
8323, 2013 WL 6485949, at *9 (S.D.N.Y. Dec. 9, 2013) ("[I]f a

seller is liable under section 10(b), it is necessarily liable under section 17(a).").

Section 206 of the Advisers Act prohibits "any investment adviser" from "directly or indirectly" either (1) "employ[ing] any device, scheme, or artifice to defraud any client or prospective client" or (2) "engag[ing] in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." 15 U.S.C. § 80b-6. Section 206 of the Advisers Act "prohibits failures to disclose material information, not just affirmative frauds." Dembski v. SEC, 726 F. App'x 841, 844 (2d Cir. 2018). Courts have recognized that "[f]acts supporting a Securities Act Section 17(a) or an Exchange Act Section 10(b) violation by an investment adviser will also support a showing of a Section 206 violation under the Advisers Act." Id. at 843-844. SEC v. Berger, 244 F. Supp. 2d 180, 192 (S.D.N.Y. 2001), aff'd, 322 F.3d 187 (2d Cir. 2003).

C.

The SEC contends that Genovese's conviction for securities fraud under Section 10(b) estops him from relitigating the same underlying facts as they pertain to the SEC's civil claims for violation of Section 10(b) and Rule 10b-5, Section 17(a), and Section 206 and Rule 206(4)-8.

Under the doctrine of offensive collateral estoppel, a
plaintiff may bar a defendant from relitigating an issue if the
Court determines that "(1) the issues in both proceedings are
identical, (2) the issue in the prior proceeding was actually
litigated and actually decided, (3) there was full and fair
opportunity to litigate in the prior proceeding, and (4) the
issue previously litigated was necessary to support a valid and
final judgment on the merits." SEC v. Haligiannis, 470 F. Supp.
2d 373, 382 (S.D.N.Y. 2007) (quoting NLRB v. Thalbo Corp., 171
F.3d 102, 109 (2d Cir. 1999)). "It is well-settled that a
criminal conviction, whether by jury verdict or guilty plea,
constitutes estoppel in favor of the United States in a
subsequent civil proceeding as to those matters determined by
the judgment in the criminal case." Maietta v. Artuz, 84 F.3d
100, 102 & n.1 (2d Cir. 1996) (quoting United States v. Podell,
572 F.2d 31, 35 (2d Cir. 1978)); see also SEC v. Illarramendi,
732 F. App'x 10, 12 (2d Cir. 2018) (defendant's guilty plea to
five felony offenses, including a violation of Section 206 of
the Advisers Act, collaterally estopped him from denying
liability for identical Advisers Act violations in his civil
case). Because the government "bears a higher burden of proof in
the criminal than in the civil context," the government
"consequently may rely on the collateral estoppel effect of a
criminal conviction in a subsequent civil case," and the

"criminal defendant is barred from relitigating any issue determined adversely to him in the criminal proceeding, provided that he had a full and fair opportunity to litigate the issue." SEC v. Shehyn, No. 04-cv-2003, 2010 WL 3290977, at *3 (S.D.N.Y. Aug. 9, 2010) (quoting Gelb v. Royal Globe Ins. Co., 798 F.2d 38, 43 (2d Cir. 1986)).

Courts in this Circuit "have applied collateral estoppel in the securities fraud context because the elements necessary to establish civil liability under Section[s] 17(a) and 10(b) are identical to those necessary to establish criminal liability under Section 10(b)." Haligiannis, 470 F. Supp. 2d at 382 (granting summary judgment on SEC's Sections 17(a), 10(b), and 206(1) and (2) claims after finding defendant was estopped from contesting liability based on his conviction of one criminal count of a Section 10(b) violation). See, e.g., SEC v. McGinn, Smith & Co., Inc., No. 10-cv-457, 2015 WL 667848 at *6 (N.D.N.Y. Feb. 17, 2015); SEC v. Tzolov, No. 08-cv-7699, 2011 WL 308274 at *1-6 (S.D.N.Y. Jan. 26, 2011); SEC v. Roor, No. 99-cv-3372, 2004 WL 1933578, at *7 (S.D.N.Y. Aug. 30, 2004); SEC v. McCaskey, No. 98-cv-6153, 2001 WL 1029053, at *3 (S.D.N.Y. Sept. 6, 2001); SEC v. Grossman, 887 F. Supp. 649, 659 (S.D.N.Y. 1995).

Collateral estoppel is appropriate in this case. Genovese's criminal conviction and the SEC's claims alleging violations of Section 10(b) of the Exchange Act and Rule 10b-5, Section 17(a)

of the Securities Act, and Section 206 of the Advisers Act and Rule 206(4)-8 involve the same factual predicate and legal elements. See Haligiannis, 470 F. Supp. 2d at 382. To determine whether the legal and factual issues raised in a subsequent civil action are identical to a prior criminal proceeding, "courts routinely compare the criminal indictment with the civil complaint." McGinn, Smith & Co., Inc., 2015 WL 667848, at *9 (collecting cases). Here, a comparison of the SEC's complaint and the charge in the criminal indictment to which Genovese pleaded guilty demonstrates that the claims relate to the same scheme to defraud investors, based on misrepresentations of Genovese's identity, expertise, and background. Compare ECF No. 1 with Hanson SJ Decl., Ex. 2. Moreover, the charge to which Genovese pleaded guilty in the indictment covers more conduct than the SEC's complaint, given that the SEC's complaint is limited to the $5.32 million taken from investors. ECF No. 1; Hanson SJ Decl. Ex. 2. Genovese had a full and fair opportunity to litigate the factual basis and legal elements of his criminal securities fraud conviction; and, the relevant factual predicate and legal elements relevant to the SEC's claims against Genovese in this action were necessary to his conviction. Haligiannis, 470 F. Supp. 2d at 382.

Genovese has argued that the conduct at issue in this case could be different from the conduct for which he pleaded guilty

in the criminal case and that the SEC is not the same party as the USAO. Neither argument is persuasive. The SEC and USAO both initiated proceedings on the same day, based on substantially identical allegations. Compare ECF No. 1 with Hanson TRO Decl. Ex. 1. Further, the SEC and USAO, both representatives of the United States Government, have been recognized repeatedly to be the same party for purposes of offensive collateral estoppel in similar parallel criminal and civil securities fraud cases by courts in this district. See, e.g., McGinn, Smith & Co., 2015 WL 667848 at *6; Tzolov, 2011 WL 308274 at *1-6; Haligiannis, 470 F.Supp.2d at 383; Roor, 2004 WL 1933578, at *7; McCaskey, 2001 WL 1029053, at *3; Grossman, 887 F. Supp. at 659. Similarly, although Genovese pleaded guilty to one count of securities fraud, Genovese had both a full and fair opportunity to litigate the underlying factual predicate and legal issues related to his conviction.

D.

The SEC also argues that, even without the preclusive effect of collateral estoppel from Genovese's guilty plea, the SEC is entitled to summary judgment, because Genovese has failed to demonstrate the existence of any material issues of fact. In opposition, Genovese has argued that the SEC has failed to provide sufficient factual evidence and that he is entitled to further discovery.

Federal Rule of Civil Rule 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition" to a motion for summary judgment, a court may defer consideration or deny the motion or allow time for further discovery. In this case, the SEC has represented that it has produced "all non-privileged documents" and produced the documents to Genovese on several occasions. ECF Nos. 34, 37, 42, 83. Genovese has made broad and conclusory allegations that the SEC has withheld pre-arrest documents or improperly shielded certain documents with privileges, such as the notes of investigators. But, Genovese has failed to explain what these alleged documents could possibly contain that could contradict the evidence that the SEC has provided in support of its claims. Nor has Genovese articulated any possible facts that could be supported by further discovery that would undermine Genovese's guilty plea and sentence for violation of Section 10(b), and his plea colloquy in which he admitted to the factual predicate that the SEC relies on in this case. See Paddington Partners v. Bouchard, 34 F.3d 1132, 1138 (2d Cir. 1994) ("A court can reject a request for discovery, even if properly and timely made through a [Rule 56(d)] affidavit, if it deems the request to be based on speculation as to what potentially could be

discovered.")[5]; see also Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008) ("A fact is material if it might affect the outcome of the suit under the governing law.").

The SEC has produced a sworn affidavit from Orley, a copy of the PPM which Orley has sworn was provided to him by Genovese, declarations from an SEC examiner, and communications provided to the SEC by a representative of the WC Fund and Willow Creek regarding active client accounts. In addition, the SEC has provided Genovese's own statements during his plea allocution and sentencing hearing. Berger, 244 F. Supp. 2d at 189 (a defendant's "own statements at his plea allocution, including his explicit and unambiguous agreement with the description of evidence given by the Government," were admissible evidence, appropriately considered on a motion for summary judgment, despite defendant's pending application to withdraw his guilty plea), aff'd, 322 F.3d 187 (2d Cir. 2003).

In his submissions, Genovese has made broad, unsupported, and categorical denials of the SEC's factual allegations. Genovese has argued that these denials create questions of fact such that the Court cannot grant summary judgment in the SEC's favor. However, despite his numerous denials, Genovese has not specifically denied, nor presented any competent evidence to

---

[5] Prior Rule 56(f) has been carried forward without substantial change to current Rule 56(d). See Fed. R. Civ. P. 56, Advisory Committee Notes to 2010 Amendment.

demonstrate a genuine dispute over any of the material facts that support the SEC's claims: namely, that he misled investors through material misstatements and omissions about his background and level of experience in connection with the sale of securities. Moreover, even for those allegations by the SEC that Genovese has provided unsupported denials, it is well-established in this Circuit that a party may not create a genuine issue of material fact merely by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous sworn testimony. Illarramendi, 732 F. App'x at 13 ("[B]elated and unsworn repudiations cannot undermine prior sworn testimony so as to raise a triable issue of fact."); see also SEC v. Afriyie, No. 16-cv-2777, 2018 WL 6991097, at *4 (S.D.N.Y. Nov. 26, 2018) (concluding defendant's "factual claims in his opposition memorandum" that attempt "to relitigate a criminal conviction" based on "bald assertions, unsupported by evidence" were "not sufficient to overcome a motion for summary judgment"), aff'd, 788 F. App'x 59 (2d Cir. 2019).

Genovese appears to argue, in the alternative, that his investors were not mislead because they were sophisticated investors and that he did not have an obligation to disclose his criminal history or past bankruptcy. This argument misconstrues the SEC's burden of proof and is insufficient to defeat summary

judgment. The SEC is not required to demonstrate reliance when bringing the enforcement claims at issue here, unlike plaintiffs in private causes of action. See, e.g., SEC v. N. Am. Rsch. & Dev. Corp., 424 F.2d 63, 84 (2d Cir. 1970); SEC v. Penn, 225 F. Supp. 3d 225, 235 (S.D.N.Y. 2016); SEC v. Richetelli, No. 09-cv-361, 2010 WL 2802911, at *6 (D. Conn. July 12, 2010); SEC v. Simpson Cap. Mgmt., Inc., 586 F. Supp. 2d 196, 201 (S.D.N.Y. 2008). Moreover, Orley has stated that once he and his brother discovered Genovese's criminal history and lack of qualifications, Orley took steps to redeem his investment, despite having received reports from Willow Creek that the investments were doing well. Hanson TRO Decl., Ex. 2 ¶¶ 9, 11.

Genovese's attempts to minimize his conduct notwithstanding, the record establishes that Genovese misrepresented his background and expertise, as well as the nature of Willow Creek, to induce investments. Such misrepresentations were part of a deliberate effort to conceal the risk that Genovese, who was inexperienced and unqualified, lacked the ability to manage the funds invested in the WC Fund. Genovese's repeated requests for further discovery of investigatory materials and blanket denials of SEC allegations (including statements directly contrary to his prior, sworn statements at his plea hearing) are not sufficient to demonstrate a genuine issue of material fact. Genovese cannot

defeat a motion for summary judgment, either by seeking to create questions of fact through an affidavit inconsistent with his prior sworn statements, or by seeking unnecessary, additional discovery or posing questions about minor details of the submitted evidence.

E.

Finally, the SEC has moved for summary judgment against Willow Creek and the WC Fund. Despite repeated warnings and extensions, no counsel has appeared on behalf of Willow Creek and the WC Fund throughout the proceeding. ECF Nos. 26, 35, 38, 44. As an LP and LLC, respectively, the WC Fund and Willow Creek can only appear through licensed counsel. Lattanzio, 481 F.3d at 139-40; Eagle Assocs., 926 F.2d at 1310. On October 20, 2020, the Clerk issued Certificates of Default for WF Fund and Willow Creek. ECF Nos. 58, 59.

Federal Rule of Civil Procedure 55(b)(2) provides that where a party fails to plead or otherwise defend against a complaint, and after entry of default, a default judgment may be entered against such person. Upon entry of default, a court should accept as true all of the factual allegations of the complaint, except those relating to damages, and "draw all reasonable inferences" in the moving party's favor. Finkel v. Romanowicz, 577 F.3d 79, 84 (2d Cir. 2009); see also Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981); SEC v.

Syndicated Food Servs. Int'l, Inc., No. 04-cv-1303, 2010 WL
4668777, at *1 (E.D.N.Y. Nov. 9, 2010).

Because the WC Fund and Willow Creek are in default, the
Court accepts the factual allegations in the SEC's complaint as
true, and draws all reasonable inferences in the SEC's favor,
with respect to the WC Fund and Willow Creek. The allegations in
the SEC's Complaint are sufficient to establish that the WC Fund
violated Sections 17(a) and 10(b) (and Rule 10b-5 thereunder),
and that Willow Creek, singly or in concert, engaged in
practices that constituted violations of Section 206(1), 206(2),
and 206(4) of the Advisers Act, as well as Rule 206(4)-8
thereunder. Accordingly, the SEC is entitled to summary judgment
against the WC Fund and Willow Creek.

V.

The SEC has sought permanent injunctions against Genovese,
the WC Fund, and Willow Creek, to enjoin them from further
violations of Section 10(b) of the Exchange Act, and Rule 10b-5
promulgated thereunder, Section 17(a) of the Securities Act, and
Sections 206(1), (2), and (4) of the Advisers Act, and Rule
206(4)-8, as relevant for each of the defendants. In addition,
the SEC has sought a civil penalty of $1 million against
Genovese. Finally, the SEC has requested that the defendants be
found liable for disgorgement of $5.32 million, representing
ill-gotten gains from the conduct alleged in the complaint,

together with prejudgment interest of $724,244.67, totaling
$6,044,244.67, but has also requested that the disgorgement and
prejudgment interest be deemed satisfied by the order of
restitution in Genovese's criminal case. Hanson TRO Decl. Exs.
6, 7, 8.

A.

The Securities Act, Exchange Act, and Advisers Act each
authorize the SEC to seek injunctive relief to proscribe future
violations of federal securities laws, which a court shall grant
upon the proper showing. 15 U.S.C. § 77t(b), 15 U.S.C.
§ 78u(d)(1); 15 U.S.C. § 80b-9(d). The Second Circuit Court of
Appeals has instructed that to show such injunctive relief is
warranted, the SEC must demonstrate that there is a "substantial
likelihood of future violations of illegal securities conduct"
SEC v. Cavanagh, 155 F.3d 129, 135 (2d Cir. 1998). When
determining whether there is a sufficient likelihood that a
defendant will violate the securities laws in the future, courts
consider certain factors: "(1) the degree of scienter involved;
(2) the isolated or persistent nature of the past fraudulent
acts; (3) the defendant's appreciation of his wrongdoing; and
(4) the defendant's opportunities to commit future violations."
SEC v. Opulentica, LLC, 479 F. Supp. 2d 319, 329 (S.D.N.Y.
2007); see Cavanagh, 155 F.3d at 135; see also SEC v. Dang, No.
20-cv-1353, 2021 WL 1550593, at *6 (D. Conn. Apr. 19, 2021)

(applying Cavanagh factors to violations of Section 206 of the Advisers Act).

In this case, based upon the parties' submissions and a consideration of the relevant factors, the SEC has sufficiently demonstrated that permanent injunctive relief is warranted. Genovese's actions here were not limited to an "isolated" incident, but rather a continuous course of conduct, demonstrating a high degree of scienter. See Hanson TRO Decl. Ex. 4, at 82 (Judge Pauley remarking at Genovese's sentencing hearing that Genovese was "truly a predator, unlike any [he had] encountered in in more than 21 years on the bench"). Further, Genovese's submissions to this Court suggest both a lack of appreciation for his wrongdoing and a studied effort to avoid responsibility for his actions. Therefore, it is clear that there is a strong likelihood that, unless the defendants are enjoined, the violations will continue. First Jersey Sec., Inc., 101 F.3d at 1477. Accordingly, the SEC's request for a permanent injunction is granted.

B.

The Securities Act, Exchange Act, and Advisers Act each authorize the SEC to seek the imposition of civil money penalties, and provide for three tiers of civil monetary penalties. See 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3); 15 U.S.C. § 80b-9(e). Tier I penalties shall not exceed the greater

of $5,000 per natural person, or the gross amount of pecuniary

gain to such defendant. 15 U.S.C. § 77t(d)(2)(A); 15 U.S.C.

§ 78u(d)(3)(B)(i); 15 U.S.C. § 80b-9(e)(2)(A). Tier II penalties

are available if the violation involved "fraud, deceit,

manipulation, or deliberate or reckless disregard of a

regulatory requirement" and shall not exceed the greater of

$50,000 per natural person, or the gross amount of pecuniary

gain. 15 U.S.C. § 77t(d)(2)(B); 15 U.S.C. § 78u(d)(3)(B)(ii); 15

U.S.C. § 80b-9(e)(2)(B). Tier III penalties are available if the

violation involved "fraud, deceit, manipulation, or deliberate

or reckless disregard of a regulatory requirement" and the

violation "resulted in substantial losses or created a

significant risk of substantial losses to other persons." 15

U.S.C. § 77t(d)(2)(C); 15 U.S.C. § 78u(d)(3)(B)(iii); 15 U.S.C.

§ 80b-9(e)(2)(C). Tier III penalties shall not exceed $100,000

per natural person, or the gross amount of pecuniary gain to

such defendant. 15 U.S.C. § 77t(d)(2)(C); 15 U.S.C.

§ 78u(d)(3)(B)(iii); 15 U.S.C. § 80b-9(e)(2)(C). The penalty

amounts are adjusted for inflation for violations occurring

during the relevant time period. See 17 C.F.R. § 201.1001.

   In assessing the appropriate civil monetary penalty, courts

have considered the following factors: "(1) the egregiousness of

the defendant's violations; (2) the level of scienter involved;

(3) the repeated nature of the violations; (4) the defendant's

willingness to admit his wrongdoing; (5) the losses or risk of loss the defendant's misconduct caused to others; (6) the defendant's cooperation and honesty with the authorities, and (7) the defendant's current and future financial situation." SEC v. Zwick, No. 03-cv-2742, 2007 WL 831812, at *26 (S.D.N.Y. Mar. 16, 2007), aff'd, 317 F. App'x 34 (2d Cir. 2008).

The Securities Act, Exchange Act, and Advisers Act each provide that the Court may impose a violation for each "violation," of either the maximum pecuniary gain for the defendant or the statutory maximum penalty as adjusted for inflation, whichever is greater. 15 U.S.C. §§ 77t(d), 78u(d)(3), 80b-9(e). However, the statutes do not define the term "violation," and courts in this district have adopted a range of approaches to determining what constitutes a "violation" for purposes of imposing civil penalties. SEC v. GTF Enters., Inc., No. 10-cv-4258, 2015 WL 728159, at *4 (S.D.N.Y. Feb. 19, 2015) (collecting cases); see also SEC v. Rinfret, No. 19-cv-6037, 2020 WL 6559411, at *8 (S.D.N.Y. Nov. 9, 2020). For example, courts have "looked to the number of investors defrauded or the total number of fraudulent transactions," as well as "the number of statutes that each [d]efendant violated." Rinfret, 2020 WL 6559411, at *8.

In this case, based on the SEC's submissions, the SEC's request for a Tier III civil penalty of $1 million is

appropriate. Specifically, a civil money penalty of $1 million

is warranted, based on Genovese's defrauding at least five

investors through multiple materially false statements and

omissions in violation of several statutes. A civil penalty

against Genovese separate from Genovese's punishment in the

criminal proceeding is appropriate because of Genovese's

continued failure to take responsibility for his actions even

following his guilty plea, the substantial losses suffered by

Genovese's victims, and the blatant nature of the violations.

See, e.g., SEC v. Palmisano, 135 F.3d 860, 866 (2d Cir. 1998);

SEC v. Jean-Pierre, No. 12-cv-8886, 2015 WL 1054905, at *1, *11-

12 (S.D.N.Y. Mar. 9, 2015) (adopting report and recommendation

and imposing civil monetary penalty of $1,425,000, representing

"$75,000 for each of the 19" victims); SEC v. Moran, 944 F.

Supp. 286, 296 (S.D.N.Y. 1996) (citing the defendant's penchant

for "blaming others, including the SEC for his own conduct" and

"downplaying of the violations for which he is liable" as

additional relevant factors warranting the imposition of a civil

penalty). Accordingly, the SEC's request for a $11 million civil

penalty against Genovese of is granted.

C.

Finally, the SEC has sought disgorgement from the

defendants, in the amount of $5.32 million, representing ill-

gotten gains from the conduct alleged in the complaint, together

with prejudgment interest of $724,244.67, totaling
$6,044,244.67. The SEC has further requested that the
disgorgement and prejudgment interest be deemed satisfied by the
order of restitution in Genovese's criminal case, which amounted
to $11,211,704. Hanson TRO Decl. Ex. 4. The SEC's submissions,
including the sworn declaration of SEC examiner Janowsky and its
supporting materials, establish that the defendants in this case
raised at least $5.32 million from investors, whom the
defendants defrauded through their violations of the Securities
Act, Exchange Act, and Advisers Act. The SEC has further
provided evidence to demonstrate that no brokerage accounts
existed for Willow Creek, and that funds raised from defrauded
investors were placed in accounts under Genovese's name and
control. In addition, the SEC has provided a spreadsheet
explaining its requested prejudgment interest calculations.
Hanson SJ Decl., Ex. 7. Genovese has not specifically disputed
the SEC's request for disgorgement, nor has he presented any
evidence to dispute the SEC's calculation.

    "Once the district court has found federal securities law
violations, it has broad equitable power to fashion appropriate
remedies, including ordering that culpable defendants disgorge
their profits." First Jersey Sec., Inc., 101 F.3d at 1474. While
the district court "has broad discretion not only in determining
whether or not to order disgorgement but also in calculating the

amount to be disgorged," id. at 1474-1475, the disgorgement
award may not "exceed the gains made upon any business or
investment," excluding legitimate business expenses. Liu v. SEC,
140 S. Ct. 1936, 1949-50 (2020). However, where "the entire
profit of a business or undertaking results from the
wrongdoing . . . the defendant will not be allowed to diminish
the show of profits by putting in unconscionable claims for
personal services or other inequitable deductions." Id. at 1945.

Before disgorgement may be imposed, the SEC must first
"establish[] a reasonable approximation of the profits causally
related to the fraud." SEC v. Razmilovic, 738 F.3d 14, 31 (2d
Cir. 2013). After the SEC has established such a "reasonable
approximation," then "the burden shifts to the defendant to show
that his gains were unaffected by his offenses," and a defendant
must "clearly . . . demonstrate" that the "disgorgement figure
was not a reasonable approximation." Id. at 31-32.; see also SEC
v. Cope, No. 14-cv-7575, 2021 WL 653088, at *2 (S.D.N.Y. Feb.
19, 2021).

In this case, if viewed in isolation of the defendant's
criminal case, the SEC's request for disgorgement with
prejudgment interest, in the amount of $6,044,244.67 could be
warranted. However, disgorgement is an equitable remedy for
compensating the victims of securities law violations through
divesting a defendant of ill-gotten gains and is not intended to

be purely symbolic. As the Supreme Court has made clear in Liu, disgorgement is authorized in SEC enforcement actions only to the extent that it "may be appropriate or necessary for the benefit of investors." Liu, 140 S. Ct. at 1947. Given the much larger restitution order in Genovese's parallel criminal case, and the SEC's request that any disgorgement award be deemed satisfied by that order, the SEC has failed to explain how a disgorgement award, which is otherwise deemed satisfied, is necessary or appropriate for the benefit of investors. Accordingly, the Court declines to enter the "deemed satisfied" order of disgorgement sought by the SEC.

## CONCLUSION

The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, the remaining arguments are either moot or without merit. For the reasons explained above, Genovese's objections to the Magistrate Judge's Orders are **overruled**; Genovese's request for sanctions against the SEC is **denied**; and the SEC's motion for summary judgment is **granted**.

The SEC is directed to submit a revised proposed judgment within five days of the date of this Memorandum Opinion and Order. Genovese may submit any response ten days after the date that the SEC's response is conveyed to him.

The Clerk is directed to close all pending motions. The Clerk is further directed to mail a copy of this Memorandum Opinion and Order to the defendant.

**SO ORDERED.**

Dated:     New York, New York
           July 14, 2021

                                    _____
                                          John G. Koeltl
                               United States District Judge